# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| MELISSA BUCK; CHAD BUCK; SHAMBER FLORE; ST. VINCENT CATHOLIC CHARITIES, | |
| *Plaintiffs*, | Civil No. _____ |
| v. | **COMPLAINT** |
| ROBERT GORDON, in his official capacity as the Director of the Michigan Department of Health and Human Services; HERMAN MCCALL, in his official capacity as the Executive Director of the Michigan Children's Services Agency; DANA NESSEL, in her official capacity as Attorney General of Michigan; ALEX AZAR, in his official capacity as the Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| *Defendants*. | |

1

## INTRODUCTION

1.    St. Vincent Catholic Charities (St. Vincent) is one of the oldest and most effective foster care and adoption agencies in Michigan. St. Vincent exists to serve those in need, and it wants to continue serving foster and adoptive children in Michigan through its public adoption and foster care programs. But despite a clear need for *more* foster and adoptive homes, the State of Michigan has decided to force St. Vincent and numerous other faith-based agencies like it—serving hundreds of children across the State—to choose between following their faith and closing down a vital ministry.

2.    St. Vincent provides training, supervision, and on-going support to each foster care and adoptive family with which it partners. For adoptive parents like Chad and Melissa Buck, who have worked with St. Vincent to foster and then adopt five children with challenging medical needs and trauma from past abuse, St. Vincent has been a God-send. To this day, St. Vincent continues to be a crucial source of support for the Bucks. St. Vincent is also the only agency with institutional knowledge of the Buck's family situation, the challenges faced by their special-needs children, and the difficult dynamics with their birth

parents. The Bucks give back to St. Vincent by helping to recruit, serve, and support other foster and adoptive parents. Without St. Vincent, the Bucks are likely to miss out on the opportunity to foster and adopt a sibling of their five adopted children were he or she to enter the State's care.

3.   St. Vincent helped Shamber Flore find a home and a loving family after escaping a past filled with trauma and abuse. St. Vincent has continued to help and support Shamber and her adoptive parents, and now Shamber serves St. Vincent and its families by providing mentoring and support for children and families recovering from past trauma.

4.   Despite St. Vincent's demonstrated record of excellent service to the community, the Michigan Department of Health and Human Services (MDHHS) and the Michigan Attorney General have threatened to take action against St. Vincent solely because the agency abides by its Catholic beliefs regarding marriage. The State has made clear that it will no longer permit adoption and foster agencies to operate in accord with their religious beliefs (as they have done successfully for decades), and will penalize them if they refuse to provide written evaluations that conflict with their religious beliefs. If the State ends these relationships,

St. Vincent and many other religious child welfare agencies will be unable to continue providing foster care and adoption services in Michigan. This means that adoptive parents will have fewer choices and foster children will face longer waits to find permanent homes.

5. The State's actions violate the First and the Fourteenth Amendments to the United States Constitution. Enforcement of federal regulations supporting the State's actions likewise violates the Constitution and federal law. For this reason, the Court should issue a judgment declaring these actions unlawful and enjoining the State and the federal government from violating Plaintiffs' First and Fourteenth Amendment rights.

## IDENTIFICATION OF PARTIES

6. Plaintiff St. Vincent Catholic Charities is a Michigan nonprofit corporation with charitable and religious purposes; St. Vincent is party to foster and adoptive services contracts with MDHHS.

7. St. Vincent was originally incorporated by the Roman Catholic Bishop of Lansing and remains affiliated with the Catholic Diocese of Lansing and subject to the authority of the Bishop of Lansing, who maintains certain reserved powers over St. Vincent. Because of its

affiliation to the Catholic Diocese of Lansing, St. Vincent is listed in the Official Catholic Directory under the Catholic Diocese of Lansing.

8.    St. Vincent Catholic Charities' vision is to have "faith in God and love for all," as it "aspire[s] to create a healthier community." St. Vincent is dedicated to serving others in a spirit of humility and shares a genuine concern for the well-being of its neighbors, affirming the God-given dignity and worth of every human person. The mission of St. Vincent Catholic Charities is the work of the Catholic Church, to share the love of Christ by performing the corporal and spiritual works of mercy. In this way, those served by the Church and her members (including her charitable agencies) encounter Christ, and the Church encounters Christ in those served:

> Then the King will say to those at his right hand, "Come, O blessed of my Father, inherit the kingdom prepared for you from the foundation of the world; for I was hungry and you gave me food, I was thirsty and you gave me drink, I was a stranger and you welcomed me, I was naked and you clothed me, I was sick and you visited me, I was in prison and you came to me. . . Truly, I say to you, as you did it to one of the least of these my brethren, you did it to me."

*Matthew* 25:40. St. Vincent exercises its faith and carries out this religious mission to "the least of these" through its foster care and adoption ministries. Care for needy children and the provision of these

services is an integral, fundamental, and central part of St. Vincent's religious exercise. Providing these services in a manner consistent with Catholic teaching is part of its religious character and affiliation.

9. Many of the children in St. Vincent's care are minority children (African American, Hispanic, or Native American), and St. Vincent excels in providing extra support for families with special needs children.

10. Chad and Melissa Buck are adoptive parents and former foster parents currently living in Holt, Michigan. The Bucks adopted five special-needs children through St. Vincent. The Bucks see foster care and adoption as a religious calling, and as a part of their sincere religious exercise they serve and support other foster and adoptive parents.

11. The Bucks would struggle to provide the extensive care that their children require without the support they receive from St. Vincent. St. Vincent has provided the Bucks with training, resources, support, and professional guidance as to how to best care for their children with special needs. The Bucks have been able to call social workers at any hour and receive an answer from someone they know and trust. These social workers have become like family and have shown great love and care for their children. The Bucks continue to rely on St. Vincent for support,

including through attending St. Vincent's support group and maintaining relationships with the agency workers who know their family and their children. The Bucks also have a religious mission to serve other foster families, and they do so by working with St. Vincent to support foster and adoptive parents, including through a foster parent support group that St. Vincent facilitates, which also enables them to help support and recruit more foster parents. This group is the only foster parent support group offered in the tri-county area and it is open to all foster families, including same-sex couples.

