## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MELISSA BUCK; CHAD BUCK;
and SHAMBER FLORE;
ST. VINCENT CATHOLIC
CHARITIES,

     *Plaintiffs*,

    v.

ROBERT GORDON, in his official
capacity as the Director of the
Michigan Department of Health
and Human Services; HERMAN
MCCALL, in his official capacity
as the Executive Director of the
Michigan Children's Services
Agency; DANA NESSEL, in her
official capacity as Michigan
Attorney General; ALEX AZAR, in
his official capacity as Secretary of
Health and Human Services;
UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN
SERVICES,

     *Defendants*.

No. 1:19-CV-00286

HON. ROBERT J. JONKER

**Oral Argument Requested**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION .................................................................................... 1

BACKGROUND ...................................................................................... 3

    A. Faith-Based Agencies Help Address Michigan's Shortage of
        Foster Families. ............................................................................ 3

    B. Foster Care and Adoption Licensing Process. ............................... 7

    C. Placing Children in Loving Homes. ............................................... 14

    D. State and Federal Funding. .......................................................... 15

    E. Plaintiffs. ..................................................................................... 16

        1.    St. Vincent Catholic Charities. ............................................ 16

        2.    Melissa and Chad Buck. ...................................................... 18

        3.    Shamber Flore. .................................................................... 21

    F. Michigan Protects Faith-Based Agencies ..................................... 22

    G. The Legal Challenge and the Change of Policy ............................. 24

    H. The Present Lawsuit ...................................................................... 27

STATEMENT OF LAW ............................................................................ 28

ARGUMENT ............................................................................................ 29

    A. Plaintiffs have a strong likelihood of success on the merits. ........ 29

        1.    Defendants' policy violates the Free Exercise Clause .......... 29

            i.    *Defendants' policy is not neutral and generally*
                  *applicable and is thus subject to strict scrutiny.* .............. 30

i

       ii.    *Defendants' policy does not survive strict scrutiny.*...........40

   2.    The State's policy violates the Free Speech Clause. ............43

      i.    *MDHHS' policy unconstitutionally compels speech by private actors.* ....................................................................43

      ii.    *MDHHS' policy places an unconstitutional condition on St. Vincent's speech.*......................................................45

   3.    Injunctive relief is warranted against the Federal Defendant ................................................................................48

B. Plaintiffs will be irreparably harmed absent an injunction..........51

C. An injunction is in the public interest...........................................52

D. The balance of the equities favors Plaintiffs................................53

CONCLUSION .....................................................................................53

CERTIFICATE OF COMPLIANCE .......................................................55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agency for Int'l Dev. v. AOSI,*
  570 U.S. 205 (2013) ............................................................... 45, 46, 47

*Alpha Delta Chi-Delta Chapter v. Reed,*
  648 F.3d 790 (9th Cir. 2011) ............................................................ 33

*Axson-Flynn v. Johnson,*
  356 F.3d 1277 (10th Cir. 2004) ......................................................... 31

*Blackhawk v. Pennsylvania,*
  381 F.3d 202 (3d Cir. 2004) ............................................................. 31

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) .................................................................... 41, 45

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) .......................................................... 30, 35, 41, 46

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
  751 F.3d 427 (6th Cir. 2014) ............................................................ 28

*Connection Distrib. Co. v. Reno,*
  154 F.3d 281 (6th Cir. 1998) ............................................................. 1

*In re DeLorean Motor Co.,*
  755 F.2d 1223 (6th Cir. 1985) .......................................................... 29

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
  494 U.S. 872 (1990) .................................................................... 30, 51

*FCC v. League of Women Voters of California,*
  468 U.S. 364 (1984) ...................................................................... 46

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,*
  23 F.3d 1071 (6th Cir.1994) ............................................................ 52

iii

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ................................................................ 47

*Janus v. Am. Fed'n of State, Cty. & Mun. Emps.*,
  138 S. Ct. 2448 (2018) ....................................................... 47, 49

*Kennedy v. Bremerton Sch. Dist.*,
  139 S. Ct. 634 (2019) .............................................................. 1

*Locke v. Davey*,
  540 U.S. 712 (2004) ............................................................... 40

*Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018) ........................................................... 36

*Newsom v. Norris*,
  888 F.2d 371 (6th Cir. 1989) .................................................. 51

*NIFLA v. Becerra*,
  138 S. Ct. 2361 (2018) ........................................................... 48

*PACCAR Inc. v. TeleScan Techs., LLC*,
  319 F.3d 243, 249 (6th Cir. 2003) .......................................... 29

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ............................................................ 30-31

*Susan B. Anthony List v. Driehaus*,
  814 F.3d 466 (6th Cir. 2016) ............................................. 29, 40

*Teen Rach v. Udow*,
  389 F.Supp.2d 827 (W.D. Mich. 2005) .................................... 40

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) ................................................... 33

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017) ....................................................... 38, 40

*United Food & Commercial Workers Union, Local 1099 v.*
  *Sw. Ohio Reg'l Transit Auth.*,
  163 F.3d 341 (6th Cir. 1998) .................................................. 52

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000) ............................................................... 45

*Ward v. Polite,*
    667 F.3d 727 (6th Cir. 2012) ....................................... *passim*

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ............................................................... 47

**Statutes**

42 U.S.C. 2000bb .......................................................................... 49

42 U.S.C. § 604a ........................................................................... 50

2015 Public Act No. 53 ....................................................... 22, 41, 42

2015 Public Act No. 54 ................................................................ 22

2015 Public Act. No. 55 ............................................................... 22

Mich. Comp. Laws Ann. § 722.124e ................................. *passim*

Mich. Comp. Law § 722.115 ....................................................... 4

Mich. Comp. Law § 722.117 ....................................................... 4

Mich. Comp. Law § 722.118 ....................................................... 4

**Regulations**

45 CFR 75.300(c) ......................................................................... 49

Mich. Admin. Code R. 400.12201 ............................................ 4

Mich. Admin. Code R. 400.12304 ............................................ 5

Mich. Admin Code R. 400.12706 ............................................ 5

## Other Authorities

AdoptUSKids, *Minority Specializing Agency and Resource Directory*,
https://s3.amazonaws.com/becketnewsite/minority-specializing-agency-directory.pdf .................................................. 12, 34

Boys to Men Group Home, LLC, *Who We Are*,
http://www.boys2mengrouphome.com/about_us.html ....................... 35

Child Trends, *Transition-Age Youth in Foster Care in Michigan*, https://www.childtrends.org/wp-content/uploads/2017/09/Transition-Age-Youth_Michigan.pdf ........................................................................... 3, 4

Child Welfare League of America & Lambda Legal, *Getting Down to Basics: Tools to Support LGBTQ Youth in Care* (2012),
http://www.lambdalegal.org/sites/default/files/gdtb_2013_complete.pdf ......................................................................... 13

U.S. Department of Health & Human Services, *Children's Bureau*, https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/michigan.htm ............................................................... 3

Children's Rights, *Aging Out*,
http://www.childrensrights.org/newsroom/factsheets/aging-out/ ............................................................................................ 3

Mark E. Courtney, Amy Dworsky, Adam Brown, Colleen Cary, Kara Love & Vanessa Vorhies, *Midwest evaluation of the adult functioning of former foster youth: Outcomes at age* (2011) https://www.chapinhall.org/wp-content/uploads/Midwest-Eval-Outcomes-at-Age-26.pdf; .................... 4

Department of Human Services, *Finding an Agency That's Right for You,*
https://www.michigan.gov/documents/dhs/FosterCareAgency
Checklist_Comm4-12_381389_7.pdf ...................................................... 9

Department of Human Services, *Foster Care Agency Checklist,* https://www.michigan.gov/documents/dhs/FosterCareAgencyChecklist_Comm4-12_381389_7.pdf ............................................. 10

Erick Eckholm, *Offering Help for Former Foster Care Youths,* The New York Times (Jan. 27, 2007) https://www.nytimes.com/ 2007/01/27/us/27foster.html ..................... 4

Fox 2 Detroit, *Opponents say adoption bill discriminates against gays and lesbians* (Mar. 4, 2015, 5:34 PM) http://www.fox2detroit.com/news/opponents-say-adoption-bill-discriminates-against-gays-and-lesbians .................................... 37

Guiding Harbor, *Girlstown Residential,* http://www.guidingharbor.org/ programs/girlstown-residential ................................................................................................ 35

Ellen Herman, *Kinship by Design: A History of Adoption in the Modern United States,* 125 (2008) ................................................. 12

House Fiscal Agency, *Budget Briefing: HHS Human Services,* https://www.house.mi.gov/hfa/PDF/Briefings/HHS_HS_BudgetBriefing_fy18-19.pdf; ................................................... 15

HRC, *All Children All Families and Non-Affirming Potential Foster Families* (Oct. 3, 2018), https://register.gotowebinar.com/register/4180979117481006082 ................................................................................................ 13

HRC, *All Children - All Families Participating Agencies,* https://assets2.hrc.org/files/assets/resources/ACAF_Agency_Database.pdf?_ga=2.176489573.1586353695.1554989290-1393757968.1551898236 ................................................ 13

