UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA BUCK, *et al.*,

    Plaintiffs,

v.

ROBERT GORDON, *et al.*,

    Defendants.
_____/

CASE NO. 1:19-CV-286

HON. ROBERT J. JONKER

## ORDER

Plaintiffs Melissa Buck, Chad Buck, Shamber Flore, and St. Vincent Catholic Charities bring this lawsuit alleging violations of their rights under the First and Fourteenth Amendments of the Constitution and under the Religious Freedom and Restoration Act, 42 U.S.C. § 20000bb. (Compl., ECF No. 1.) Defendants Robert Gordon, Director of the Michigan Department of Health and Human Services; Herman McCall, Executive Director of the Michigan Children's Services Agency; and Dana Nessel, Attorney General of Michigan (collectively, the "State Defendants") contend that the case belongs in the Eastern District of Michigan and move to transfer the case. (ECF No. 29). Movants Kristy Dumont and Dana Dumont (collectively, the "Dumonts") seek leave to intervene. (ECF No. 18.) Defendant Alex Azar, Secretary of the United States Department of Health and Human Services, takes no position as to the propriety of transfer or intervention. The Court heard oral argument on the Motion to Transfer and Motion to Intervene during the Rule 16 scheduling conference held on June 26, 2019. This is the decision of the Court.

## BACKGROUND[1]

      A.      *St. Vincent and the Michigan Foster and Adoptive Process*

Plaintiff St. Vincent Catholic Charities ("St. Vincent") is a Michigan non-profit corporation organized for charitable and religious purposes and affiliated with the Catholic Diocese of Lansing, Michigan. (*Id.*, Page ID.2, 4.) St. Vincent "exercises its faith and carries out [its] religious mission … through its foster care and adoption ministries." (*Id.*, PageID.4.) St. Vincent serves as a foster care and adoption agency under foster and adoptive services contracts with Defendant Michigan Department of Health and Human Services ("MDHHS"). (*Id.*, PageID.2, 4.)[2] In Michigan, only agencies that contract with MDHHS to perform foster care placements and public adoptions may perform these services. (*Id.*, PageID.13.) "St. Vincent would not be able to provide its foster care or adoption ministry without a license and contract from the State…." (*Id.*)

St. Vincent is one of over ninety different private child placing agencies ("CPA") operating throughout the State of Michigan. (*Id.*, PageID.11.) Among other things, CPAs assist prospective adoptive or foster parents in becoming certified to foster or adopt children.[3] As part of the certification process, a prospective foster or adoptive must participate in a home study with either MDHHS or a private agency, "to assess whether the applicant's home is appropriate and suitable for the placement of foster or adoptive children." (*Id.*, PageID.14, 16.) After conducting a home study, the CPA assisting a prospective family with the certification process prepares a report and licensing recommendation for MDHHS that "analyzes the relationships in the home and provides

---

[1] The Court is reciting the allegations of the complaint for the purpose of framing the motions to transfer and to intervene. The Court makes no factual findings here.
[2] St. Vincent has helped Plaintiffs Chad and Melissa Buck foster and then adopt five children with special needs and trauma from past abuse. (*Id.*, PageID.2.) The Bucks contribute to St. Vincent by, among other things, recruiting and supporting other foster and adoptive parents. (*Id.*, PageID.3.) Plaintiff Shamber Flore was adopted as a result of St. Vincent's work. (*Id.*) She serves St. Vincent by providing mentoring and support for children and families healing from past trauma. (*Id.*)
[3] To adopt a child in Michigan, a family must become a certified pre-adoptive home. (*Id.*, PageID.14.)

a recommendation regarding placing children in that home." (*Id.*, PageID.18.) It is up to the State to provide final approval and licensing. (*Id.*) St. Vincent understands the report and licensing recommendation it provides to the State to be "a written approval of the relationships in the home and confirmation that the agency has determined the home is suitable for the placement of children." (*Id.*)