12. Plaintiff Shamber Flore is a former foster child whose family fostered and adopted her through St. Vincent. Ms. Flore exercises her faith by encouraging and mentoring foster children and sharing her own story of overcoming hardship and abuse to find love and joy. She relies upon the relationships and trust she has built with St. Vincent to serve other families working with St. Vincent.

13. Defendant Robert Gordon is the Director of MDHHS, the state agency responsible for foster care and adoption services for children in state custody. MDHHS contracts with private child placing agencies,

including St. Vincent Catholic Charities, to provide public foster care and adoption services. Defendant Gordon is sued in his official capacity only.

14. Defendant Dr. Herman McCall is Executive Director of the Children's Services Agency (CSA), a sub-agency of MDHHS that, in addition to having oversight over the work of all private child placing agencies, is mandated by law to "[r]eview, investigate, evaluate, and assess all programs within [MDHHS] related to services and programs for children," including by advising on policy related to "children's services and programs including, but not limited to, services for foster children, juvenile justice, and homeless youth." Mich. Comp. Laws § 400.227 (2015). Defendant McCall is sued in his official capacity only.

15. Defendant Dana Nessel, the Attorney General of the State of Michigan, is charged with representing state agencies and enforcing state law. Defendant Nessel has been instrumental in framing MDHHS's current policy regarding the enforcement of MDHHS contracts and state law governing religious child welfare providers. Attorney General Nessel is sued in her official capacity only.

16. Defendant Alex M. Azar is the Secretary of the United States Department of Health and Human Services (HHS). In this capacity, he

has responsibility for the operation and management of HHS and is the appointed official responsible for issuing and enforcing the challenged federal regulations. Secretary Azar is sued in his official capacity only.

17. Defendant United States Department of Health and Human Services is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged federal regulations.

## JURISDICTION AND VENUE

18. This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1361. This action arises under the Constitution and laws of the United States.

19. This Court has personal jurisdiction over Defendants because all Defendants are located, domiciled, or otherwise are present and conducting a continuous and systematic part of their general business within the State.

20. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

21. Venue lies in this district pursuant to 28 U.S.C. § 1391(e). All Plaintiffs reside in this district, as do Defendants Gordon, McCall, and Nessel ("State Defendants"). Additionally, a substantial part of the events or omissions giving rise to the claims occurred in this district. Plaintiff St. Vincent Catholic Charities is headquartered and operates in this district, and Plaintiffs Shamber Flore, Chad Buck, and Melissa Buck live in this district and all would be harmed both by the State's actions and by application of the HHS regulations to its religious ministry. The State Defendants reside in the state capital, also in this District.

## FACTUAL ALLEGATIONS

## Michigan's Foster Care System

*The State contracts with private child placing agencies*

22. Over 12,000 children are currently in Michigan's foster care system, and the need for new foster parents far outstrips the number of families seeking to care for these children. Indeed, approximately 3,000 Michigan foster children are available for adoption at any given time. Of those children, nearly 300 do not have an identified adoptive family.[1]

---

[1] Michigan Department of Health and Human Services, *Adoption* (2019) https://www.michigan.gov/mdhhs/0,5885,7-339-73971_7116---,00.html

Because there are not enough families, more than 600 of these children "age out" of foster care every year.[2] They exit the foster system at age 18 without any permanent family, and many lack the resources and skills to successfully transition into adulthood.[3] These children are much less likely to graduate high school, let alone college, and far more likely to end up in poverty.[4] Furthermore, Michigan therefore relies upon state-licensed foster care and adoption agencies ("child placing agencies") to recruit, train, certify, and supervise foster families that will care for children in the State's custody.

23. The State therefore has contracts with over 90 different private child placing agencies that operate throughout the State. By contracting with the State, these agencies agree to provide foster and adoptive services to children in need.

---

[2] Child Trends, *Transition-Age Youth in Foster Care in Michigan*, https://www.childtrends.org/wp-content/uploads/2017/09/Transition-Age-Youth_Michigan.pdf; Kristi Tanner, *More than 900 Michigan foster care youth age out*, Detroit Free Press (Jan. 31, 2015) https://www.freep.com/story/opinion/contributors/raw-data/2015/01/31/michigan-foster-care-youth/22621127/.

[3] Children's Rights, *Aging Out*, http://www.childrensrights.org/_newsroom/fact-sheets/aging-out/.

[4] Mark E. Courtney, Amy Dworsky, Adam Brown, Colleen Cary, Kara Love & Vanessa Vorhies*, Midwest evaluation of the adult functioning of former foster youth: Outcomes at age 26* (2011); Erick Eckholm, *Offering Help for Former Foster Care Youths*, The New York Times (Jan. 27, 2007) http://www.nytimes.com/2007/01/27/us/27foster.html.

24. The State encourages potential foster and adoptive parents to reach out to multiple agencies and to find an agency that will be a good fit for them, telling prospective parents that it is "important that you feel comfortable sharing personal and private information" with the agency you choose.[5] The State has also created numerous support services by which prospective foster or adoptive parents can meet with experienced "Navigators" who will help guide them through the process of finding an agency that is a good fit.[6]

25. The State benefits from, and permits, private child placing agencies to develop specializations and to focus on serving certain populations—like children with disabilities or children with a specific ethnic background. And agencies will often seek to specifically recruit foster parents that can serve those unique needs.[7] When a child placing agency is unable to work with a prospective foster or adoptive family, that agency will refer the prospective family to another agency that might

---

[5] Ex. A, page 3.

[6] Michigan Adoption Resource Exchange, *Adoption Navigators*, https://mare.org/For-Families/Adoption-Navigators.

[7] The Wayne Center, a state contracted child placing agency, advertises that it is specifically seeking "foster parents with previous experience with persons who have a developmental disability and/or expertise in related areas, e.g., medical, educational, social work, psychological, etc." Wayne Center, *Written Needs Statement*, http://www.waynecenter.org/services/foster-care.

better suit their needs. This happens routinely for numerous reasons. For example, agencies can refer applicants elsewhere if a family lives too far away from the agency, making home visits impractical, if the agency has a wait list, if the family has not been satisfied with the agency's services, or if the family is looking for a specific type of child not currently in the agency's care, just to name a few.