HRC, *All Children - All Families: Tiers of Recognition,* https://www.hrc.org/resources/all-children-all-families-tiers-of-recognition ............................................................................... 13

Human Rights Campaign Foundation, *Sample LGBTQ Affirming Homestudy Questions & Rationale*, https://assets2.hrc.org/files/assets/resources/HRC_ACAF_LGBTQ_Affirming_Homestudy_Questions_And_Rationale.pdf ........................................................................................... 11

Beth LeBlanc, *Nessel plans settlement talks in lawsuit targeting same-sex adoption refusals*, The Detroit News (Jan. 24, 2019, 1:11 PM) ................................................. 26

Letter from Steven Wagner, HHS Principal Deputy Assistant Secretary, Administration for Children and Families to Henry McMaster, Governor, South Carolina (Jan. 23, 2019), https://governor.sc.gov/sites/default/files/Documents/newsroom/HHS%20Response%20Letter%20to%20McMaster.pdf ........................................................................................... 53

Barbara Melosh, *Strangers and Kin: The American Way of Adoption* 77-79 (2002) ......................................................... 13

Michigan Adoption Resource Exchange, *Find a Licensed Agency*, http://mare.org/For-Families/New-to-Adoption/Find-a-Licensed-Agency ..................................... 34

Michigan Adoption Resource Exchange, Map, https://mare.org/Agency-Map ............................................... 11

Michigan Department of Health & Human Services, *Foster Care*, http://www.michigan.gov/mdhhs/0,5885,7-339-73971_7117---,00.html ..................................................... 3, 9

Michigan Department of Health & Humans Services, *Initial Foster/Adoption Evaluation Form*, https://www.michigan.gov/documents/mdhhs/CWL-3130_527684_7.docx ...................................................... 48

National One Church One Child, Inc., *About Us*, http://www.nationalococ.org/about.html ............................... 5

New York City Government, *Respectfully Asking Sexual Orientation and Gender Identity (SOGI) Questions,* https://www1.nyc.gov/assets/acs/pdf/lgbtq/Respectfully_Asking_SOGI_Questions.pdf;https://www1.nyc.gov/assets/acs/pdf/lgbtq/Respectfully_Asking_SOGI_Questions.pdf ...................... 13

J.R. Perry, *Promising Practices for Serving Transgender & Non-Binary Foster and Adoptive Parents*, Human Rights Campaign Foundation 41-42 (2017), https://assets2.hrc.org/files/assets/resources/HRC_ACAF_Promising_Practices_Serving_Transgender_Non-Binary_Parents.pdf .............................................................................. 10

Rick Pluta, *Faith-based adoption bills headed to House floor,* Michigan Radio NPR (Mar. 4, 2015), https://www.michiganradio.org/post/faith-based-adoption-bills-headed-house-floor ........................................................................ 37

Ruth Ellis Center, *Ruth's House*, http://www.ruthelliscenter.org/what-we-do/ruths-house/ ................. 35

Sault Ste. Marie Tribe of Chippewa Indians, *Child Placement,* https://www.saulttribe.com/membership-services/acfs/child-placement ........................................................ 12, 34

Michigan Government, *Summary Statement of Dumont v. Gordon Settlement Agreement* (March 22, 2019), https://www.michigan.gov/documents/ag/03.22.19_FINAL_Dumont_settlement_summary_650097_7.pdf ............................ 27, 49

Kristi Tanner, *More than 900 Michigan foster care youth age out*, Detroit Free Press (Jan. 31, 2015) https://www.freep.com/story/ opinion/contributors/raw-data/2015/01/31/michigan-foster-care-youth/22621127 ....................... 3

Wayne Center, *Foster Parenting: Wayne Center's Written Needs Statement*, http://www.waynecenter.org/services/foster-care .......................... 12, 34

Ed White, *Dem AG candidate: Adoption law discriminates against gays,* Associated Press (Sept. 27, 2018), https://apnews.com/a1fc021e8e2e4b3b829586 ba56ad9c0 .............................................................................. 25

Julie Williams, *AG Nessel to enter lawsuit in same-sex adoption bans, WILX 10* (Jan. 25, 2019), https://www.wilx.com/content/news/Michigan-AG-to-enter-lawsuit-in-same-sex-adoption-bans-504852332.html ............. 37

## INTRODUCTION

Michigan needs more foster and adoptive parents in its child welfare system. For years, it has relied on a diverse group of private agencies who recruit and train foster parents, conduct home studies, make written recommendations about potential foster and adoptive families to the state, and then help and support those parents as they continue with the often heart-wrenching foster and adoption process. Some of those agencies are faith-based. That's true of St. Vincent Catholic Charities, which performs works of mercy as a way of living out its Catholic faith. St. Vincent partners with foster parents like Chad and Melissa Buck, and former foster children like Shamber Flore to provide a wide variety of foster and adoptive services.

Michigan has repeatedly recognized the value of these agencies, and has partnered with them successfully for many years. Michigan knew about the agencies' diverse religious beliefs and worked to accommodate them. Three weeks ago, that all changed. The State announced a new policy. Under that policy, child welfare agencies must provide certifications for same-sex couples, even if those certifications violate their religious beliefs. If agencies refuse to engage in speech and

1

actions that violate their religious beliefs, they will lose the ability to provide foster care or adoption services for any children in the child welfare system. Successful foster care and adoption programs that have served thousands of Michigan children will have no choice but to close.

St. Vincent, as part of living out its Catholic faith, cannot engage in speech endorsing unmarried and same-sex relationships by providing written recommendations to the State regarding their relationships. If such a couple seeks St. Vincent's services, the agency refers them to other nearby agencies who can help them. There is no evidence that any unmarried or same-sex couple has been unable to foster or adopt because of St. Vincent's religious beliefs. To the contrary, gay couples who wish to help children have been able to adopt foster children in St. Vincent's care in the past after receiving their evaluation and written recommendation from a different agency.

But that is not enough for the State, which demands that St. Vincent conform to the State's new orthodoxy or else be labeled a "hatemonger," ineligible to serve children in need. Urgent relief is necessary to safeguard the rights of St. Vincent, the Bucks, and Ms. Flore

and to ensure they can continue to serve children in need—as they have for decades—while this case proceeds.

## BACKGROUND

### A. Faith-Based Agencies Help Address Michigan's Shortage of Foster Families

Michigan has a chronic shortage of foster and adoptive homes. Ex.1, ¶9; Ex.2, ¶11; Ex.3, ¶5. There are nearly 12,000 children in foster care in Michigan, all of whom need safe homes.[1] And as of 2017, over 3,300 children in Michigan are waiting for a family to be willing to adopt them.[2] Because there are not enough families, more than 600 of these children "age out" of foster care every year.[3] They exit the foster system at age 18 without any permanent family, and many lack the resources and skills to successfully transition into adulthood.[4] This number is on the rise,[5]

---

[1] Michigan Department of Health & Human Services, *Foster Care*, http://www.michigan.gov/mdhhs/0,5885,7-339-73971_7117---,00.html.

[2] This means that these children have a goal of adoption and have had parental rights terminated. U.S. Department of Health & Human Services, *Children's Bureau,* https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/michigan.html.

[3] Child Trends, *Transition-Age Youth in Foster Care in Michigan*, https://www.childtrends.org/wp-content/uploads/2017/09/Transition-Age-Youth_Michigan.pdf; Kristi Tanner, *More than 900 Michigan foster care youth age out*, Detroit Free Press (Jan. 31, 2015) https://www.freep.com/story/opinion/contributors/raw-data/2015/01/31/michigan-foster-care-youth/22621127/.

[4] Children's Rights, *Aging Out*, http://www.childrensrights.org/_newsroom/fact-sheets/aging-out/ (last visited April 16, 2019).

[5] Child Trends, *Transition-Age Youth in Foster Care in Michigan*,

and a recent study shows these children are much less likely to graduate high school, let alone college, and far more likely to end up in poverty.[6]

Because the State cannot meet this acute need on its own, it relies on over 90 private child placing agencies (agencies) to help with foster care, and over 60 for adoption. Ex.4 at 4. Indeed, as the State has recognized, "[h]aving as many possible qualified adoption and foster parent agencies in this state is a substantial benefit to the children of this state."[7]

These agencies oversee foster homes and adoption placements, services for which they are compensated by the State. Ex.1, ¶10. An agency may only oversee foster care placements and facilitate adoptions for foster children if it is licensed by (and signs a contract with) the Michigan Department of Health and Human Services (MDHHS).[8] Private agencies evaluate and recruit families they wish to recommend

---

https://www.childtrends.org/wp-content/uploads/2017/09/Transition-Age-Youth_Michigan.pdf (last visited April 16, 2019).

[6] Mark E. Courtney, Amy Dworsky, Adam Brown, Colleen Cary, Kara Love & Vanessa Vorhies, *Midwest evaluation of the adult functioning of former foster youth: Outcomes at age 26* (2011) https://www.chapinhall.org/wp-content/uploads/Midwest-Eval-Outcomes-at-Age-26.pdf; Erick Eckholm, *Offering Help for Former Foster Care Youths*, The New York Times (Jan. 27, 2007), https://www.nytimes.com/2007/01/27/us/27foster.html.