"St. Vincent shares the religious beliefs and teachings of the Catholic Church regarding same-sex marriage." (*Id.*, PageID.25.) St. Vincent states that it "would never stop a family who wants to foster or adopt from having the opportunity to complete the application and home study process." (*Id.*) If St. Vincent is not able to work with a prospective adoptive foster or adoptive family -- including an unmarried or same-sex couple -- because of St. Vincent's religious beliefs, St. Vincent provides the couple with the list of other area agencies who do not share its religious beliefs and could assist them in becoming foster or adoptive parents." (*Id.*, PageID.14.) Through the State's central adoption portal, the Michigan Adoption Resource Exchange (M.A.R.E.), "any foster family, including a same-sex or unmarried couple, can be connected to a private child placing agency, become a certified pre-adoptive home, and then adopt a child that is currently placed in a foster home serviced by a different agency, including St. Vincent." (*Id.*) Prospective parents, including same-sex and unmarried couples, who are "interested in adopting a child in St. Vincent's care need not work directly with St. Vincent to adopt that child, but may work with another agency." (*Id.*) "[N]o same-sex couple has been prevented from fostering or adopting a child by St. Vincent." (*Id.*, PageID.14.)

The State's adoptive services contract with St. Vincent includes a provision that states:

> The Contractor shall comply with the DHHS non-discrimination statement:

> Michigan Department of Health and Human Services (DHHS) will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs or disability.
>
> The above statement applies to all applications filed for adoption of DHHS supervised children, including DHHS supervised children assigned to a contracted agency.

(ECF No. 34-6, PageID.1022.) The State's foster care services contract with St. Vincent likewise provides that the Contractor "shall comply with the MDHHS non-discrimination statement." (ECF No. 34-7, PageID.1048.)

### B.   The Dumont Litigation

Historically, the State of Michigan has permitted St. Vincent to refer prospective parents to other agencies if St. Vincent's sincerely held religious beliefs prevented it from assisting with the certification and licensing recommendation process. In 2017, the ACLU on behalf of two same-sex couples sued MDHHS for permitting this practice, alleging violations of the Establishment and Equal Protection clauses of the Constitution. (*Id.*, PageID.29.) The lawsuit, *Dumont v. Lyon*, No. 17-cv-13080 (E.D. Mich. Sept. 20, 2017), "alleged that these couples had approached Bethany Christian Services and St. Vincent Catholic Charities seeking to adopt a child, but were referred to another agency based on their sexual orientation." (*Id.*) Plaintiffs St. Vincent, Chad and Melissa Buck, and Shamber Flore sought and were granted leave to intervene in the *Dumont* case on the side of the State defendants in that case. (*Id.*, PageID.29-30.) As intervenors, St. Vincent, the Bucks, and Ms. Flores argued that "the State's decision to contract with St. Vincent and other faith-based agencies did not violate the Constitution and was protected under state and federal law." (*Id.*)

Following the general election in November of 2018, new leaders took over in Michigan, and the position of the State defendants changed from that of St. Vincent, the Bucks, and Ms.

Flore. In January 2019, the State of Michigan and ACLU entered into settlement discussions in the *Dumont* case. (*Id.*, PageID.32.) The ACLU and the State announced a settlement on March 22, 2019. (*Id.*) Intervenor defendants St. Vincent, the Bucks, and Ms. Flores were not party to the settlement negotiations or eventual agreement. (*Id.*) In a joint motion for a stipulated dismissal of the *Dumont* case, the ACLU and State noted that the intervenor defendants had neither asserted claims nor had claims asserted against them. (*Id.*) The court granted the motion for stipulated dismissal, dismissing the plaintiffs' claims against the State "with prejudice pursuant to the terms of the Settlement Agreement" and retaining jurisdiction over the enforcement of the Settlement Agreement under *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) and its progeny. ECF No. 31-6, PageID.746-47.) The court was not asked to approve or disapprove the terms of settlement. Nor did the court reach a final merits determination one way or the other on the issues.[4]

Among other things, the Settlement Agreement provides:

> Unless prohibited by law or court order:
>
> a. The Department shall continue including in Contracts, and shall continue requiring all Contractors to include in Subcontracts, the Non-Discrimination provision, or a materially and substantially similar provision….
>
> b. For the avoidance of doubt, policies and practices prohibited under the Non-Discrimination Provision include, without limitation,
>
> i. turning away or referring to another contracted CPA an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a Contract or a Subcontract;
>
> ….