26. As Steve Yager, Executive Direct of the Children's Services Agency within MDHHS, previously stated: "[W]e work with agencies based on a contract, not on their belief system, stated or otherwise. We do not compel agencies to accept referrals—never have; rather, we create through contracts a vast array of providers to meet the very diverse needs of the children and families we serve."[8]

27. In Michigan, foster care placements and public adoptions can only be performed by agencies that contract with MDHHS to perform these services. St. Vincent would not be able to provide its foster care or adoption ministry without a license and contract from the State, as the State is the sole source of public foster care and adoption referrals. Without new referrals, St. Vincent would quickly lose the ability to

---

[8] Ex. B.

continue providing foster care and adoptive services and would have to shut down both programs.

*The Home Studies and Certification Process*

28.  There is no shortage of opportunities for same-sex couples to foster or adopt in Michigan.

29.  DHHS welcomes and encourages same-sex couples to foster and adopt, and no same-sex couple has been prevented from fostering or adopting a child by St. Vincent.

30.  If St. Vincent is unable to work with a couple due to its religious beliefs, it provides the couple with a list of other area agencies who do not share St. Vincent's religious beliefs and could assist them in becoming foster or adoptive parents.

31. In fact, through the Michigan Adoption Resource Exchange (M.A.R.E) (the State's central adoption portal), any foster family, including a same-sex or unmarried couple, can be connected to a private child placing agency, become a certified pre-adoptive home, and then adopt a child that is currently placed in a foster home serviced by a different agency, including St. Vincent.

32. In other words, parents interested in adopting a child in St. Vincent's care need not work directly with St. Vincent to adopt that child, but may work with another agency.

33. In this way, LGBTQ individuals have been able to adopt a child in St. Vincent's care.

34. As part of the certification process, a prospective foster or adoptive parent must work with either MDHHS or a private agency to complete a "home study" before they can be approved by the State to adopt or foster a child.

35. As part of the home study, a social worker will visit the applicant's home in person and meet with all of the individuals living in that home.

36. This in-person meeting is a necessary component of the home study because it allows the social worker to asses both the home and the individuals living in it.

37. During this in person meeting, the social worker will ask the applicant very specific, personal, and difficult questions to gauge whether it would be appropriate to place a foster child in need in their home.

38. These questions are necessary to allow the agency to assess whether the applicant's home is appropriate and suitable for the placement of foster or adoptive children.

39. Often, these children have been subject to past abuse or other traumatic events, so careful evaluation of the family's living situation is necessary to avoid unnecessary and potentially harmful conflicts.

40. In addition, MDHHS's foster/adoption home evaluation form specifically requires agencies to assess the "[s]trengths and weaknesses" of the parents and the "[s]trengths of the relationship" between the couple, including "level of satisfaction" and "stability" of the relationship.

41. Regarding home studies for LGBTQ individuals, the Human Rights Campaign (HRC) has recognized that a social worker may ask "all kinds of questions about [the applicant's] childhood and upbringing, including questions about puberty, sex and sexuality."[9] HRC stated that the "homestudy serves as an evaluation tool that allows you to determine if a prospective resource parent has that capability to provide a child with

---

[9] Perry, J.R., *Promising Practices for Serving Transgender & Non-Binary Foster and Adoptive Parents*, Human Rights Campaign Foundation 41-42 (2017), https://assets2.hrc.org/files/assets/resources/HRC_ACAF_Promising_Practices_Serving_Transgender_Non-Binary_Parents.pdf

a safe and nurturing home" and should be based on a "thorough evaluation."[10] A home study also requires an agency to ask very personal questions regarding an LGBT individual's past and sensitive questions about their relationships, family, and love life.[11] In short, a home study is not a mere box to be checked.

42. Home studies are very invasive, thorough, and in-depth investigations that take into account every aspect of an applicant's family life and are part of the process by which an agency and the applicant determine if they are the right fit for each other. As Michigan recognizes, it is crucial that applicants "trust [their] instincts" and "[c]hoose an agency [they] are compatible with."[12]

---

[10] *Id.* at 44.

[11] HRC created a list of sample questions for social workers to ask during an LGBT home study. This sample list includes numerous questions that are deeply personal and even intimate: "In the past, have you ever been "outed" by someone? How did you handle it?"; "What has been the attitude of your extended family to your partner?"; "How have homo/bi/transphobia and/or heterosexism or cissexism affected your life and how have you dealt with this?"; and "Where are you in the process of grieving any feelings of loss you may have around not having biological children?" *Sample LGBTQ Affirming Homestudy Questions & Rationale*, Human Rights Campaign Foundation, https://assets2.hrc.org/files/assets/resources/HRC_ACAF_LGBTQ_Aff irming_Homestudy_Questions_And_Rationale.pdf.

[12] *Foster Care Agency Checklist*, Department of Human Services, https://www.michigan.gov/documents/dhs/FosterCareAgencyChecklist_Comm4-12_381389_7.pdf.

43. Only after a home study and assessment by a social worker is complete will the agency refer the application to the State with a recommendation that the State provide final approval and licensing.

44. As part of this licensing recommendation, an agency must prepare a report and licensing recommendation for MDHHS. That report analyzes the relationships in the home and provides a recommendation regarding placing children in that home. That report is—and St. Vincent understands that report to be—a written approval of the relationships in the home and confirmation that the agency has determined the home is suitable for the placement of children.

45. HRC and other LGBTQ-advocacy organizations believe that agencies should not place children with families that would not be affirming of LGBTQ children, including for religious reasons.[13]   HRC

---

[13] HRC, *All Children All Families and Non-Affirming Potential Foster Families* (Oct. 3, 2018), https://register.gotowebinar.com/register/4180979117481006082 (free registration required to view) (describing a foster family's reaction to a child's identification as a member of the LGBTQ community as the "all-important discussion" that if not handled correctly can "harm" the child). HRC also describes New York City's approach as a "best practice." New York City policies state, "If the parent displays negative attitudes about LGBTQ people, even when deeply rooted in religious beliefs and cultural values, and the alleged abused and/or maltreatment are related to the youth's perceived or actual sexual orientation, gender identity, or gender expression, the staff must determine whether those attitudes are impacting the youth's immediate safety as well as whether those attitudes may put the youth at risk for future physical or emotional harm." New York City Government,

provides a "Seal of Recognition" to agencies that are leaders in serving LGBTQ foster families and children.[14] In Michigan, the following agencies have received the Seal of Recognition: Fostering Futures, Hands Across the Water, and Judson Center - Foster Care & Adoption.