[7] Mich. Comp. Laws Ann. § 722.124e.

[8] Mich. Comp. Laws §§ 722.115, 722.117, 722.118; Mich. Admin. Code R. 400.12201.

4

to MDHHS for licensure as foster or adoptive families.[9]  MDHHS then makes the ultimate determination regarding whether to license a foster family or approve an adoption. *See* Ex.1, ¶7.

Faith-based agencies are particularly effective at recruiting families that otherwise might not choose to foster or adopt.[10] *See* Ex.2, ¶¶3,6. Michigan recognized that "faith congregations have been extremely valuable partners" and "have helped us recruit loving foster and adoptive families by networking in their local communities and with other faith congregations," and that faith-based "private agencies . . . and the local faith congregations that recruit and support foster families are *both vitally important to finding loving homes for vulnerable children.*" Ex.5 (emphasis added). The State also determined that "[e]nsuring that faith-based child placing agencies can continue to provide adoption and foster care services will benefit the children and families who receive publicly funded services." *Id*.

The numbers bear this out. St. Vincent recruits homes for children

---

[9] Mich. Admin. Code R. §§ 400.12304, 400.12706.

[10]    National One Church One Child, Inc., *About Us*, http://www.nationalococ.org/about.html (noting Illinois partnership with African-American churches).

with disabilities at nearly double the average rate across the State. St. Vincent also recruits more homes for sibling groups than the average agency, and recruits more homes overall than the average agency.[11]



In the last eighteen months, St. Vincent has recruited more new foster families total than all of the other private agencies in its tri-county foster area. Ex.1, ¶3. And in the last four fiscal years, St. Vincent has served an average of 74 children in its foster care program every year,

---

[11] This data comes from Ex.17. Averages are calculated by dividing the totals in these three categories by 157, which is the combined number of private licensed agencies and DHHS offices performing these services.

and through its work over 100 adoptions for foster children were finalized. Ex.1, ¶3.

## B. Foster Care and Adoption Licensing Process

Adoption and foster agencies develop a close working relationship with the families they recommend. Agencies must perform a home study on prospective foster or adoptive families, which involves an exhaustive and deeply-personal review of the family's eligibility and characteristics. MDHHS requires agencies to assess the "[s]trengths and weaknesses" of the parents and the "[s]trengths of the relationship" between the couple, including "level of satisfaction" and "stability" of the relationship. Ex.1, ¶6 & Attachment A. Agencies are also required to assess the parents' "roles," "involvement," "styles," "childrearing techniques," and "values." *Id.* Assessments must also include an evaluation of the "[r]ole of religion in the family" and the "[r]elationship history" of the parents. *Id.*

Based on these inquiries, the agency must provide written findings and a recommendation as to whether the home is suitable for placing children. *Id.* ¶7. Michigan (rather than the agency) makes the ultimate determination about whether to issue a license. *Id.*

Michigan recognizes that foster agencies will vary, and that not

every agency is a good fit for every potential foster family. Michigan therefore encourages families to look for a foster or adoption agency that is a good fit for that family. MDHHS's Foster Care Navigator program helps families find the "agency that's right for you."[12] As part of this process, prospective foster parents receive a worksheet advising them to, among other things, "make sure you know all of the agencies located in your area," "[m]eet with the agency's workers to find out what services and support they offer," "interview a couple agencies until you're certain you've found the right one," and then "[c]hoose an agency you are compatible with."[13]

MDHHS directs prospective adoptive parents to its Michigan's Adoption Resource Exchange (MARE) website. MARE advises prospective parents to find an agency "you feel comfortable sharing personal and private information" with, as "you will be working closely with them during the approval process" and "they will be charged with identifying your future son(s) and/or daughter(s)." Ex.6 at 1. The State

---

[12] Michigan Department of Health and Human Services, *Foster Care*, https://www.michigan.gov/mdhhs/0,5885,7-339-73971_7117---,00.html.
[13] Department of Human Services, *Finding an Agency That's Right for You*, https://www.michigan.gov/documents/dhs/FosterCareAgencyChecklist_Comm4-12_381389_7.pdf.

thus emphasizes that it is crucial applicants "trust [their] instincts" and "[c]hoose an agency [they] are compatible with."[14]

Along these same lines, the Human Rights Campaign (HRC) has recognized that a social worker may ask "all kinds of questions about [the applicant's] childhood and upbringing, including questions about puberty, sex and sexuality."[15] HRC stated that the "homestudy serves as an evaluation tool that allows you to determine if a prospective resource parent has that capability to provide a child with a safe and nurturing home" and should be based on a "thorough evaluation."[16] A home study also requires an agency to ask very personal questions regarding an LGBT individual's past and sensitive questions about their relationships, family, and love life.[17]

---

[14] Department of Human Services, *Foster Care Agency Checklist,* https://www.michigan.gov/documents/dhs/FosterCareAgencyChecklist_Comm4-12_381389_7.pdf.

[15] Perry, J.R., *Promising Practices for Serving Transgender & Non-Binary Foster and Adoptive Parents*, Human Rights Campaign Foundation 41-42 (2017), https://assets2.hrc.org/files/assets/resources/HRC_ACAF_Promising_Practices_Serving_Transgender_Non-Binary_Parents.pdf.

[16] *Id*. at 44.

[17] HRC created a list of sample questions for social workers to ask during an LGBT home study, including personal/intimate questions: "In the past, have you ever been 'outed' by someone? How did you handle it?"; "What has been the attitude of your extended family to your partner?"; "How have homo/bi/transphobia and/or heterosexism or cissexism affected your life and how have you dealt with this?"; and "Where are you in the process of grieving any feelings of loss you may have around

For both foster care and adoption, MDHHS provides online lists and interactive maps showing all foster care and adoption agencies across the state.[18] Applicants can also contact private agencies directly. When this happens, the agency can either (1) work with the applicants to perform home study assessments and (potentially) endorse them for State licensing or (2) refer them to another agency that might better meet their needs. Ex.1, ¶21. As Steve Yager, executive director of MDHHS' Children's Services Agency, explained: "We do not compel agencies to accept referrals—never have; rather, we create through contracts a vast array of providers to meet the very diverse needs of the children and families we serve." Ex.7.

Private agencies in Michigan have always been able to refer families to other agencies or MDHHS for a variety of reasons, including: (1) the family may live further away than the agency would like to drive for home visits, so they refer them to a closer agency, (2) the agency already has a waiting list, (3) the family has not been satisfied with the

---

not having biological children?" Human Rights Campaign Foundation, *Sample LGBTQ Affirming Homestudy Questions & Rationale*, https://assets2.hrc.org/files/assets/resources/HRC_ACAF_LGBTQ_ Affirming_Homestudy_Questions_And_Rationale.pdf.
[18] Michigan Adoption Resource Exchange, Map, https://mare.org/Agency-Map (allowing users to filter by foster or adoptive agencies).

agency's services so far, (4) the agency does not specialize in medical or behavioral health issues, and (5) the family is looking to adopt a child with particular needs or characteristics that the agency does not have the ability to support. Ex.1, ¶21.

Some agencies have specialized missions, meaning they often refer prospective parents elsewhere when they do not fit with the agency's specialty. For example, some agencies specialize in placing children with Native American families,[19] finding homes for African American children,[20] or serving children with developmental disabilities.[21] And faith-based agencies have long referred families elsewhere when they cannot adequately serve a family consistent with their religious beliefs.[22]

---

[19] Sault Ste. Marie Tribe of Chippewa Indians, *Child Placement,* https://www.saulttribe.com/membership-services/acfs/child-placement ("The Sault Tribe Binogii Placement Agency is our tribal child placement agency. The agency is licensed by the state of Michigan . . . The agency services children who are enrolled or eligible for enrollment as Sault Ste. Marie Tribe of Chippewa Indians members and Sault Tribe households.").

[20] AdoptUSKids, *Minority Specializing Agency and Resource Directory*, 4 https://s3.amazonaws.com/becketnewsite/minority-specializing-agency-directory.pdf (discussing how Homes for Black Children focused on the "adoptive placement of black children"). Homes for Black Children has since closed for reasons unrelated to this case.

[21] Wayne Center, *Foster Parenting,* http://www.waynecenter.org/services/foster-care (the agency is specifically "seeking foster parents with previous experience with persons who have a developmental disability and/or expertise in related areas").

[22] Historically, some state laws allowed religious organizations to make placements consistent with their religious beliefs. Ellen Herman, *Kinship by Design: A History of Adoption in the Modern United States* 60, 125 (2008). Children were routinely placed

HRC and other LGBTQ-advocacy organizations believe that agencies should not place children with families that would not be LGBTQ affirming, including for religious reasons.[23]  HRC provides a "Seal of Recognition" to agencies that are leaders in serving LGBTQ foster families and children.[24] In Michigan, the following agencies have received the Seal of Recognition: Fostering Futures, Hands Across the Water, and Judson Center - Foster Care & Adoption.[25]

---

with families of the same faith whether through self-selection, informal referrals between agencies, or religion-matching laws. Barbara Melosh, *Strangers and Kin: The American Way of Adoption* 77-79 (2002) (describing how religious organizations referred adoptive parents to each other based on the parent's religious beliefs).