---

[4] The court denied a motion to dismiss filed by the State defendants and intervening defendants St. Vincent, Chad and Melissa Buck, and Shamber Flore. *Dumont v. Lyon*, 341 F.Supp.3d 706 (E.D. Mich. 2018). In denying the motion, the court allowed the Dumont plaintiffs' claims under the Establishment Clause of the First Amendment and Due Process Clause of the Fourteenth Amendment to proceed. The court explicitly described as "premature" and based on "contested matters outside the pleadings" St. Vincent's attempt to assert as an affirmative defense that an order preventing the State from permitting faith-based CPAs would violate St. Vincent's rights under the First Amendment. *Id.* at 548-49. The court explained that at the motion to dismiss stage, "the only issue before the Court [is] whether Plaintiffs have adequately pleaded cognizable Establishment Clause and Equal Protection claims." *Id.* at 749.

>> iii.    refusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a Contract or a Subcontract; and
>
> ….
>
> d.    The Department shall require all Contractors to enforce the Non-Discrimination provision or Similar Provision against a CPA that the Contractor or the Department determines is in violation of, or is unwilling to comply with, such provisions … up to and including termination of the Subcontracts … including without limitation:
>
>> i.    In the event a CPA refuses to comply with the Non-Discrimination Provision or Similar Provision within a reasonable time after notification by the Contractor or the Department of a Subcontract Violation, the Department will require the Contractor to terminate the CPA's Subcontracts."

(ECF No. 31-5, PageID.719-720.)

### C.    The Federal Defendant

Michigan relies on both state and federal funds to administer its foster care and adoption programs. (*Id.*, PageID.21.) Federal regulations impose conditions on the federal funds, including a condition that "'no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation.'" (*Id.*, PageID.22, quoting 45 C.F.R. § 75.300(c)). St. Vincent alleges on information and belief that the State Defendants recently have interpreted federal regulations to "operate to require the State to force St. Vincent to violate its sincere religious beliefs by providing home studies for same-sex relationships." (*Id.*, PageID.22-23.) St. Vincent alleges that if it fails to comply, "MDHHS will cut St. Vincent's funding and refuse to continue contracting with the agency." (*Id.*, PageID.23.) Plaintiffs assert that Attorney General Nessel interprets State

policies and federal regulations "to require the State to deny agencies like St. Vincent religious exemptions from allegedly applicable anti-discrimination laws." (*Id.*, PageID.34.) St. Vincent notes that its adoption contract with the State is up for renewal in October 2019 and that it fears the State will refuse to renew the contract because of St. Vincent's religious beliefs and practices. (*Id.*, PageID.37.)

### D. The Relief Requested in this Case

In this lawsuit, Plaintiffs claim that: (1) Defendants have violated the Free Exercise Clause of the First Amendment by "adopting a policy requiring the State to discriminate against child placing agencies with religious objections to same-sex marriage" and granting individualized exemptions from child placing agency requirements selectively (*Id.*, PageID.42-46 ); (2) Defendants have violated the Free Speech Clause of the First Amendment by "conditioning St. Vincent's license, its contracts with MDHHS, and the ongoing ability to engage in the religious exercise of helping children in need, on St. Vincent's willingness to make [affirmative statements that contradict St. Vincent's religious beliefs];" (3) Defendants have retaliated against Plaintiffs for protected speech and religious exercise, in violation of the Free Exercise and Free Speech clauses of the First Amendment; (4) Defendants have violated the Free Exercise and Establishment Clauses of the First Amendment by applying laws in a manner that selectively penalizes Plaintiffs for their religious beliefs; (5) Defendants have violated the Equal Protection Clause of the Fourteenth Amendment by penalizing Plaintiffs because of their religious beliefs while allowing contractors espousing contrary religious beliefs to maintain contractual relationships with the State; and (6) Defendants have violated the RFRA by enforcing federal law in a manner that substantially burdens Plaintiffs' sincere religious exercise without a compelling government

interest and through a means more restrictive than necessary to achieve the stated interest. Plaintiffs seek declaratory and injunctive relief.