46. Upon information and belief, the State does not take the position that it would be a violation of state law or policy for an agency to refuse to place a child with a religious foster family if the agency determined that the family would not be affirming of LGBTQ children.

47. Upon information and belief, the State does not take the position that it would be a violation of state law or policy for an agency to refuse to recommend for certification a foster family if the agency determined that the family would not be affirming of LGBTQ children.

48. Upon information and belief, the State has never investigated or penalized an agency for refusing to recommend for certification a foster

---

*Respectfully Asking Sexual Orientation and Gender Identity (SOGI) Questions*, https://www1.nyc.gov/assets/acs/pdf/lgbtq/Respectfully_Asking_SOGI_Questions.pdf ; *see also* Child Welfare League of America & Lambda Legal, *Getting Down to Basics: Tools to Support LGBTQ Youth in Care*, 25-26 (2012), http://www.lambdalegal.org/sites/default/files/gdtb_2013_complete.pdf ("If these personal religious beliefs might prevent offering nonjudgmental care to an LGBTQ young person, the practitioner or foster parent should seek outside support and make alternative care arrangements. They must put the needs of young people above their own personal beliefs.").

[14] *All Children - All Families: Tiers of Recognition*, HRC, https://www.hrc.org/resources/all-children-all-families-tiers-of-recognition.

family if the agency determined that the family would not be affirming of LGBTQ children.

49.  Upon information and belief, the State has never investigated or penalized the Sault Tribe Binogii Placement Agency, a State-licensed child placing agency, for only placing children with Native American foster or adoptive parents.

50.  Upon information and belief, the State has never investigated or penalized the Wayne Center, a State-licensed child placing agency, for seeking only parents with prior experience caring for developmentally disabled children.

51.  Upon information and belief, the State has never investigated or penalized Homes for Black Children, a former State-licensed child placing agency, for specializing in providing care for Black children.

*Placing a child in a certified foster or adoptive home*

52.  When a child must be removed from their home and placed in a foster home, DHHS's goal is to place that child in a home within 24 hours. In order to do this, the State will reach out to one or more of the child placing agencies with which it has contracted to see if that agency has a family ready and willing to take in that child. The child placing agency

will then be given one hour by MDHHS to contact one or more families and see if it can find a placement for that child. If the first agency MDHHS contacts cannot find an available family, MDHHS contacts additional agencies. Sometimes, MDHHS will contact multiple agencies at the same time when the situation is urgent.

53. Once a certified family is "matched" with the child in need, MDHHS will transfer that child into the foster family and the private child placing agency with whom that family was certified will oversee the placement, providing ongoing support and training to the foster family.

54. As discussed above, families certified through one foster agencies may still adopt children under the supervision of a different agency through M.A.R.E.

55. Michigan relies upon state and federal funds, including federal Temporary Assistance to Needy Families (TANF) block grants, to administer its foster care and adoption programs. As a condition of receiving these funds, the Department of Health and Human Services is required by 45 CFR § 75.300(a) to "communicate to the non-Federal entity [here, MDHHS] all relevant public policy requirements . . . and incorporate them either directly or by reference in the terms and

conditions of the Federal award." *Id.* One such public policy requirement imposed by these same regulation is that "no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation." 45 CFR § 75.300(c). Through contracts with private child placing agencies, Michigan provides foster parents and the agencies that supervise them per diem payments from a combination of federal and state funds. That funding is provided to child placing agencies only after an agency has accepted the referral of a child and is supervising that placement with a certified foster family.

56.   Through contracts with private child placing agencies, Michigan also provides specified funding to adoptive parents and the agencies that supervise them from a combination of federal and state funds.

57. Upon information and belief, MDHHS and Attorney General Nessel have interpreted 45 CFR § 75.300(a) to apply to St. Vincent Catholic Charities and operate to require the State to force St. Vincent to

violate its sincere religious beliefs by providing home studies for same-sex relationships.

58. Were St. Vincent to fail to comply with this regulation, MDHHS will cut St. Vincent's funding and refuse to continue contracting with the agency.

*State law protects the religious exercise of child placing agencies*

59. State law expressly protects the ability of child placing agencies to decline to perform a home study or make a licensing recommendation. *See* Mich. Comp. Laws 722.124e(h) (2015). This law, passed in 2015, prohibits the State from declining to contract, declining to renew a contract, or taking any other adverse action against a child placing agency based on its decision to refer same-sex or unmarried couples to other agencies for religious reasons. *Id.*

60. When this law was passed, Michigan explained that "[h]aving as many possible qualified adoption and foster parent agencies in this state is a substantial benefit to the children of this state who are in need of these placement services." Mich. Comp. Laws 722.124e(c) (2015). Michigan also found that it crucial to "ensur[e] that faith-based child placing agencies can continue to provide adoption and foster care

services" because their work "benefit[s] the children and families who receive publicly funded services." Mich. Comp. Laws 722.124e(g) (2015). Accordingly, Michigan chose to protect faith-based agencies by permitting them to refer prospective applicants to another agency if serving that applicant would conflict with the agency's sincerely held religious beliefs. Michigan concluded that this was in the public interest and in the interest of serving the most families and children in need. *Id.*

61.  Soon after the law was passed, MDHHS interpreted the statute to mean that it could not penalize or terminate contracts with religious child welfare agencies if those agencies declined to perform home studies for same-sex or unmarried couples.

62.  MDHHS determined that the state law might not apply in some cases involving child-specific adoption contracts, but even in those cases, MDHHS granted case-by-case exemptions which permitted child welfare agencies to continue operating according to their religious beliefs.