[23] HRC, *All Children All Families and Non-Affirming Potential Foster Families,* (Oct. 3, 2018), https://register.gotowebinar.com/register/4180979117481006082 (free registration required to view) (describing a foster family's reaction to a child's identification as a member of the LGBTQ community as the "all-important discussion" that if not handled correctly can "harm" the child). HRC also describes New York City's approach as a "best practice." New York City policies state, "[i]f the parent displays negative attitudes about LGBTQ people, even when deeply rooted in religious beliefs and cultural values, and the alleged abused and/or maltreatment are related to the youth's perceived or actual sexual orientation, gender identity, or gender expression, the staff must determine whether those attitudes are impacting the youth's immediate safety as well as whether those attitudes may put the youth at risk for future physical or emotional harm." New York City Government, *Respectfully Asking Sexual Orientation and Gender Identity (SOGI) Questions,* https://www1.nyc.gov/assets/acs/pdf/lgbtq/Respectfully_Asking_SOGI_Questions.pdf ; *see also* Child Welfare League of America & Lambda Legal, *Getting Down to Basics: Tools to Support LGBTQ Youth in Care,* 25-26 (2012), http://www.lambdalegal.org/sites/default/files/gdtb_2013_complete.pdf.

[24] HRC, *All Children - All Families: Tiers of Recognition*, https://www.hrc.org/resources/all-children-all-families-tiers-of-recognition.

[25] HRC, *All Children - All Families Participating Agencies,* https://assets2.hrc.org/files/assets/resources/ACAF_Agency_Database.pdf?_ga=2.176 489573.1586353695.1554989290-1393757968.1551898236.

### C. Placing Children in Loving Homes

For families seeking to provide foster care, or foster to adopt, after they are licensed, they join that agency's pool of homes waiting to serve a child. When a child is removed from his or her home because of abuse or neglect, MDHHS reaches out to foster agencies until an appropriate home is found—either a relative of the child or a certified family. Ex.1, ¶15. Under the State's contracts, MDHHS gives agencies just one hour to contact their pool of foster homes and determine if any are willing to foster the child. *Id.* Agencies thus have to move very quickly down their list of families, and sometimes the family only has a matter of minutes to decide. *Id.* If the agency cannot a family to place the child within that hour, MDHHS moves on to the next agency. *Id.*

Often children who are placed in non-permanent foster homes still need parents to adopt them. Ex.1, ¶15. The MARE website includes information about all children currently seeking adoption in the State. Families certified by any of the over 60 private agencies in Michigan are allowed adopt any child on MARE's website; they are not limited to children supervised by the agency that initially recommended the family for licensing. Ex.1, ¶17. Through this process, and by performing the

13

certification process with different agencies, gay couples have been able to adopt a child in St. Vincent's care in the past. *Id*.

## D. State and Federal Funding

For the services MDHHS funds related to foster care and adoption, it does so through a combination of state funds and federal funds, including Title IV-E and TANF funds through the federal Department of Health and Human Services.[26] State payments for foster care only begin after the child is placed with a family. Ex.1, ¶10. At that point, Michigan pays a per diem to the agency overseeing that placement. *Id*. Most of the funds go to the family to defray the costs of providing care, and a portion remains with the agency to compensate the agency for its support services. *Id*. For the majority of adoptions from foster care, the State makes payments to the agency as part of the foster care system in pre-adoptive placements, and makes a lump-sum payment after the adoption is complete. *Id*.

The home study and recruitment process is nether billed to nor compensated by MDHHS. Ex.1, ¶11, Ex.8, Ex.9. Instead, St. Vincent uses

---

[26]   House Fiscal Agency, *Budget Briefing: HHS Human Services,* https://www.house.mi.gov/hfa/PDF/Briefings/HHS_HS_BudgetBriefing_fy18-19.pdf; Ex.10.

14

private funds to cover the costs of home studies and recruiting. Ex.1, ¶13. These funds come from a cost center that is kept separate from the funding provided by the State for other child welfare activities. *Id.*[27]

Last fiscal year St. Vincent's foster and adoption programs operated at a significant loss based on the state funding alone, and these programs would not have been able to operate without St. Vincent's private subsidies. Ex.1, ¶20.

### E. Plaintiffs

*1.    St. Vincent Catholic Charities.* St. Vincent is one of the oldest and most effective adoption agencies in Michigan. Ex.1, ¶3. St. Vincent has served children and families for over 70 years, helping those in crisis find hope and safety. *Id.* ¶5. As a nonprofit, faith-based organization, St. Vincent's mission is "to share the love of Christ by performing the corporal and spiritual works of mercy." *Id.* Today, St. Vincent provides a range of charitable services, including foster care

---

[27] In some exceptional cases, the State might use a different payment structure pursuant to a separate, child-specific contract to directly pay for home study services for foster children being placed with relatives. St. Vincent has never been a party to such a contract for the provision of home study services for an LGBTQ couple. Ex.1, ¶12. Outside of this exceptional circumstance for placement with relatives, foster care and adoption home studies are not specifically listed as a "service" under St. Vincent's contracts with the State. Ex.8, 9.

and adoption. *Id.*

Many of the children St. Vincent serves have experienced physical or emotional abuse, neglect, or the illness or death of a parent. Ex.1, ¶18. St. Vincent provides services including individual, family, and group therapy, monthly home visits, visitation with birth parents and other relatives, as well as monitoring and referrals to community resources for additional treatment and support. *Id.* St. Vincent staff are on call 24 hours a day to address foster families' concerns. *Id.*

Adoptive and foster families are not expected to share St. Vincent's faith. *Id.* ¶8. And St. Vincent happily serves both LGBTQ individuals and children. For example, St. Vincent regularly serves LGBTQ foster children in both its foster program and its group home, and St. Vincent welcomes LGBTQ couples to attend a parent support group that St. Vincent facilitates. *Id.* However, as a Catholic organization, St. Vincent cannot provide a written recommendation to the State endorsing an adult relationship that would conflict with St. Vincent's sincere religious beliefs. *Id.*

If unmarried or LGBTQ couples thus seek St. Vincent's endorsement, the agency's staff, consistent with State law, provide

16

written information from the State's website and contact information for a list of other local agencies that would be able to work with the family. *Id*. ¶15. The State has long been aware of St. Vincent's religious beliefs and practices, and in 2015 St. Vincent's executive director testified before the legislature regarding the need for legal protection for faith-based adoption agencies. *Id*. ¶21.

It is illegal to provide adoption or foster care services to children in Michigan's child welfare system without a MDHHS contract. *Id*. ¶19. Therefore, if the State refuses to contract with St. Vincent, the agency would be forced to immediately shut down its foster and adoption ministries. *Id*.

**2.   *Melissa and Chad Buck.*** Melissa and Chad Buck envisioned having a small family with one or two children. Ex.2, ¶2. However, after years of heartbreaking infertility, the Bucks decided to adopt. *Id*. When St. Vincent approached them about a sibling group of three children who had suffered severe abuse, they were at first hesitant. *Id*. But Melissa and Chad felt that after these children had lost all of the other connections they had, the only thing they had left was each other. So they agreed to take all three—and they haven't looked back since. *Id*.

17

St. Vincent later approached Melissa and Chad about adopting a new infant sibling of their adopted children. The Bucks' first instinct was to say no. *Id.* ¶4. But they couldn't stop thinking about how much it would mean for this child to be raised with her siblings. *Id.* So the Bucks put aside their fears and opened their home again. *Id.* In doing this, St. Vincent was a crucial source of support for the Bucks. *Id.* The Bucks also worked with St. Vincent to adopt a baby girl. Id. ¶4.

The Bucks' five children have a range of special needs. *Id.* ¶5. These include autism, a genetic disorder similar to diabetes, severe anxiety, attachment disorder, and other learning disabilities. *Id.* Most of the children also suffered severe trauma and physical abuse before they entered foster care. *Id.*

Most of the Bucks' adoptions involved a heart-wrenching and difficult process that would not have been possible without the services St. Vincent workers lovingly provided. *Id.* ¶6. This included St. Vincent acting as a trusted intermediary with hostile birth parents, being available at all hours to provide emotional support, and accompanying the Bucks to countless medical appointments. *Id.* The Bucks are not aware of any other agency that goes to these lengths to support families.

18

*Id.*

It is possible that someday the Bucks will be asked to adopt a new biological sibling of their children. *Id.* ¶7. The Bucks are open to this possibility. *Id.* But the Bucks cannot envision putting their family through such a traumatic process again without St. Vincent's constant care and support. *Id.*  What is more, without St. Vincent it is unlikely that the Bucks would be contacted or even made aware of this possibility—placement decisions are made within an hour and only St. Vincent has the institutional knowledge and relationships necessary to ensure that connection is made. *Id.* ¶7, ¶8.