The State Defendants disagree with Plaintiffs on the merits of their claims. But for present purposes, the key claim of the State Defendants is that this case amounts to an attack on the *Dumont* settlement and should be transferred to the Eastern District of Michigan.[5] Proposed Intervenors Kristy and Dana Dumont seek leave to intervene principally to preserve their interests under the Settlement Agreement. They also disagree with Plaintiffs on the merits and support a transfer of venue. The Court considers the motions in turn.

### 1. MOTION TO TRANSFER

The State Defendants seek transfer of the case to the Eastern District of Michigan under 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Plaintiffs oppose the motion to transfer. For the following reasons, the Court finds that transfer under § 1404(a) is not appropriate.

#### A. *Legally Proper Venue*

First, venue in the Eastern District of Michigan would be improper, and so the case could not have been brought there in the first instance. This case includes as a defendant an officer or employee of the United States acting in his or her official capacity, and so 28 U.S.C. § 1391(e) controls proper venue. Any such action

> may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

---

[5] The State Defendants move, in the alternative, for dismissal of the case altogether. If this Court retains the case, it will address those issues as part of the preliminary injunction proceedings.

> (C) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action and in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

28 U.S.C. § 1391(e)(1). All parties agree that the controlling provision is section 1391(e)(1)(A), but they disagree on how it applies here. The State Defendants agree no federal defendant resides in the Eastern District, but they contend that at least one State Defendant does, and that is enough under the plain language of the statute. Plaintiffs posit that "a defendant" refers only to a federal defendant, none of whom reside in the Eastern District. If Plaintiffs are correct, transfer to the Eastern District would be legally improper.

The Court finds that the reference in § 1391(e)(1)(A) to "a defendant" refers only to a federal defendant. Any other construction would make the reference to "additional persons" who may be joined as parties subject to "such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party" entirely superfluous. The authoritative commentary on federal procedure agrees. Wright and Miller state explicitly that § 1391(e)(1)(A) "applies only to proper federal defendants." 14D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3815 (4th ed. 2013). Venue is determined separately for non-federal defendants. *Id.* Courts concur: *See, e.g., A.J. Taft Coal Co., Inc. v. Barnhart*, 291 F. Supp. 2d 1290, 1300-1301 (N.D. Ala. 2003) (noting that § 1391(e) does not confer venue as to non-federal defendants) (citing *Lamont v. Haig*, 590 F.2d 1124, 1128-29 (D.C. Cir. 1978)); *Reuben H. Donnelly Corp. v. F.T.C.*, 580 F.2d 264, 266-67 (1978) (noting that venue under § 1391(e)(1) "is proper in any district in which 'a (federal) defendant resides.'"); *Rogers v. Civil Air Patrol*, 129 F.Supp. 1334, 1338 (M.D. Ala. 2001) ("This court … holds that the term 'a defendant' in section 1391(e)(1) refers only to a federal officer or agency defendant in the case, and not to 'any'

defendant, including a non-federal one. Non-federal defendants are governed by the 'additional persons' provisions of the section.").[6]

Accordingly, the Court finds that 28 U.S.C. § 1391(e)(1)(A) limits venue to the districts in which a federal defendant resides, which does not include the Eastern District of Michigan for any federal defendant in this case. The State Defendants identify no other basis in § 1391(e) for venue in the Eastern District of Michigan. Under these circumstances, transfer under § 1404(a) is legally improper, because the case could not have been brought there properly in the first instance.

### B. *The Focus of the Case and the Dumont Settlement*

The State Defendants contend that transfer is warranted because this case amounts to an attack on the *Dumont* Settlement Agreement. This at least implicitly suggests that venue might be supported under section 1391(e)(1)(B), though no party has made that explicit claim. With or without consideration of the *Dumont* settlement, the Western District of Michigan is properly the venue for this case because the parties, the proposed intervenors, and the issues have their roots here, and because the *Dumont* settlement is not under attack in this case.