63.  In response to this new law, MDHHS also updated its individual child adoption forms and contracts.

## St. Vincent's Adoption and Foster Care Program

64. St. Vincent shares Michigan's goal of working to fill the shortage of safe foster homes for these vulnerable kids. St. Vincent is able to recruit prospective families who would not otherwise feel able to foster or adopt children based on its religious character and mission.

65. St. Vincent provides public foster care and adoption services. It performs home studies and makes licensing recommendations to the state, oversees foster and adoptive placements, and also provides ongoing training and support for the foster or adoptive family and works with case workers to coordinate services to the foster family, birth family and child in order to achieve a positive outcome.

66. St. Vincent serves and places children regardless of their race, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, source of income, familial status, genetic information, or sexual violence victim status.

67. St. Vincent shares the religious beliefs and teachings of the Catholic Church regarding same-sex marriage. But St. Vincent would never stop a family who wants to foster or adopt from having the opportunity to complete the application and home study process. If

St. Vincent were ever unable to perform in-depth home assessments and make reports and written certifications to the State for any reason, including based on St. Vincent's own religious beliefs, then it would refer the applicants to another agency that could better serve their needs.

68.   According to M.A.R.E., there are 16 other agencies that also serve Ingham County, which is where St. Vincent is located.[15]

69. For over 50 years, St. Vincent has provided foster care and adoption services in Michigan pursuant to regularly renewed contracts. In reliance upon these contracts, St. Vincent currently employs 18 staff members who work exclusively on these contracts, has budgeted and raised funds designed to supplement state funding on that contract, and has taken other concrete steps in expectation that it will continue to receive referrals and be able to perform its duties under these contracts.

70. St. Vincent provides training, supervision, and on-going support to each foster care and adoptive family with which it partners. For adoptive parents like Chad and Melissa Buck, who have worked with St. Vincent to foster and then adopt five children with challenging

---

[15] Michigan Adoption Resource Exchange, Agency Map, https://mare.org/Agency-Map (under "Filter by County" select "Ingham" for map and list of all 17 agencies).

medical needs and trauma from past abuse, St. Vincent has been a God-send. To this day, St. Vincent continues to be a crucial source of support for the Bucks, and they in turn provide support and assistance to other families fostering and adopting through St. Vincent. For the Bucks, serving as adoptive parents and serving other adoptive parents is a religious calling. St. Vincent facilitates ongoing services to families that have adopted, like a monthly support group—the only such group open to any foster or adoptive parents in the region.

71. St. Vincent helped Shamber Flore to find a home and a loving family after past filled with trauma and abuse. St. Vincent has continued to help and support Shamber and her adoptive parents, and now Shamber serves St. Vincent and its families by providing mentoring and support for children and families recovering from past trauma.

72. In the foster care context, the home study assessment process allows St. Vincent to prepare families to accept a child into their home; only after a child is placed in the certified family's home do St. Vincent and the family begin to receive funding from the State.

73. In some exceptional cases, the State might use a different payment structure pursuant to a separate, child-specific contract to

directly pay for home study services for foster children being placed with relatives. St. Vincent has never been a party to such a contract for the provision of home study services for an LGBTQ couple.

74. Unless the State specifically contracts for a home study assessment in this exceptional circumstance, home studies are not paid for with state funds under St. Vincent's ordinary foster care or adoption contracts with the State.

75. Outside of this exceptional circumstance for placement with relatives, foster care and adoption home studies are not specifically listed as a "service" under St. Vincent's contracts with the State.

76. Outside of this exceptional circumstance, St. Vincent pays for home studies, assessments, and its general recruitment with private funds in a cost center that is kept separate from the funding provided by the State for other child welfare activities.

77. St. Vincent offers a significant subsidy to Michigan by recruiting new foster parents using its own private funds and supplementing State funds with private donations and volunteer hours to cover costs that state funding cannot.

78. For example, last fiscal year both St. Vincent's foster program and adoption programs operated at a significant loss based on the state funding alone, and these programs would not have been able to operate without St. Vincent's private subsidies.

79. Michigan has been aware of St. Vincent' religious beliefs for years.

**MDHHS Targets St. Vincent**

*The ACLU's Lawsuit*

80. On September 20, 2017, the ACLU filed a lawsuit against MDHHS on behalf of two LGBT couples. The lawsuit alleged that these couples had approached Bethany Christian Services and St. Vincent Catholic Charities seeking to adopt a child, but were referred to another agency based on their sexual orientation. The ACLU claimed that the state's decision to continue contracting with these private agencies violated the Establishment and Equal Protection Clauses. Complaint at ¶¶ 75-81, *Dumont v. Lyon*, No. 17-cv-13080 (E.D. Mich. Sept. 20, 2017), ECF No. 1.

81. Plaintiffs St. Vincent Catholic Charities, Melissa Buck, Chad Buck, and Shamber Flore moved to intervene in the lawsuit filed by the ACLU, arguing that the State's decision to contract with St. Vincent and

other faith-based agencies did not violate the Constitution and was protected under state and federal law. Motion to Intervene at 19-21, *Dumont v. Lyon*, No. 17-cv-13080 (E.D. Mich. Dec. 18, 2017), ECF No. 18.

82. On October 1, 2017, and in light of the ACLU's lawsuit filed against the State of Michigan, Stacie Bladen, the Deputy Director of the Children's Services Agency within MDHHS, submitted three official "contract compliance complaints" with MDHHS licensing staff against St. Vincent Catholic Charities, Bethany of East Lansing, and Bethany of Madison Heights for allegedly referring a same-sex couple to another child placing agency.[16] Ms. Bladen claimed that the actions of these agencies violated their contracts by referring same-sex couples to other adoption agencies based on their sincerely held religious beliefs.

83. Soon after Ms. Bladen lodged her complaint, MDHHS opened investigations into all three of these agencies solely because they exercised their rights under state law and the First Amendment.[17]

84. These investigations were inconsistent with MDHHS's prior statements and policies regarding compliance with state law.

---

[16] Ex. C.
[17] State Defendant's Response to Intervenor Defendant's Amended First Set of Interrogatories at 6–7, *Dumont v. Lyon*, No. 17-cv-13080 (E.D. Mich. Dec. 28, 2018), Ex. D.