St. Vincent continues to provide support to the Bucks. Ex.2, ¶9, ¶10. For example, the Bucks attend a monthly parent support group that St. Vincent helps facilitate. Ex.2, ¶9. This group provides critical resources that allow the Bucks to care for their special-needs children, including training and helpful literature. *Id.* In addition to receiving support from St. Vincent, the Bucks practice their own faith by assisting other foster and adoptive parents, helping to lead support groups, and recruiting new families. Ex.2, ¶10. If St. Vincent were to close its foster and adoption programs, the Bucks would be hindered in their ability to

minister to others going through the same experience. *Id.* And the Bucks and many other families would be left without support or the ability to continue taking children into their homes. *Id.* at ¶9.

**3.    *Shamber Flore.*** Shamber Flore was removed from her birth home at the age of five after experiencing years of abuse, poverty, and neglect, all while being exposed to drugs, gangs, and prostitution. Ex.3, ¶2. But when St. Vincent placed Shamber and her two siblings with their new adoptive family—the Flores—Shamber was able to begin healing. *Id.*

Today, Shamber is a vibrant young woman who loves her family and mentors others at St. Vincent who have dealt with trauma and abuse. *Id.* ¶¶3-4. Shamber wouldn't have been adopted by the Flore family if it were not for St. Vincent's work. *Id.* ¶3. Shamber's adoptive parents, Tam'al and Jerry Flore, had previously tried to adopt with a state agency and had a very negative experience. *Id.* Because adoption is already so difficult, the Flores would not have been able to continue the adoption process if they had not found a trusted partner and ally in St. Vincent. *Id.* Shamber is one of 16 children the Flores have adopted over the past 14 years. *Id.*

20

If St. Vincent were forced to close its adoption and foster care ministries, Shamber would lose the opportunity to mentor others as a St. Vincent volunteer. *Id*. ¶5. She also believes that if St. Vincent can no longer recruit families like the Flores, many children who were abused and alone like her will lose the opportunity to find a loving home. *Id*.

## F. Michigan Protects Faith-Based Agencies

On June 11, 2015, Michigan passed 2015 Public Act Nos. 53, 54, & 55 (the "Michigan Laws"). These three laws were passed to protect the status quo by "[e]nsuring that faith-based child placing agencies can continue to provide adoption and foster care services" consistent with their religious beliefs.[28] Accordingly, Michigan determined that "[p]rivate child placing agencies, including faith-based child placing agencies, have the right to free exercise of religion under both the state and federal constitutions" and that "this right includes the freedom to abstain from conduct that conflicts with an agency's sincerely held religious beliefs."[29] Michigan also confirmed that "a private child placing agency does not receive public funding with respect to a particular child or particular

---

[28] Mich. Comp. Laws § 722.124e(1)(g).
[29] Mich. Comp. Laws § 722.124e(1)(e).

individuals referred by the department unless that agency affirmatively accepts the referral."[30]

The law also requires faith-based agencies unable to serve a particular family for a religious reason to provide "information advising the applicant of the department's website . . . and a list of adoption or foster care service providers with contact information."[31] In practice, this law simply reaffirmed the practices already in place at faith-based agencies. If an agency complies with these requirements, as St. Vincent does, "the state or a local unit of government shall not take an adverse action against a child placing agency" based on their decision to decline to provide the requested services.[32]

MDHHS was well aware of these agency practices, including St. Vincent's practices. In order to comply with the state law, MDHHS updated its forms and contract documents to provide additional clarity. Ex.14 at 1. MDHHS staff, some of whom were personally opposed to the law, nevertheless expressed their views that they could not penalize agencies, nor decline to contract with agencies, because those agencies

---

[30] Mich. Comp. Laws § 722.124e(1)(h).
[31] Mich. Comp. Laws § 722.124e(4).
[32] Mich. Comp. Laws § 722.124e(3).

22

referred same-sex and unmarried couples elsewhere. Ex.15 at 1 ("Certainly, 2015 PA 53 permits a child placing agency to decline to provide foster care case management or adoption services, but only under specific circumstances plainly expressed in the act."). In court filings, MDHHS expressed its opinion that it needed to continue working with religious adoption agencies like St. Vincent, and that it was bound to comply with the state law by permitting those agencies to follow their religious beliefs. Motion to Dismiss, *Dumont v. Gordon*, No. 2:17-cv-13080-PDB-EAS (E.D. Mich., Dec. 15, 2017), ECF No. 16 at 1.

## G. The Legal Challenge and the Change of Policy

In September 2017, the ACLU (representing two same-sex couples) filed a lawsuit against the State, alleging that Michigan, by contracting with faith-based agencies like St. Vincent, violated the Establishment and Equal Protection Clauses of the U.S. Constitution. The ACLU therefore sought to "enjoin[] Defendants, in their official capacities, from contracting with or providing taxpayer funding to private child placing agencies that exclude same-sex couples from consideration as foster or adoptive parents." Complaint, *Dumont v. Gordon*, 2:17-cv-13080-PDB-EAS (E.D. Mich. Sept. 20, 2017), ECF No. 1 ¶B.

23

The complaint specifically mentioned St. Vincent and included the allegation that a same-sex couple had approached the agency and was "immediately . . . refer[ed] to another agency." *Id.* ¶43. St. Vincent, the Bucks, and Shamber Flore intervened to defend the Michigan Laws alongside the State, which (up until January 2019) had taken the consistent position that contracting with faith-based agencies was constitutional.

In November 2018, Michigan elected a new attorney general, Dana Nessel. During her campaign, Nessel took the position that there is "no viable defense" for the Michigan Laws and that their "purpose is to discriminate against people."[33] She also made clear that if she were elected, she would not to defend the Michigan Laws, and that she would hire outside counsel to do so.[34] Instead, shortly after taking office, Attorney General Nessel fired the outside counsel who had been defending the laws and, instead of recusing, entered into settlement discussions with the ACLU.[35]

---

[33] Ed White, *Dem AG candidate: Adoption law discriminates against gays*, Associated Press (Sept. 27, 2018), https://apnews.com/a1fc021e8e2e4b3b829586ba56ad9c07

[34] *Id.*

[35] Beth LeBlanc, *Nessel plans settlement talks in lawsuit targeting same-sex adoption*

On March 22, the State and the ACLU jointly moved to dismiss their lawsuit based upon a private settlement agreement. That agreement was attached to a voluntary dismissal motion but not substantively approved by the court. *Dumont v. Gordon*, 2:17-cv-13080-PDB-EAS (E.D. Mich., Mar. 22, 2019), ECF No. 82 (motion), ECF No. 83 (order). The intervenors were not consulted on that agreement and are not party to that agreement. *See id.* In their motion to dismiss, the State and ACLU emphasized that the entire case could be dismissed on the agreement of the two parties. ECF No. 82 at 3–4.  The court immediately dismissed the case. ECF No. 83 at 1–2. In that agreement, the State took the position that its contracts prohibited faith-based agencies from referring same-sex couples elsewhere, despite the state law. It claimed that "[e]xamples of prohibited discriminatory conduct include . . . turning away or referring to another contracted CPA an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for contracted services." ECF No. 82 at 4. In other words, when an agency accepts a

---

*refusals*,   The   Detroit   News   (Jan.   24,   2019,   1:11   PM), https://www.detroitnews.com/story/news/politics/2019/01/24/nessel-settlement-discussions-same-sex-adoption-refusals/2667906002/

referral for a single child, the state laws protecting that agency no longer applies to that agency at all.

The Attorney General's office released a statement explaining its about-face. That statement included Nessel's determination that St. Vincent had violated its state contracts: "According to MDHHS, on the dates that [St. Vincent] and Bethany turned away Plaintiffs, each agency was providing foster care case management services or adoption services for one or more children for whom the agency had accepted an MDHHS referral. . . . Consequently, each agency was contractually prohibited from discriminating against Plaintiffs . . . ."[36] The statement also claimed that the new policy was required by federal regulations. *See id.* The State Defendants thus announced their intention to enforce the non-discrimination provisions in a manner previously understood to be prohibited by State law. *See id.*

## H. The Present Lawsuit

As a result of MDHHS's change in policy, adverse action against St. Vincent is imminent and impending, including both the non-renewal

---

[36] Michigan Government, *Summary Statement of Dumont v. Gordon Settlement Agreement* (Mar. 22, 2019), https://www.michigan.gov/documents/ag/03.22.19_FINAL_Dumont_settlement_summary_650097_7.pdf

of St. Vincent's adoption and foster care contracts, as well as suspension or termination of its current contracts. As a result, Plaintiffs filed this action on April 15, seeking declaratory and injunctive relief against state and federal officials. On this same date, Plaintiffs also asked the defendants to agree to the relief sought in this motion. Neither the state nor the federal defendants have taken a position, and Plaintiffs now ask this Court for relief.

## STATEMENT OF LAW

Preliminary injunctive relief is necessary to prevent irreparable harm to the Bucks, Ms. Flore, St. Vincent, and those others St. Vincent serves, as well as to preserve the status quo. When granting a preliminary injunction, a court must balance four factors: ""(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."" *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *PACCAR Inc. v. TeleScan Techs., LLC*, 319 F.3d 243, 249 (6th Cir. 2003)). "[T]he degree of likelihood of

success required [for one factor] may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

## ARGUMENT

### A. Plaintiffs have a strong likelihood of success on the merits.

Plaintiffs are likely to succeed on their Free Exercise, Free Speech, and Religious Freedom Restoration Act claims.