The Plaintiffs themselves are all residents of the Western District of Michigan. St. Vincent was originally incorporated by the Roman Catholic Bishop of Lansing; is affiliated with the Catholic Diocese of Lansing; and provides foster and adoption services in Lansing, which is in the Western District of Michigan. (ECF No. 1, PageID.4-5; ECF No. 1-1, PageID.62.) Chad and Melissa Buck live in Holt, Michigan, near Lansing. (*Id.*, PageID.6.) Ms. Flore resides in Lansing. (ECF No. 46, PageID.1727.) Moreover, the seat of government for the State of Michigan is the City of Lansing. All the State Defendants maintain offices in Lansing. Even the proposed

---

[6] To the extent the State Defendants argue that these cases lack precedential value because the cases pre-date the 2011 amendments to § 1391(e), the argument is unpersuasive. *See* 14D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3815 (4th ed. 2013) (noting that the 2011 amendments "change[d] subheadings and made no substantive changes" in the four choices § 1391(e) provides).

intervenors reside in the Western District of Michigan.[7] The constitutional and statutory rights Plaintiffs seek to vindicate involve their ability to speak and practice their religion freely in this District without interference or retaliation by the governmental Defendants, as alleged in the Complaint. And the proposed intervenors say they were improperly turned away in the Western District. The Western District of Michigan is the natural focus of the case for venue purposes.

Nothing in the *Dumont* litigation or settlement changes that. In the first place, Plaintiffs have not asked for any relief directed toward to the Settlement Agreement itself. Nor have Plaintiffs sought any relief that calls for interpretation of the Settlement Agreement's terms. Second, if Plaintiffs ultimately prevail on their constitutional and statutory claims here, and if that relief calls for the State Defendants to take action or refrain from acting in some manner covered by the Settlement Agreement, the parties to the Settlement Agreement already contemplated and provided for that by building an escape clause into their agreement: **"Unless prohibited by law or court order**…[the] Department shall continue including in Contracts, and shall continue requiring all Contractors to include in Subcontracts, the Non-Discrimination Provision, or a materially and substantially similar provision…." (ECF No. 31-5, PageID.719) (emphasis added). All sides recognize that law will trump any contrary contractual provisions. Third, the Plaintiffs never had the incentive or opportunity to raise their claims in *Dumont* because until the settlement happened, they were aligned with the State defendants. When the position of the State Defendants changed after the 2018 general election, the settlement occurred without the input of Plaintiffs or approval of the court. Subsequent litigation like this was the inevitable next step following the

---

[7] *See* ECF No. 31-2, Exhibits to Mot. to Transfer, at PageID.628 (the Dumonts assert in their Eastern District of Michigan Complaint (¶ 19) that they reside in Dimondale, Michigan). Dimondale is in Eaton County, which is part of the Western District of Michigan. 28 U.S.C. § 102(b)(1).

11

private settlement. The proper and natural venue for that inevitable next step was the Western District of Michigan.

      C.      *Public and Private Interest Factors*

As the case could not have been brought in the Eastern District of Michigan, where venue would be improper under § 1391(e), the Court lacks discretion to transfer the case under § 1404(a). Even assuming it had such discretion, the Court would not transfer the case. Courts in the Sixth Circuit consider six private interest factors in deciding the propriety of transfer under § 1404(a): (1) convenience of the parties and witnesses; (2) accessibility of evidence; (3) availability of process to require reluctant witnesses to testify; (4) the costs of obtaining willing witnesses; (5) the practicalities of trying the case "expeditiously and inexpensively"; and (6) the interests of justice. *Reese v. CNH America LLC*, 574 F.3d 315, 320 (6th Cir. 2009). Public interest factors include (1) the enforceability of the judgment; (2) practicalities of trial management; (3) docket congestion; (4) the local interest in deciding local controversies; (5) public policy of the fora; and (6) the familiarity of the trial judge with applicable state law. *Steelcase, Inc. v. Smart Technologies, Inc.*, 336 F.Supp.2d 714, 719 (W.D. Mich. 2004). Unless the balance of factors strongly favors the defendant, a plaintiff's choice of forum "should rarely be disturbed." *Reese*, 574 F.3d at 320 (quotation marks omitted).