85.  As Stacie Bladen, speaking on behalf of MDHHS, stated earlier on September 23, 2016, "[i]f the child placing agency declines to accept a referral, whether for foster care case management or adoption services, based on sincerely held religious beliefs, the Department cannot take 'adverse action' (as defined in the act) against the agency."[18]

86. Bladen's earlier position was also consistent with MDHHS guidance outlined in a policy document regarding "foster and adoptive parent recruitment, licensing, and retention."[19]

87.  In this document, the agency made clear that faith-based agencies could continue contracting with the State and making referrals in accord with their religious beliefs: "[b]efore accepting a referral, the child-placing agency has the sole discretion to decide whether to engage in activities and perform services related to *that* referral."[20]

88.  The document further notes that "[i]f MDHHS makes a referral to a child-placing agency for foster care case management or adoption services *pursuant to a contract*, the child-placing agency must accept or decline the referral."[21]

---

[18] Ex. E.
[19] Ex. F.
[20] *Id*. at 8 (emphasis added).
[21] *Id*. at 9 (emphasis added).

89.  Then, after months of discovery—and just days before depositions were set to begin—the State of Michigan and the ACLU announced on January 23, 2019 that they had entered into settlement talks, giving intervening defendants one hour's notice to determine whether they would agree to or oppose a stay and refusing to share any details of the settlement discussions. On March 22, 2019, the State and the ACLU then announced that they had entered into a settlement and agreed to the dismissal of the ACLU's claims.

90.  The intervenors did not join that settlement. The settlement was not shown to them prior to filing. In its motion to dismiss the case, the ACLU and State Defendants jointly moved for a stipulated dismissal of the case, noting that "Intervenor Defendants, who have asserted no claims and against whom no claims have been asserted, are not party to the Settlement Agreement." Stipulation of Voluntary Dismissal with Prejudice at 3–4, *Dumont v. Lyon*, No. 17-cv-13080 (E.D. Mich. Mar. 22, 2019), ECF No. 82. The District Court granted the motion to dismiss the case, but declining to address or incorporate the terms of the settlement in its order.

91. In a statement accompanying the settlement, Defendant Nessel announced that after reviewing the ACLU's claims, she "determined that MDHHS may be subject to liability on Plaintiffs' claims," and thus directed MDHHS to change its internal policy regarding permitting private child placing agencies to refer couples to other agencies.[22] Nessel claimed that this new policy was actually "consistent with the law and existing agency contracts," and would now be enforced against agencies like St. Vincent.

92. In prior public statements, Defendant Nessel has explained to the press that she believes "there's 'no viable defense' to the 2015 law," and that the law's "only purpose is discriminatory animus."[23]

93. Defendant Nessel had previously made similar disparaging statements regarding those who share St. Vincent's religious beliefs, and had publicly stated that she would not enforce the state law protecting religious child welfare agencies.

---

[22] State Settles Same-Sex Adoption Case, Department of Attorney General, https://www.michigan.gov/ag/0,4534,7-359-82927-492743--,00.html; Summary of Settlement, https://www.michigan.gov/documents/ag/03.22.19_FINAL_Dumont_settlement_summary_650097_7.pdf.

[23] Ed White, *Dem AG candidate: Adoption law discriminates against gays*, Associated Press News (Sept. 27, 2018) https://apnews.com/a1fc021e8e2e4b3b829586ba56ads9c07.

94. In justifying this decision, Nessel relied on both State policies and federal regulations which she interpreted to require the State to deny agencies like St. Vincent religious exemptions from allegedly applicable anti-discrimination laws.

95. As Nessel explained, Michigan receives "a significant portion" of its funding under Title IV-E of the Social Security Act, a child welfare grant program administered through the HHS.

96. In fact, MDHHS alone receives over 3.8 billion dollars annually from the federal government through Title IV-E, TANF, and other similar programs.[24]

97. According to Nessel, "[a]s a condition of receiving these federal funds, the United States Department of Health and Human Services requires that states' Title IV-E-funded programs prohibit discrimination on the basis of sexual orientation or gender identity."

98. The State is also bound by other federal regulations, which require it to respect the religious character of social service providers who receive federal funds. *See, e.g.*, 45 C.F.R. § 87.3(a) ("Neither the HHS

---

[24] Budget Briefing: HHS Human Services, House Fiscal Agency, https://www.house.mi.gov/hfa/PDF/Briefings/HHS_HS_BudgetBriefing_fy18-19.pdf (last visited Apr. 15, 2019).

awarding agency, nor any State or local government and other pass-through entity receiving funds under any HHS awarding agency program shall, in the selection of service providers, discriminate for or against an organization on the basis of the organization's religious character or affiliation.").

99. Nessel therefore directed MDHHS to, "[i]n compliance with this federal requirement," prevent faith-based agencies from, among other things:

    a.  "[R]eferring to another contracted agency an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the agency for contracted services," and

    b.  "[R]efusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for contracted services." [25]

100. Per the Attorney General's statement and the terms of the settlement, any private agency which refuses to comply with these requirements "within a reasonable time after notification by the

---

[25] Summary of Settlement, https://www.michigan.gov/documents/ag/03.22.19_FINAL_Dumont_settlement_summary_650097_7.pdf (last visited Apr. 15, 2019).

Department of a Contract Violation" will have its contracts "terminate[d]."[26]

101.    MDHHS also stated it will "initiate an investigation when made of aware of an alleged Contract Violation," and will terminate the agency's contracts if it "fails to demonstrate compliance after a reasonable opportunity to implement the approved corrective action plan."[27]

102.    The State has already begun taking steps to enforce this policy, including requiring that child welfare agencies complete training on this new policy.

103.    Upon information and belief, the State has also communicated to state employees that they must desist a prior practice of sending referrals of same-sex couples to other agencies instead of agencies like St. Vincent.

104.    St. Vincent continues to provide services to foster and adoptive families under its state contracts.

---

[26] Settlement Agreement, *Dumont et al. v. Gordon et al.*, USDC EDMI Case No. 2:17-cv-13080-PDB-EAS, https://www.michigan. gov/documents/ag/Settlement_Agre ement_with_Sig_Pages_-_FINAL_650100_7.pdf.
[27] *Id.*

105.    St. Vincent's adoption contract is up for renewal in October 2019, and St. Vincent reasonably fears that the State will refuse to renew the contract on the basis of St. Vincent's religious beliefs and practices. Based upon the newly announced policy that would prohibit St. Vincent from providing adoption services consistent with its religious beliefs, St. Vincent believes that adverse action from the State Defendants is certainly impending.