### 1. Defendants' policy violates the Free Exercise Clause.

Plaintiffs are likely to prevail on their Free Exercise Claims (Counts I, II, and III) because the State's policy is subject to strict scrutiny but cannot satisfy this "highest level of review." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016).

Under the Free Exercise Clause, "public authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012). But this "rule comes with an exception." *Id*. When the policy "appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-based practice," *id*., the policy "must run the gauntlet of strict scrutiny." *Id*. at 740.   A policy satisfies strict scrutiny only if it

28

"advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (internal quotation marks and citations omitted).

> i. *Defendants' policy is not neutral and generally applicable and is thus subject to strict scrutiny.*

The State's policy is subject to strict scrutiny for three independent reasons: (1) the State's policy against referrals permits individualized and discretionary exemptions, (2) the State is selectively enforcing its policy by permitting other agencies to refer families for a variety of reasons, and (3) the State is explicitly targeting St. Vincent for adverse government action based on its religious beliefs.

***Individualized and discretionary exemptions.*** Both Supreme Court and Sixth Circuit precedent make clear that when a law gives the government discretion to grant case-by-case exemptions based on "the reasons for the relevant conduct," strict scrutiny is required. *Lukumi*, 508 U.S. at 537 (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 884 (1990)); *see also Sherbert v. Verner*, 374 U.S. 398 (1963). Such discretionary exemptions are, by definition, the opposite of a neutral and generally applicable law.

29

In *Ward*, a graduate-level counseling student challenged a university policy that on its face prohibited students from referring counseling clients to other students. 667 F.3d at 736. Upon closer inspection, however, it became clear that this rule was actually an "ad hoc" policy applied at the discretion of the school. This Court thus struck down the policy, explaining that "[a]t some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy[.]" *Id*. at 740; s*ee also Blackhawk v. Pennsylvania*, 381 F.3d. 202, 211 (3d Cir. 2004) ("[T]he waiver mechanism . . . create[d] a regime of individualized, discretionary exemptions that triggers strict scrutiny.") (Alito, J.); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298-99 (10th Cir. 2004) (striking down a university policy that allowed "ad hoc" exemptions from the university's curricular requirements).

Here too, contracts between St. Vincent and the State include a clear discretionary exception: referrals are allowed "upon the written approval of the County Director, the Children's Services Agency Director, or the

30

Deputy Director."[37] By granting MDHHS officials the authority to grant individualized exceptions to their policy, the State has subjected its policy to strict scrutiny. *Ward*, 667 F.3d at 740.

**Selective Enforcement.** In addition to explicitly permitting discretionary, individualized exceptions, the State's policy is selectively enforced. Agency referrals are permitted for numerous secular—but not religious—reasons.

If a policy is facially neutral and generally applicable, it may still be subject to strict scrutiny if it is selectively enforced against only some violators. This Court's decision in *Ward* provides a perfect example of unconstitutional selective enforcement. The University claimed to have a "no-referral policy," requiring all graduate student counselors to serve any client. 667 F.3d at 740. But in practice, there was "no evidence" of any actual written policy prohibiting referrals, and in fact the University permitted referrals for numerous secular reasons. *Id* at 739. It even permitted referrals for reasons that violated the University's antidiscrimination policy (the only written policy it could point to), while

---

[37] Ex.12. Almost identical language is in St. Vincent's current foster care contracts, permitting the agency to return a case to DHHS "upon the written approval of the County Director, the Children's Services Agency Director, or the Deputy Director." Ex.9 at 2.

refusing to grant similar exceptions for religious reasons. *See id.* "The policy thus seems to permit referrals for secular—indeed mundane—reasons, but not for faith-based reasons." *Id.*

Judge Sutton explained why this was so problematic: "What poses a problem is not the adoption of an anti-discrimination policy; it is the implementation of the policy, permitting secular exemptions but not religious ones and failing to apply the policy in an even-handed, much less a faith-neutral, manner to Ward." *Id.* Such selective enforcement required the policy to be subjected to strict scrutiny. *Id. See also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 168 (3d Cir. 2002) (applying strict scrutiny because the government's "selective, discretionary application" primarily against conduct "motivated by Orthodox Jewish beliefs" was "suggestive of discriminatory intent"); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804-05 (9th Cir. 2011) (holding that strict scrutiny would apply if a policy had been applied selectively against religious groups).

Here too, Michigan permits agencies to refer families elsewhere for any number of reasons, and even permits them to violate its non-discrimination policy. As a MDHHS official explained, "We do not compel

agencies to accept referrals—never have; rather, we create through contracts a vast array of providers to meet the very diverse needs of the children and families we serve." Ex.7.

The State's non-discrimination policy prevents agencies from denying services on the basis of, among other things, sex, sexual orientation, race, ethnicity and disability. Ex.12. But the State has chosen to contract with private organizations that specialize in serving African American children,[38] Native American children,[39] children with disabilities,[40] and to partner with organizations that serve only LGBTQ

---

[38]   Michigan Adoption Resource Exchange, *Find a Licensed Agency*, http://mare.org/For-Families/New-to-Adoption/Find-a-Licensed-Agency (listing Homes for Black Children) (last visited Apr. 16, 2019); AdoptUSKids, *Minority Specializing Agency and Resource Directory*, 4 https://s3.amazonaws.com/becketnewsite/minority-specializing-agency-directory.pdf (discussing how Homes for Black Children focused on the "adoptive placement of black children")

[39]   Sault Ste. Marie Tribe of Chippewa Indians, *Child Placement,* https://www.saulttribe.com/membership-services/acfs/child-placement (last visited Apr. 16, 2019)

[40]   Wayne Center, *Foster Parenting: Wayne Center's Written Needs Statement*, http://www.waynecenter.org/services/foster-care (last visited Apr. 16, 2019). What is more, the agency is specifically "seeking foster parents with previous experience with persons who have a developmental disability and/or expertise in related areas."

youth,[41] only girls,[42] and only boys.[43] These exceptions undermine the State's claimed interest and show that the policy itself is not actually neutral and generally applicable—it is instead selectively enforced against religious groups with beliefs disliked by the State. Strict scrutiny must apply.

*Religious Targeting*. As the Supreme Court explained in *Lukumi*, "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt," and there are "many ways of demonstrating" that the government has impermissibly targeted a religious exercise. 508 U.S. at 533-34. Accordingly, all courts must "meticulously" assess government policies for "subtle departures from neutrality," and the "covert suppression of particular religious beliefs" *Id*. at 534 (internal citations omitted). Two such departures from neutrality occurred here.

First, the State's public statements and the record surrounding its

---

[41] Ruth Ellis Center, *Ruth's House*, http://www.ruthelliscenter.org/what-we-do/ruths-house/ (last visited Apr. 16, 2019). The State has also never indicated that it would investigate an agency for turning away parents based on religious beliefs the agency viewed as non-LGBTQ affirming.

[42] Guiding Harbor, *Girlstown Residential*, http://www.guidingharbor.org/programs/girlstown-residential/ (last visited Apr. 16, 2019).

[43] Boys to Men Group Home, LLC, *Who We Are*, http://www.boys2mengrouphome.com/about_us.html (last visited Apr. 16, 2019).

decision to penalize Catholic agencies show hostility by MDHHS decisionmakers toward St. Vincent's religious beliefs. Second, the State has expressly discriminated against St. Vincent by excluding it from participation in a government program based solely on its sincere religious beliefs.

*Government Hostility*. The Supreme Court has made clear that if "impermissible hostility toward . . . sincere religious beliefs" is the motivation for a government's "objection" to religious conduct, that government action is unconstitutional. *Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018). The Court in *Masterpiece* noted that Colorado had "disparage[d] [the baker's] religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere." *Id.* at 1729. In an opinion joined by seven Justices, the Court held that "[t]his sentiment is inappropriate for a Commission charged with the solemn responsibility of fair and neutral enforcement of . . . anti-discrimination law" *Id.* Further, the Court noted that government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* at 1721-22.

35

State officials have acted in a manner that passes judgment upon and presupposes the illegitimacy of St. Vincent's religious beliefs and practices. In September 2017, after the ACLU filed its lawsuit against the state, a high-ranking MDHHS official took it upon herself to file formal complaints against St. Vincent and other religious child welfare agencies based solely upon their religious practices. Ex.16. Defendant Nessel has repeatedly disparaged religious beliefs and practices like St. Vincent's. Prior to her election, she responded to the passage of PA 53 by stating "These types of laws are a victory for the hate mongers."[44] She also stated, "If you are a proponent of this type of bill, you honestly have to concede that you just dislike gay people more than you care about the needs of foster care kids."[45] Although she had previously stated that she would not defend the law she disagreed with, she instead decided to remain involved in the case and adopt an absurd interpretation of the law that rendered it meaningless.[46]   These actions show that public

---

[44] Fox 2 Detroit, *Opponents say adoption bill discriminates against gays and lesbians* (Mar. 4, 2015, 5:34 PM), http://www.fox2detroit.com/news/opponents-say-adoption-bill-discriminates-against-gays-and-lesbians.