The balance of factors disfavors transfer. All the factors either weigh in favor of keeping the case in the Western District of Michigan or are neutral. The Western District of Michigan is the more convenient forum, because Plaintiffs, State Defendants, and Dumonts all reside or maintain offices in the Western District. The most likely witnesses, including, without limitation, the individual plaintiffs, St. Vincent's employees, and State employees, generally reside or are based in or around Lansing, Michigan, in the Western District. For this reason, the cost of obtaining

their testimony is likely to be lower in the Western District than in the Eastern District, and this Court's subpoena power is more likely to reach unwilling witnesses. The practicalities of trying the case expeditiously and inexpensively do not favor transfer. The State Defendants argue that the Eastern District court has greater familiarity with the issues, but Plaintiffs are bringing different claims in this case. The interests of justice favor keeping the case in the Western District, which is where the alleged unconstitutional conduct occurs. Injunctive relief and a judgment in this case would be more easily enforced in the Western District of Michigan, where State agencies and St. Vincent reside. Docket congestion is a neutral factor here, as are the public policies of the fora and familiarity with state law.

The State Defendants suggest that Plaintiffs' bringing the lawsuit in the Western District amounts to forum shopping. The Court disagrees. There is nothing unusual about plaintiffs bringing a case in the judicial district in which they reside, especially when that is also the district where all State Defendants, and the proposed intervenors reside or maintain offices. The private Settlement Agreement in the earlier litigation does not convert this natural choice to forum selection. Plaintiffs are not parties to the Settlement Agreement. They were not asked to be part of the Settlement Agreement. And their claims do not challenge the Settlement Agreement.

### 2. MOTION FOR LEAVE TO INTERVENE

FED. R. CIV. P. 24 provides for intervention of right for a proposed intervenor who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." To intervene as of right, a proposed intervenor must establish "(1) that the motion to intervene was timely; (2) that they have a substantial legal interest in the subject matter of the case; (3) that their ability to protect

that interest may be impaired in the absence of intervention; and (4) that the parties already before the court may not adequately represent their interest." *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999). FED. R. CIV. P. 24 provides for permissive intervention if a proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact."

The proposed intervenors rest their claim for intervention as of right on their interest in maintaining the Settlement Agreement. But that is an insufficient basis to support intervention as of right for at least two reasons. First, Plaintiffs are not asking for any relief directed at the Settlement Agreement itself. They do not seek to interpret its terms. Nor do they seek to invalidate any of its terms. From Plaintiffs' point of view, the Settlement Agreement is beside the point and irrelevant to the constitutional and statutory claims asserted. Second, the State is fully capable of protecting any interest the Dumonts have in the terms of the Settlement Agreement in any event. The State Defendants and the Dumonts are fundamentally aligned at this time in not only their views of the Settlement Agreement, but also their views of the merits (or more accurately, the demerits) of Plaintiffs' claims.

It is possible to imagine a basis for permissive intervention if the interests of the State Defendants and the proposed intervenors diverge; or if the Court grants some or all of the preliminary injunctive relief Plaintiffs seek in a way that potentially affects the Dumonts in some way it does not affect the State Defendants; or if later developments in the case create a basis for defenses or counterclaims – Establishment Clause theories, for example – that may be uniquely available to the Dumonts. But that is not where the case presently is. At this point the proposed intervenors and the State Defendants are aligned in all material respects. The unique contribution of the Dumonts can be fully provided through their participation as amicus parties, which the Court welcomes.

## CONCLUSION

For these reasons, the Court concludes that neither the requested transfer nor the requested leave to intervene is warranted.

**ACCORDINGLY, IT IS ORDERED**:

1. The State Defendants' Motion to Transfer (ECF No. 29) is **DENIED**.

2. The Motion to Intervene (ECF No. 18) is **DENIED** without prejudice to the ability to renew the motion at a later point in the case. The Proposed Motion to Transfer Case (ECF No. 21) is **DISMISSED AS MOOT**.

3. Movants Kristy and Dana Dumont may participate as amici curiae in the case.

4. A hearing on Plaintiffs' Motion for Preliminary Injunction (ECF No. 5) is set for **August 22, 2019 at 2:00 p.m.**, 699 Federal Building, Grand Rapids, Michigan, before the undersigned.

Dated:    July 31, 2019                    /s/ Robert J. Jonker
                                                                                          ROBERT J. JONKER
                                                                                          CHIEF UNITED STATES DISTRICT JUDGE