*Referrals to accommodate sincere religious beliefs denied*

106.    Michigan has also treated St. Vincent's request for referrals based on its sincere religious beliefs differently from referrals for other reason. The State has admitted that "child placing agencies may refer a prospective foster or adoptive family to another child placing agency" under certain circumstances, but they have decided to deny St. Vincent the ability to make referrals for religious reasons.

107.    The State has admitted that child placing agencies in Michigan are allowed to refer families to other agencies for geographic reasons, if they have a long wait list, or if they are unable to accommodate the families' preferences.[28] State law also permits, and indeed requires,

---

[28] Ex. G, page 7.

agencies to decline to work with parents for various reasons, including Native American ancestry.

108.     And agencies can still seek to specifically recruit foster parents that can serve specific needs of children, including children with disabilities or mental health issues.[29]

109.     Under the State's new policy, however, the *only* justification for a referral that is now impermissible is a religious objection to same-sex marriage.

110.     On information and belief, MDHHS also treated St. Vincent differently from other religious foster care agencies in 2017 and 2018.

111.     Following two prior incidents in which a private child placing agency had to transfer a case for religious reasons, MDHHS told another faith-based foster care agency that child placing agencies are permitted to decline to accept a referral for foster care case management or adoption services based on sincerely held religious beliefs, and that MDHHS cannot take adverse action against the agency based on this decision.

---

[29] The Wayne Center, a state contracted child placing agency, advertises that it is specifically seeking "foster parents with previous experience with persons who have a developmental disability and/or expertise in related areas, e.g., medical, educational, social work, psychological, etc." Wayne Center, Written Needs Statement, http://www.waynecenter.org/services/foster-care (last visited Apr. 15, 2019).

112.    On information and belief, MDHHS has taken positions contrary to its current position that once an agency accepts a child for case from MDHHS it is no longer protected by state law. This is inconsistent with prior interpretations by the State in which it explained that the law permitted faith-based child placing agencies to accept or decline a DHHS referral at any time based on their sincerely held religious beliefs.

113.    MDHHS has changed its position on this issue solely to target agencies like St. Vincent Catholic Charities for their religious beliefs that do not allow them to endorse same-sex relationships.

**Michigan's Unlawful Actions Harm St. Vincent and the Children of Michigan**

114.    Michigan's unlawful actions harm St. Vincent and the children and families it serves. If St. Vincent is unable to receive referrals from or contract with the State, it will be forced to close its foster care and adoption programs, ending a decades-old religious ministry and reducing the number of agencies available to serve families and children in need.

115.    Across Michigan, the State's actions affect untold thousands of families and children in need, and would force numerous agencies—

and all of the Catholic Charities agencies across the State—to close their foster and adoption programs. This would impact hundreds of children statewide, as these agencies are some of the most successful in the State at finding loving homes for children in need.

116.    If the State refuses to work with St. Vincent, then the families currently licensed by St. Vincent would face the difficult choice of either trying to find a new agency that will work with and endorse them as foster parents—and having to start back at square one with a new agency that doesn't know anything about the specific needs of their families or the kids they are serving—or choosing to stop providing foster care services. Upon information and belief, many of St. Vincent's licensed foster parents would stop providing foster care if forced into that choice.

117.    If the State refuses to work with St. Vincent, then the families currently in the home study process, or awaiting adoption placements, would be forced to either begin the process anew with a different agency or go through the process of transferring their licenses to a new agency, losing the relationships they have built in the process.  This change would lead to delays in the adoption process for both the parents and for

children might be matched with them and are currently awaiting loving homes.

118.    If the State refuses to work with St. Vincent, the Bucks will lose the relationships and support they have depended upon to serve their children and their ongoing needs. The Bucks would also be restricted and burdened in their religious exercise of providing support to other foster and adoptive parents. Should another biological sibling of their adopted children enter the child welfare system, the Bucks would likely miss the opportunity to foster and adopt that child and keep the siblings together.

119.    If the State refuses to work with St. Vincent, Ms. Flore would be unable to volunteer at the agency to support and mentor foster and adoptive children, and would be restricted and burdened in her religious exercise of serving children who share the same struggles she experienced.

120.    The State's actions substantially burden, denigrate, and discriminate against St. Vincent, the Bucks, Shamber Flore, and others who share their religious beliefs.

121.     St. Vincent remains willing and able to continue its ministry serving children in Michigan. It wants to help alleviate the foster care crisis in Michigan, and it has not and will not prevent any qualified family from becoming a foster parent, be it through St. Vincent or a referral to another agency.    But because of Michigan's actions, St. Vincent's over 70-year-old ministry to at-risk children is in jeopardy.

## CLAIMS

### Count I
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause
### Not Neutral

122.     Plaintiffs incorporate by reference all preceding paragraphs.

123.     "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

124.     By adopting a policy requiring the State to discriminate against child placing agencies with religious objections to same-sex marriage, Defendants have targeted St. Vincent's religious beliefs and practices.

42

125.     The statements of Defendants and their officials demonstrate that hostility toward Plaintiffs and their religious beliefs was a motivation for Defendants' actions.

126.     Defendants' laws and policies have not been evenly enforced, demonstrating that the current attempt at enforcement is designed to target particular religious beliefs and practices.

127.     Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

128.     Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

### Count II
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause
### Not Generally Applicable

129.     Plaintiffs incorporate by reference all preceding paragraphs.

130.     "[L]aws burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

131.     Defendants' laws and policies have not been evenly enforced, demonstrating that the current attempt at enforcement is designed to target particular religious beliefs and practices.

132.     Defendants have never enforced their laws, policies, and contract provisions in the manner they are currently being enforced against Plaintiffs.

133.     The public statements of Defendants and their officials demonstrate that hostility toward Plaintiffs and their religious beliefs was a motivation for Defendants' actions.