[45] Rick Pluta, *Faith-based adoption bills headed to House floor,* Michigan Radio NPR (Mar. 4, 2015), https://www.michiganradio.org/post/faith-based-adoption-bills-headed-house-floor.

[46] Julie Williams, A*G Nessel to enter lawsuit in same-sex adoption bans,* WILX 10

36

officials in charge of the decisionmaking on these issues made statements evincing hostility, just as the Colorado commission did in *Masterpiece*, and also backed up those statements with adverse legal action against religious agencies.

***Express Discrimination.*** Any "policy [which] expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character . . . . imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017). In *Trinity Lutheran*, a religiously affiliated preschool was denied the "right to participate in a government benefit program" solely because of its "religious character." *Id.* at 2022. The Court emphasized that "[t]he express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant." *Id.* The Court also emphasized that the Government is also forbidden from "regulat[ing] or outlaw[ing] conduct

---

(Jan. 25, 2019), https://www.wilx.com/content/news/Michigan-AG-to-enter-lawsuit-in-same-sex-adoption-bans-504852332.html.

because it is religiously motivated," as well as "discriminat[ing] against 'some or all religious beliefs.'" *Id.* at 2021 (citation omitted).

St. Vincent has suffered the same express discrimination. The State has adopted a policy specifically designed to end government partnerships with religious groups based upon a disfavored religious belief. Like the church in *Trinity Lutheran*, these groups would be eligible to continue and renew their government contracts but for their religious beliefs.

If anything, this discrimination is more severe than *Trinity Lutheran*, since the state previously recognized that "Ensuring that faith-based child placing agencies can continue to provide adoption and foster care services will benefit the children and families who receive publicly funded services," and that "[t]o the fullest extent permitted by state and federal law, a child placing agency shall not be required to provide any services if those services conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs. . . ." Mich. Comp. Laws Ann. § 722.124e(1)(g), (2). The State then changed course and adopted a policy designed to exclude those—and only those—with a particular set of

religious practices. The State has specifically outlined a set of actions which are prohibited by the new policy, such as referring "LGBTQ individual or same-sex couple" to another agency or declining to complete a home study for an "LGBTQ individual or same-sex couple." *Dumont*, ECF No. 82 at 9.

Its actions demonstrate that the exclusion is not based upon any consistent application of state or federal law, but on the desire to penalize and marginalize groups based upon a particular, disfavored religious belief.[47]

### ii. *Defendants' policy does not survive strict scrutiny*

"Laws subject to strict scrutiny are presumptively unconstitutional and can only survive if they (1) serve a compelling state interest and (2)

---

[47] The State may point to *Teen Ranch v. Udow* as a contrary example, but that case is inapposite. First, it was decided before *Trinity Lutheran*, and relies on an expansive reading of *Locke v. Davey* that was expressly disclaimed in *Trinity Lutheran*. 137 S. Ct. at 2025 ("the Court today appropriately construes *Locke* narrowly") (Thomas, J., concurring in part). Second, the government contractor in *Teen Ranch* used government funding to run a program that was alleged to "coerce[] children into participating in religious activities." 479 F.3d 403, 406 (6th 2007). No such coercion occurs here. As the District Court explained, the State could exclude Teen Ranch from its government contracting program because the State is permitted to choose "not to fund a distinct category of instruction." *Teen Rach v. Udow*, 389 F.Supp.2d 827, 838 (W.D. Mich. 2005) (quoting *Locke v. Davey*, 540 U.S. 712, 720 (2004)). Here, there is no allegation that St. Vincent is using government funds to provide religious instruction, and the challenged activity (referring prospective parents to other agencies) is not funded by the State.

are narrowly tailored to achieve that interest." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). This is a demanding inquiry, as "[a] law that targets religious conduct . . . will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546.

***Compelling Interest.*** A compelling interest is an interest "of the highest order," of the type that would justify the most serious government infringements upon constitutional rights. *Lukumi*, 508 U.S. at 546. When considering a claim of compelling interest, courts must "look beyond broadly formulated interests and . . . scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in enforcing the [new policy] in these cases." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726–27 (2014) (internal quotations marks, alterations and citation omitted).

Here, the State has no compelling interest in closing down faith-based agencies; quite the opposite. As the State previously acknowledged, "[h]aving as many possible qualified adoption and foster parent agencies in this state is a substantial benefit to the children of this state who are in need of these placement services." [48] For that reason, the State worked

---

[48] Mich. Comp. Laws Ann. § 722.124e.

to create a system in which all families—regardless of sexual orientation or gender identity—are able to foster or adopt, while still allowing faith-based agencies to serve those in need consistent with their religious obligations. This system is in the best interest of children, families, and "all of the citizens of this state." *Id.* MDHHS cannot have a compelling interest in actions that undermine this goal.

MDHHS has no reason to enforce its policy specifically against St. Vincent. The State has done nothing to show why St. Vincent must certify and endorse same-sex relationships *even though* there are numerous other nearby agencies that could perform the same service, and gay couples who receive such certification services elsewhere can still adopt children in St. Vincent's care. What is more, closing down faith-based agencies will not make it any easier for same-sex couples to adopt—there will instead be fewer agencies available for all couples, which will likely cause more couples to seek to work with existing agencies, making it harder for all families to find an agency with resources to help them.

***Least Restrictive Means.*** The least-restrictive-means standard is "exceptionally demanding," and requires the government to "sho[w] that

41

it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby*, 573 U.S. at 728. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 815 (2000). A policy flunks this prong if "[the proffered] interests could be achieved by narrower ordinances that burde[n] [the right] to a far lesser degree." *Lukumi,* 508 U.S. at 546.

Here again, the State legislature has identified a less restrictive alternative: requiring faith-based agencies to make referrals to other agencies when they cannot serve a family based on their sincerely held religious beliefs, thus maximizing both the number of foster parents available and the number of foster children receiving homes. *See* Mich. Comp. Laws Ann. § 722.124e(4). This alternative has been the law of the land in Michigan for over three years, and there is no indication that during this period fewer families were certified or children were harmed as a result.

The evidence actually shows numerous positive changes during this period, including (1) an increase in the number of children discharged

42

from foster care to permanency within 24 months year-over-year from 2015 through 2017, (2) a decrease in number of children who reenter foster care within 12 months of discharge year-over year from 2015 through 2017, and (3) an increase in relative placement year-over-year from 2015 through 2017. Ex.13.

Nor is there any evidence that the State law has prevented same-sex couples from becoming foster parents. A less restrictive alternative exists and has been in place for years. MDHHS cannot argue that enforcing its anti-discrimination provision against every faith-based agency in the State is the only way of achieving its allegedly compelling interests.

### 2. *The State's policy violates the Free Speech Clause.*

#### i. *MDHHS' policy unconstitutionally compels speech by private actors.*

The First Amendment protects speakers from government attempts to "compel[] them to voice ideas with which they disagree." *Janus v. Am. Fed'n of State, Cty. & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018). It is "always demeaning" when speakers are "coerced into betraying their convictions," and forced "to endorse ideas they find objectionable." *Id.* Courts apply strict scrutiny to government actions that compel speech and expressive conduct, particularly when sincere religious beliefs are at

stake. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 716 (1977) (requirement to display state motto on license plates was compelled speech); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995) (using public accommodations law to force a parade to include an LGBTQ group was compelled speech).

Strict scrutiny applies here because Michigan is attempting to compel St. Vincent to engage in speech contrary to its religious beliefs. The State has threatened to take adverse action against St. Vincent if St. Vincent is not willing to perform home study assessments, which include written recommendations evaluating and approving LGBTQ and unmarried relationships and the suitability of placing children in those homes. As discussed above, MDHHS requires agencies performing a home study to assess the "[s]trengths and weaknesses" of the parents and the "[s]trengths of the relationship" between the couple, including "level of satisfaction" and "stability" of the relationship. Agencies are also required to assess the parents' "roles," "involvement," "styles," "childrearing techniques," and "values."[49] Assessment must also include

---

[49] Michigan Department of Health & Humans Services, *Initial Foster/Adoption Evaluation Form*, https://www.michigan.gov/documents/mdhhs/CWL-3130_527684_7.docx.

"[r]ole of religion in the family" and the "[r]elationship history" of the parents. *Id.* After making those assessments, agencies must provide written findings and recommendations to the State. *See id.*

St. Vincent cannot make such written recommendations when they contradict the Catholic teachings upon which the agency was founded. Nor does St. Vincent want to send the State written recommendations that all unmarried or LGBTQ couples who come to it are unsuitable for adoption. Rather, on this sensitive and important issue, St. Vincent stands aside and allows other qualified agencies to make recommendations on behalf of unmarried or LGBTQ couples. Ex.1, ¶8. But if St. Vincent will not agree to provide these written evaluations of same-sex couples, then it cannot continue to serve these children *at all*. This is an attempt to "compel[] them to voice ideas with which they disagree" in violation of the First Amendment. *Janus*, 138 S. Ct. at 2464. If St. Vincent refuses to speak the words the State demands, it will be forced to close its longstanding program. Such actions must face strict scrutiny.