134.     Defendants have made exceptions to their policies in some instances.

135.     Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

136.     Absent injunctive and declaratory relief against Defendants, Plaintiffs will be irreparably harmed.

**Count III**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**System of Individualized Exemptions**

137.     Plaintiffs incorporate by reference all preceding paragraphs.

138.     An "exception-ridden policy," or one that permits discretionary "individualized exemptions" is "the antithesis of a neutral and generally applicable policy" and therefore "must run the gauntlet of strict scrutiny." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012).

139.     Michigan engages in the individualized assessment of alleged contract violations by agencies and exercised a great deal of discretion in creating corrective action plans and permitting exceptions. Defendants are therefore engaging in individualized, discretionary assessments of St. Vincent's conduct.

140.     State law and MDHHS contracts permits individualized exemptions from child placing agency requirements.

141.     Pursuant to the referral provisions of the foster care and adoption contracts entered into between St. Vincent Catholic Charities and MDHHS, MDHHS is permitted to grant individualized exemptions

from its policy of prohibiting contractors from transferring cases back to MDHHS.

142.    The Defendants' actions against Plaintiffs are the product of a system of individualized exemptions and burden Plaintiffs' religious exercise.

143.    Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

144.    Absent injunctive and declaratory relief against Defendants, Plaintiffs are and will continue to be irreparably harmed.

## Count IV
## 42 U.S.C. § 1983
## Violation of the First Amendment to the U.S. Constitution
## Free Speech Clause
## Compelled Speech

145.    Plaintiffs incorporate by reference all preceding paragraphs.

146.    Defendants are seeking to compel St. Vincent to make affirmative statements that contradict St. Vincent's religious beliefs.

147.    Michigan is conditioning St. Vincent's license, its contracts with MDHHS, and the ongoing ability to engage in the religious exercise

of helping children in need, on Plaintiffs' willingness to make such statements.

148. Such compulsion amounts to compelled speech in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

149. Absent injunctive and declaratory relief against Defendants, St. Vincent is and will continue to be irreparably harmed.

**Count V**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise and Free Speech Clauses**
**Retaliation for Protected Speech and Religious Exercise**

150. Plaintiffs incorporate by reference all preceding paragraphs.

151. Statements made by and on behalf of Plaintiffs about their religious beliefs and practices are both religious exercise and protected speech.

152. Defendants' contract investigation and impending termination, and their threats of additional adverse action, would be sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights.

153.   A causal link exists between Plaintiffs' religious exercise and protected speech and Defendants' adverse actions against Plaintiffs.

154.   Such actions are retaliation for religious exercise and protected speech in violation of the First Amendment to the United States Constitution.

155.   Absent injunctive and declaratory relief against defendants, Plaintiffs are and will continue to be irreparably harmed.

### Count VI
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise and Establishment Clauses
### Denominational Preference and Discrimination

156.   Plaintiffs incorporate by reference all preceding paragraphs.

157.   The Free Exercise and Establishment Clauses prohibit government from officially preferring one denomination over another or discriminating against a religious group for its religious beliefs and practices. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

158.   Defendants are applying their laws in a manner which penalizes St. Vincent for its religious beliefs. Defendants' actions also

alienate, communicate disapproval to, and impose concrete harms on foster families such as the Bucks and volunteers such as Ms. Flore, who share St. Vincent's Christian religious beliefs.

159.    Defendants have not penalized other religious groups for their religious beliefs.

160.    Defendants' preference for some religious beliefs and practices and discrimination against Plaintiffs' beliefs and practices violates the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution.

161.    Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

162.    Absent injunctive and declaratory relief against Defendants, Plaintiffs have been and will continue to be irreparably harmed.

### Count VII
### 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment to the U.S. Constitution
### Equal Protection

163.    Plaintiffs incorporate by reference all preceding paragraphs.

164.    The Equal Protection Clause prohibits discrimination on the basis of religion.

165.    Defendants' likely impending contract termination and other adverse actions penalizes Plaintiffs because of their religious beliefs.

166.     Contractors that espouse religious beliefs contrary to those espoused by Plaintiffs are allowed to maintain their contractual relationships with the State.

167.    Defendants' preference for one set of religious beliefs and against Plaintiffs' religious beliefs violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

168.     Absent injunctive and declaratory relief, Plaintiffs have been and will continue to be irreparably harmed.

**Count VII**
**42 U.S.C. § 2000bb**
**Religious Freedom Restoration Act (RFRA)**

169.    Plaintiffs incorporate by reference all preceding paragraphs.

170.    RFRA prohibits the enforcement of federal law when such enforcement substantially burdens religious exercise.

171.    The State Defendants have claimed that enforcement of federal law will require them to take adverse action against St. Vincent.

172.    Terminating the States' contracts with St. Vincent or taking other adverse action against St. Vincent would impose a substantial burden on Plaintiffs' sincere religious exercise.

173.    That burden would not be justified by any compelling government interest, and contract termination or adverse action against St. Vincent would not be the least restrictive means of furthering such interests.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Declare that the First and Fourteenth Amendments to the United States Constitution require Defendants to cease discriminating against Plaintiffs and to cease their ongoing investigation and impending adverse actions on the basis of Plaintiffs' religious beliefs, speech, and practices;

b. Declare that the Religious Freedom Restoration Act prohibits Defendants from using federal regulations or the enforcement of federal law to substantially burden Plaintiffs' religious exercise;

c. Order Defendants to continue performance of the Contract;

d. Issue preliminary and permanent injunctions prohibiting Defendants from taking retaliatory action against Plaintiffs, including

cancellation or non-renewal of the foster care and/or adoption contracts, or from otherwise penalizing Plaintiffs for their religious belief, speech, and practices regarding marriage;

e. Award Plaintiffs nominal damages for the loss of their rights as protected by law;

g. Award Plaintiffs the costs of this action and reasonable attorney's fees; and

h. Award such other and further relief as the Court deems equitable and just.

Dated: April 15, 2019               Respectfully submitted,

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
(517) 342-2522
wbloomfield@dioceseoflansing.org

Mark Rienzi*
Lori Windham
Nicholas Reaves*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

*Counsel for Plaintiff*
*\*Admission pending*