### ii. *MDHHS' policy places an unconstitutional condition on St. Vincent's speech.*

Michigan's actions violate the Free Speech Clause for another

reason: governments cannot use a government funding program to silence unfunded, private speech they may find offensive. *Agency for Int'l Dev. v. AOSI*, 570 U.S. 205 (2013). *AOSI* involved a federal funding program requiring every group that received funds to have "a policy explicitly opposing prostitution and sex trafficking." *Id*. at 210. The Supreme Court held that requirement unconstitutional: "[T]he government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Id*. at 212. The government cannot "seek to leverage funding to regulate speech outside the contours of the program itself." *Id*. at 214-15.

As another illustration of an unconstitutional condition, the Court pointed to *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984). There, the government provided funding to noncommercial broadcasters, but as a condition on this funding "prohibited all editorializing, including with private funds." *AOSI*, 570 U.S. at 215-16. Thus, "even a station receiving only one percent of its budget from the Federal Government . . . was barred absolutely from all editorializing."

46

*Id.* at 216 (internal quotation marks and citation omitted). This condition "leveraged the federal funding to regulate the stations' speech outside the scope of the program," and was therefore unconstitutional. *Id.* The same is true here.

Michigan is attempting to compel speech that it does not pay for. Specifically, it is requiring agencies to provide certain written evaluations and recommendations regarding licenses for foster and adoptive families. Yet St. Vincent performs these services by using its own private funds accounted for under a separate cost center. The State does not list home studies as a "service" under its normal foster care or adoption contracts with St. Vincent, nor require any specific amount of home studies to be performed. Ex.1, ¶14. To the contrary, the State has demonstrated in other contexts that when it wants to specifically contract for and pay for home study services, it has a mechanism for doing so. St. Vincent has never entered into such a specific home study contract for any LGBTQ couples.  Ex.1, ¶12.

Home studies are St. Vincent's private speech and outside the scope of MDHHS' foster care and adoption funding programs. Michigan's attempts to condition St. Vincent's foster care and adoption contracts on

47

its willingness to provide this speech constitutes an unconstitutional condition on St. Vincent's private speech under *AOSI* and *League of Women Voters*.

Indeed, this is an even easier case than *AOSI*, where the organizations could forego government funding and "take a different tack with respect to" the policy question at issue. 570 U.S. at 225 (Scalia, J., dissenting). Here, without its contract with the government, St. Vincent cannot perform foster care or public adoption services *at all*. As the Supreme Court has recently recognized, the government may not wield licenses as a tool for "invidious discrimination of disfavored subjects." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2375 (2018). "[I]t is not forward thinking to force individuals to 'be an instrument for fostering public adherence to an ideological point of view [they] fin[d] un-acceptable.'" *Id.* at 2379 (citation omitted) (Kennedy, J. concurring). That is precisely what has happened here.

### 3. *Injunctive relief is warranted against the Federal Defendant.*

For all the reasons described above, the Plaintiffs' First Amendment rights have been violated. Injunctive relief is necessary against both the state and federal defendants. Attorney General Nessel has stated that

her unconstitutional actions were necessary in order to comply with federal regulations. Therefore, the Court should also issue injunctive relief against Defendant Azar so that HHS may not engage in unlawful enforcement actions, and so that Michigan cannot use the perceived threat of federal enforcement as an excuse to violate Plaintiffs' rights.

Nessel claims that 45 CFR 75.300(c), which prohibits sexual orientation discrimination in certain federally funded programs, applies here.[50] But HHS recently took the position that application of the non-discrimination provisions of 75.300(c) to a religious adoption agency would violate the federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. 2000bb.[51] Under RFRA, actions which substantially burden religious exercise must face strict scrutiny. 42 U.S.C. 2000bb-2. According to HHS, "sincere religious exercise would be substantially burdened by application of the religious nondiscrimination requirement

---

[50] Michigan Government, *Summary Statement of Dumont v. Gordon Settlement Agreement* (Mar. 22, 2019), https://www.michigan.gov/documents/ag/03.22.19_FINAL_Dumont_settlement_summary_650097_7.pdf.

[51] Letter from Steven Wagner, HHS Principal Deputy Assistant Secretary, Administration for Children and Families to Henry McMaster, Governor, South Carolina (Jan. 23, 2019), https://governor.sc.gov/sites/default/files/Documents/newsroom/HHS%20Response%20Letter%20to%20McMaster.pdf ("Wagner Letter").

of 75.300(c)."[52] Such enforcement would not further a compelling government interest, and "the interest of allowing potential foster parents into the SC Foster Care program appears capable of being served by other providers in the program."[53] Moreover, the "application of the regulatory requirement would also cause a significant programmatic burden for the SC Foster Care Program by impeding the placement of children into foster care."[54]

The same is true here. For all the reasons listed above, shutting down St. Vincent's adoption and foster care program would burden Plaintiffs' religious exercise. Application of 75.300(c) to St. Vincent does not further any compelling interest, particularly given any apparent lack of similar enforcement against private religious adoption agencies. In fact, application of this provision to religious child welfare agencies would impede the State's interest in ensuring more homes for children. The State also has an interest in complying with federal law, and federal law requires that agencies receiving federal funds not discriminate against

---

[52] *Id.* at 3.
[53] *Id.*
[54] *Id.*

religious service providers.[55] And, as Michigan itself has recognized, other less restrictive alternatives are available, such as referrals to other agencies. *See* Mich. Comp. Laws Ann. § 722.124e(4). Enforcement of 75.300(c) in the manner threatened here would violate federal law, and therefore the Court should enjoin any attempt to enforce 75.300(c) to burden St. Vincent's religious exercise.[56]

## B. Plaintiffs will be irreparably harmed absent an injunction.

"The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) Thus, "to the extent that [Plaintiff] can establish a substantial likelihood of success on the merits of its First Amendment claim, it also has established the possibility of

---

[55] *See* 42 U.S.C. § 604a(c) ("neither the Federal Government nor a State receiving funds under such programs shall discriminate against an organization which is or applies to be a contractor to provide assistance, or which accepts certificates, vouchers, or other forms of disbursement, on the basis that the organization has a religious character.").

[56] Such enforcement would also violate the First Amendment for all the reasons given above. Plaintiffs note that the substantial burden test used by RFRA has been used under the Free Exercise Clause in the past, prior to *Employment Division v. Smith*, and there is some indication that the Supreme Court may revisit *Smith*. *See Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019) (Alito, J., concurring). Plaintiffs reserve their right to argue that *Employment Division v. Smith* should be overturned and that they should prevail under either test.

irreparable harm as a result of the deprivation of the claimed [First Amendment] rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). In addition to the loss of their First Amendment rights, St. Vincent will be forced to close its foster care and adoption ministries, and all the families that rely on St. Vincent for crucial support could lose the opportunity to care for children in need. This would harm the Bucks and other families who depend on St. Vincent for support, as well as Shamber Flore, the Bucks, and others who exercise their faith by volunteering at St. Vincent.

## C. An injunction is in the public interest.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994).

Here, even apart from Plaintiffs' constitutional claims, the public interest is best served by ensuring that at-risk children are placed with loving foster parents and that children seeking adoption can quickly find permanency. Michigan has already conceded this point in law. *See* Mich. Comp. Laws Ann. § 722.124e(1). Closing one of the best foster care and adoption agencies in the State does not advance that interest.

52

### D. The balance of the equities favors Plaintiffs.

Finally, harm to Plaintiffs "should the preliminary injunction not be issued must be weighed against the harm to others from the granting of the injunction." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998). This factor also supports granting an injunction. Compared to the irreparable harms suffered by Plaintiffs, Defendants or others will not suffer any harm were this Court to maintain the *status quo* pending final resolution of Plaintiffs' claims. St. Vincent has worked with the State for decades, and has served those in need through its foster care and adoption ministries for over 75 years. Gay couples interested in adopting and who receive their certification through another agency can still adopt children in St. Vincent's care at any time. There is no reason that St. Vincent's continued operation during the course of this litigation will harm the State or children in need.

### CONCLUSION

For all the foregoing reasons, the Court should enjoin the Defendants from violating Plaintiffs' constitutional and statutory rights and enter a preliminary injunction preserving the status quo.

53

Dated: April 16,  2019

Respectfully submitted,

/s/ *Lori Windham*
Lori Windham
Mark Rienzi*
Nicholas Reaves*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
(517) 342-2522
wbloomfield@dioceseoflansing.org

*Counsel for Plaintiffs*
**Admission pending*

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of LR 7.2(B)(i) because, excluding the parts exempted by LR 7.2(B)(i), it contains 10,748 words. The word count was generated using Microsoft Word 2016.

/s/ *Lori Windham*
Lori H. Windham
Mark L. Rienzi*
Nicholas R. Reaves*
Counsel for Intervenor-Defendants
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700 Washington, DC, 20036
Tel.: (202) 955-0095
Fax: (202) 955-0090
mrienzi@becketlaw.org

*Counsel for Plaintiffs*
*\*Admission pending*