# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                               :

MELISSA BUCK; CHAD BUCK; SHAMBER   :
FLORE; ST. VINCENT CATHOLIC        :
CHARITIES,                         :
                               :

            Plaintiffs,           :

                               :        No. 1:19-cv-00286-RJJ-PJG

          v.                  :

                               :        HON. ROBERT J. JONKER

ROBERT GORDON, in his official capacity as   :
the Director of the Michigan Department of   :
Health and Human Services; JOOYEUN    :     **KRISTY AND DANA DUMONT'S**
CHANG, in her official capacity as the      :  **BRIEF AMICI CURIAE IN SUPPORT**
Executive Director of the Michigan Children's  :  **OF THE STATE'S OPPOSITION TO**
Services Agency; DANA NESSEL, in her    :    **PLAINTIFFS' MOTION FOR**
official capacity as Attorney General of      :     **PRELIMINARY INJUNCTION**
Michigan; ALEX AZAR, in his official capacity  :
as the Secretary of the United States Department  :    **ORAL ARGUMENT REQUESTED**
of Health and Human Services; UNITED    :
STATES DEPARTMENT OF HEALTH AND   :
HUMAN SERVICES,                :
                               :

           Defendants.        :
                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ....................................................................................1

PRELIMINARY STATEMENT ...................................................................................2

BACKGROUND ............................................................................................................4

      A.    Michigan's Child Welfare System...............................................................4

      B.    Michigan Contracts with Private Agencies To Care for Children. ..............5

      C.    The Contracts Prohibit Agencies from Discriminating Against
            Prospective Parents Based on Sexual Orientation ......................................6

      D.    The *Dumont* Plaintiffs Were Turned Away by State Contractors and
            Filed Suit. ..................................................................................................6

LEGAL STANDARD.....................................................................................................8

ARGUMENT ..................................................................................................................9

  I.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF
        PREVAILING ON ANY CLAIMS ............................................................9

      A.    Plaintiffs Will Not Prevail on Their Free Exercise Claims........................9

      B.    Plaintiffs Will Not Prevail on Their Free Speech Claim Because
            Defendants Have Not Compelled Any Private Speech.............................19

      C.    Plaintiffs Cannot Succeed on the Merits Because, if the State Were To
            Allow STVCC To Use Religious Criteria To Exclude Qualified
            Families, It Would Violate the Establishment Clause ..............................21

      D.    Plaintiffs Cannot Succeed on the Merits Because, Were the State To
            Allow STVCC To Turn Away Same-Sex Couples, It Would Violate
            the Equal Protection Clause .....................................................................24

  II.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE
        HARM IN THE ABSENCE OF PRELIMINARY RELIEF ...............................25

  III.  THE BALANCE OF THE EQUITIES REQUIRES DENYING
        PLAINTIFFS' REQUESTED RELIEF ................................................................27

  IV.  EXPERT TESTIMONY DEMONSTRATES THAT AN INJUNCTION
        WOULD HARM THE PUBLIC INTEREST........................................................29

CONCLUSION..............................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev.* v. *All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) .................................................................................................10, 21

*Bd. of Educ. of Kiryas Joel Village Sch. Dist.* v. *Grumet*,
    512 U.S. 687 (1994) .................................................................................................22, 23

*Bonnell* v. *Lorenzo*,
    241 F.3d 800 (6th Cir. 2001) ...................................................................................9, 29

*Bowen* v. *Kendrick*,
    487 U.S. 589 (1988) .....................................................................................................23

*Campaign for S. Equality* v. *Miss. Dep't of Human Servs.*,
    175 F. Supp. 3d 691 (S.D. Miss. 2016) ......................................................................26

*City of Boerne* v. *Flores*,
    521 U.S. 507 (1997) .....................................................................................................34

*City of Cleburne* v. *Cleburne Living Ctr.*,
    473 U.S. 432 (1985) .....................................................................................................25

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*,
    508 U.S. 520 (1993) .........................................................................................13, 14, 15

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter Day Saints* v.
    *Amos*,
    483 U.S. 327 (1987) .....................................................................................................25

*Cutter* v. *Wilkinson*,
    544 U.S. 709 (2005) .....................................................................................................25

*Doe* v. *Porter*,
    370 F.3d 558 (6th Cir. 2004) .......................................................................................22

*Dumont* v. *Lyon*,
    341 F. Supp. 3d 706 (E.D. Mich. 2018) .............................................................. *passim*

*Edwards* v. *Aguillard*,
    482 U.S. 578 (1987) .....................................................................................................23

*Emp't Div., Dept. of Human Res.* v. *Smith*,
    494 U.S. 872 (1990) ................................................................................................12

*Estate of Thornton* v. *Caldor, Inc.*,
    472 U.S. 703 (1985) ................................................................................................25

*Fulton* v. *City of Phila.*,
    922 F.3d 140 (3d Cir. 2019) ............................................................... *passim*

*Larkin* v. *Grendel's Den*,
    459 U.S. 116 (1982) ..........................................................................................22, 23

*Lehr* v. *Robertson*,
    463 U.S. 248 (1983) ................................................................................................25

*Masterpiece Cakeshop, Ltd.* v. *Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) ...................................................................... *passim*

*New Hope Family Servs., Inc.* v. *Poole*,
    2019 WL 2138355 (N.D.N.Y. May 16, 2019) ................................................13, 20

*Obergefell* v. *Hodges*,
    135 S. Ct. 2584 (2015) ..........................................................................................26

*Ondo* v. *City of Cleveland*,
    795 F.3d 597 (6th Cir. 2015) ................................................................................26

*Overstreet* v. *Lexington-Fayette Urban Cty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ..................................................................................9

*Rust* v. *Sullivan*,
    500 U.S. 173 (1991) ................................................................................................10

*Santa Fe Indep. Sch. Dist.* v. *Doe*,
    530 U.S. 290 (2000) ................................................................................................24

*Smith* v. *Jefferson Cty. Bd. of Sch. Comm'rs*,
    788 F.3d 580 (6th Cir. 2015) ................................................................................24

*Taylor Novelty, Inc.* v. *City of Taylor*,
    816 F.2d 682 (6th Cir. 1987) ................................................................................27

*Teen Ranch* v. *Udow*,
    389 F. Supp. 2d 827 (W.D. Mich. 2005) ................................................11, 20, 21

*Townsend* v. *Ouellette*,
    2018 WL 286427 (W.D. Mich. Jan. 4, 2018) ........................................................34

*Trinity Lutheran Church of Columbia, Inc.* v. *Comer*,
    137 S. Ct. 2012 (2017)..........................................................................................18, 19

*Ward* v. *Polite*,
    667 F.3d 727 (2012) ...........................................................................................14

*Wills* v. *Dreybeck*,
    2013 WL 3287986 (W.D. Mich. June 28, 2013) .....................................................9

*Windsor* v. *United States*,
    699 F.3d 169 (2d Cir. 2012), ...............................................................................26

*Winter* v. *Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..........................................................................................10, 27

## Statutes and Other Authorities

45 CFR 75.300 .......................................................................................................34

Fed. R. App. P. 4 ....................................................................................................9

Fed. R. Civ. P. 25 ..................................................................................................2

Mich. Admin. Code R. 400 et seq. ......................................................................6, 21

Mich. Comp. Laws § 400 et seq. .........................................................................6

Mich. Comp. Laws § 722 et seq. ...................................................................... *passim*

U.S. Const. ....................................................................................................... *passim*

## CONCISE STATEMENT OF REASONS
## <u>SUPPORTING POSITION OF AMICI CURIAE</u>

Plaintiffs have not demonstrated that they meet any of the four requirements for preliminary injunctive relief.  (1)  Plaintiffs will not succeed on the merits of their Free Exercise claim because St. Vincent Catholic Charities ("STVCC") voluntarily entered the public sphere to perform taxpayer-funded child welfare services for the State—and, in doing so, voluntarily executed a contract containing a non-discrimination provision.  That provision, and the settlement agreement in *Dumont* v. *Gordon* requiring the State to retain and enforce such a provision without exception, do not violate Plaintiffs' Free Exercise rights.  To the contrary, they are neutral policies that apply to all state-contracted agencies, regardless of any agency's rationale for breaching its contract with the State. Plaintiffs' Free Speech claim will not succeed because, in choosing to carry out government services under contract with the State, STVCC is not engaging in private speech.  Plaintiffs' claims cannot succeed because the relief requested—an injunction requiring the State to permit contracted agencies providing public child welfare services on its behalf to use religious criteria to exclude prospective foster and adoptive families headed by same-sex couples—would violate the Establishment and Equal Protection Clauses. (2) Plaintiffs have not demonstrated that they would suffer irreparable harm in advance of trial, which, subject to the Court's schedule, should occur quickly given the largely duplicative discovery already completed in *Dumont*.  (3) The balance of the equities favors allowing the State to enforce its contract, as required by the *Dumont* settlement "so ordered" by the *Dumont* Court.  (4) As demonstrated by the expert and lay testimony attached hereto, the requested injunction would harm children by permitting State-contracted agencies to turn away qualified prospective parents.

## INTEREST OF AMICI CURIAE

Kristy and Dana Dumont are seeking to adopt a child through foster care in Michigan.  After being turned away by two state-contracted, taxpayer-funded child placing agencies (including STVCC) based on their use of religious eligibility criteria to exclude same-sex couples, the Dumonts sued to enjoin the State from permitting agencies to use religious exclusion criteria when providing public child welfare services.  They reached a settlement agreement, *inter alia*, requiring the State to maintain and enforce non-discrimination clauses in agencies' contracts.  The Dumont settlement meant the Dumonts could now pursue their plan to adopt a child in foster care without the risk of being exposed to further discrimination and with the same choice of agencies that are available to different-sex couples.  The Dumonts are interested in this litigation because the relief plaintiffs seek would subject the State to competing, inconsistent obligations in different districts, and would require them again to pursue adoption through foster care in a system permitting discrimination against them and denying them the full range of agency options from which different-sex couples can choose.

To protect their ability to foster and adopt children in the State's care on equal footing with other well-qualified prospective families—as reflected in their settlement agreement—the Dumonts respectfully submit this brief.[1]

---

[1]  No counsel for a party authored this brief.  No person other than amici and their counsel contributed any money toward its preparation or submission.

## PRELIMINARY STATEMENT

This suit seeks to unravel the relief obtained by Kristy Dumont, Dana Dumont, Erin Busk-Sutton and Rebecca Busk-Sutton (the "*Dumont* Plaintiffs") in their suit against Robert Gordon and Jennifer Wrayno (the "State Defendants").[2]   The *Dumont* Plaintiffs filed suit under the Establishment and Equal Protection Clauses of the United States Constitution to enjoin Michigan's apparent practice of permitting State-contracted, taxpayer-funded child placing agencies ("CPAs"), operating as part of the State's public child welfare system, to use religious criteria when selecting foster and adoptive parents for wards of the State.  Specifically, some CPAs were unwilling to accept same-sex couples, including the Dumonts, who were turned away by one of the plaintiffs here, St. Vincent Catholic Charities.

The Plaintiffs in this action (the "*Buck* Plaintiffs") moved to intervene in *Dumont* v. *Gordon*, 2:17-cv-13080-PDB-EAS (E.D. Mich.) ("*Dumont*") to defend the use of religious eligibility criteria by state-contracted agencies, and the *Dumont* Court (Borman, J.) granted their motion to intervene.  Plaintiffs participated fully in the motions to dismiss and both fact and expert discovery.  In their motion to dismiss in *Dumont*, the *Buck* Plaintiffs raised the same arguments on which they rely here: that the Free Exercise and Free Speech Clauses compel the State of Michigan to enter into a contract with STVCC, place its wards in STVCC's care, refrain from enforcing the contract's non-discrimination requirement, and condone the use of religious criteria by STVCC to

---

[2]      Jennifer Ludolph was also a plaintiff in *Dumont*, but her claims were dismissed for lack of taxpayer standing.  The defendants in *Dumont* were Nick Lyon, in his official capacity as the Director of the Michigan Department of Health and Human Services, and Herman McCall, in his official capacity as the Executive Director of the Michigan Children's Services Agency; Gordon and Wrayno succeeded Lyon and McCall, respectively, and were substituted in *Dumont* earlier this year by operation of law.  JooYeun Chang has since succeeded Wrayno and therefore has "automatically" replaced McCall as a defendant in this action by operation of Fed. R. Civ. P. 25(d).  Throughout this brief, "State Defendants" refers to the officials holding these two positions at the pertinent time.

exclude prospective foster and adoptive families for those children.  In an opinion denying in pertinent part the motions to dismiss, Judge Borman "[was] unconvinced that St. Vincent can prevail on a claim that prohibiting the State from allowing the use of religious criteria by [CPAs] hired to do the State's work would violate St. Vincent's Free Exercise or Free Speech rights." *Dumont* v. *Lyon*, 341 F. Supp. 3d 706, 749 (E.D. Mich. 2018).  The Third Circuit reached a similar conclusion in April, affirming a district court's denial of a request to preliminarily enjoin Philadelphia's enforcement of its non-discrimination policy for government-contracted foster care agencies and rejecting Free Exercise and Free Speech claims of an agency unwilling to accept same-sex couples for religious reasons.  *Fulton* v. *City of Philadelphia*, 922 F.3d 140, 165 (3d Cir. 2019).

After substantial discovery, the *Dumont* Plaintiffs and the State Defendants reached a settlement in which the State agreed to enforce its contracts' non-discrimination requirements, and the Court dismissed the case with prejudice "pursuant to the terms of the Settlement Agreement," noting that "[t]he Court retains jurisdiction over the enforcement of the Settlement Agreement."  *Dumont*, ECF No. 83, PageID.1469.  Rather than lodging any objection or challenge to the Settlement Agreement, the *Buck* Plaintiffs fled to a new venue, filed a do-over lawsuit, and urged this Court to enter a preliminary injunction that would effectively vacate the Settlement Agreement and require the State of Michigan to enter into a contract that authorizes discrimination against qualified foster and adoptive parents, undermining the best interests of children.

The *Buck* Plaintiffs have failed to prove that they meet any of the four requirements for a preliminary injunction.  *First,* they have not shown a likelihood of success on the merits. Like in *Fulton*, Plaintiffs cannot prevail on their Free Exercise claim because the Constitution does not empower organizations accepting taxpayer dollars to provide government services unilaterally

to dictate the terms of their contract with the State, and because the contracts' non-discrimination provision is a neutral, generally applicable policy which governs the actions of all State contractors that provide public child welfare services. Plaintiffs will further be unable to show that STVCC's provision of services for the children the State commits to its care—including conducting home studies and certifying families—is private speech, rather than fulfillment of its obligations as a State contractor providing a government service.

The *Buck* Plaintiffs' claims also fail on the merits because the Establishment and Equal Protection Clauses bar the relief they seek. The *Buck* Plaintiffs seek an injunction compelling the State to permit State-contracted CPAs to use religious criteria to exclude prospective foster and adoptive families headed by same-sex couples. That would violate the Establishment Clause by allowing agencies to whom the government has delegated a public function to use religious criteria in carrying out that function and by objectively appearing to endorse certain religious beliefs. Moreover, the practice would deny to same-sex couples the full array of rights incident to marriage, in violation of the Equal Protection Clause.

*Second*, the *Buck* Plaintiffs have not demonstrated a likelihood that they will suffer irreparable injury absent injunctive relief. Since Plaintiffs have not shown a likelihood of success on the merits, they cannot point to their alleged constitutional injuries as irreparable harm. Moreover, given the largely duplicative issues in *Dumont*, where discovery was complete except for depositions, this case could proceed swiftly to trial. There is no evidence Plaintiffs would suffer irreparable harm in the interim.

Moreover, the *Buck* Plaintiffs had multiple opportunities in *Dumont* to address any alleged irreparable harm by opposing the settlement reached in that case. Having elected to forgo

-4-

raising their alleged harm months ago, they have demonstrated by their own actions a lack of irreparable injury and should not be permitted to seek a preliminary injunction now.

*Finally*, the balance of the equities and the public interest weigh heavily against granting this injunction to compel the State to permit discrimination in its public child welfare program.  As reflected in the expert report submitted in *Dumont* by child welfare expert Dr. David M. Brodzinsky, "child welfare policies and practices that allow the exclusion of families willing and able to foster and adopt these vulnerable children do not serve the interests of these children or society in general."  Ex. A, Expert Report of David M. Brodzinsky, Ph.D. ("Brodzinsky Rpt."), ¶ 26.  And, the record in the *Dumont* action makes clear that discrimination causes real harms. *See, e.g.*, Ex. B, Declaration of Katie Page Sander ("Sander Decl.") ¶ 17 (former Program Manager of statewide Foster Care Navigator Program, recalling incident in which an agency "refused to work with [a same-sex couple] [and] [t]he family was so discouraged that they decided not to call another agency"); *see also* Brodzinsky Rpt. ¶¶ 34-37 (explaining how discrimination by state-contracted agencies deters same-sex couples' participation in the foster care system).

Because Plaintiffs have not satisfied any of the factors considered by courts in grating  preliminary relief, this Court should not now compel the State to permit discrimination by State contractors using public funds.

## BACKGROUND

### A.    Michigan's Child Welfare System

The Michigan Department of Health and Human Services ("MDHHS") is responsible for administering Michigan's foster care and adoption system.  This system must "promote the well-being and safety of all children who receive foster care or are adopted, . . . eliminate barriers to the adoption of children[,] and . . . promote the provision of a stable and loving family environment."  Mich. Comp. L. § 722.953.  There is an insufficient number of families for

-5-

the children under the care of MDHHS, and many children remain in the system until they age out, without ever being placed in an adoptive family.  *See* Brodzinsky Rpt. ¶ 30 (describing challenges faced by youth who age out).

**B.     Michigan Contracts with Private Agencies To Care for Children**

MDHHS is authorized to enter into contracts with private CPAs.  *See* Mich. Comp. L. §§ 400.14f, 722.111(1)(c).  MDHHS is "responsible for the development of rules for the care and protection of children" it cares for, including those assigned to private agencies, and those agencies are obligated to comply with such rules.  *Id.* § 722.112(1); Mich. Admin. Code R. 400.12201 *et seq.* (rules governing child placing agencies).  MDHHS and each CPA must "strive to achieve a permanent placement for each child."  Mich. Comp. L. § 722.954b.  Under MDHHS's regulations, part of a CPA's responsibility in handling a child's case is to recruit potential foster and adoptive parents.  *See, e.g.*, Mich. Admin. Code. R. 400.12304, .12706.; MDHHS's Adoption Services Manual ("ADM") 0400 ("Child placing agencies . . . must develop and maintain an ongoing program to recruit adoptive families for children available for adoption.");[3] *see also* Ex. C, State Defendants' Objections And Responses To [*Dumont*] Plaintiffs' Amended Interrogatories, 43 ("[CPAs] must provide . . . [r]ecruitment activities, orientation, and training of prospective adoptive families focusing on meeting the needs of children available for adoption.").  MDHHS has granted CPAs substantial discretion in evaluating families and selecting appropriate placements for children.  *See* Mich. Admin. Code R.400.12310, .12404, .12605, .12709.  Once a CPA accepts MDHHS's referral for a child's case, it receives taxpayer dollars to carry out services for the child under the State contracts, including identifying and recruiting potential foster and

---

[3]     *Available at* http://DHHS.michigan.gov/OLMWEB/EX/AD/Public/ADM/0400.pdf.

adoptive parents and assisting them through the licensing process.  (*See* ECF No. 6-8, PageID.302-303; ECF No. 6-9, PageID.344.)

Usually, CPAs choose families for children under their care from the roster of families they have recruited and licensed.  *See* Sander Decl. ¶ 11.  In some cases, the CPA will list that child on the Michigan Adoption Resource Exchange ("MARE") website to recruit families more broadly.[4]  When placing a child through MARE, the child's CPA must still make a "determination . . . that the MARE potential family 'match' is appropriate."  (ECF No. 6-8, PageID.297.)

C.    **The Contracts Prohibit Agencies from Discriminating Against Prospective Parents Based on Sexual Orientation.**

The contracts between the State and *every* CPA expressly forbid discrimination on the basis of certain characteristics unrelated to the ability to care for a child—*inter alia*, religion, marital status, and sexual orientation—including with respect to "applications filed for adoption of MDHHS supervised children including MDHHS supervised children assigned to a contracted agency."  (ECF No. 6-8, PageID.297; *see also* ECF No. 6-9, PageID.326 (same).)  If an agency violates its contract, including the non-discrimination provision, the State may demand compliance and, if necessary, terminate the contract under the plain terms of those agreements.

D.    **The *Dumont* Plaintiffs Were Turned Away by State Contractors and Filed Suit.**

The Dumonts are a "prospective adoptive famil[y] . . . ready, willing, and able to provide a 'forever family' to children in the foster care system."  *Dumont*, ECF No. 1, PageID.2-3.  The Dumonts called two CPAs and were turned away on the basis of the agencies' religious

---

[4]    Not all children in the public child welfare system are available for adoption through MARE.  Ex. D, 25.

objection to same-sex couples.  *Id.*, PageID.16 (STVCC "told [the Dumonts] that the agency does not work with same-sex couples.").  The *Dumont* Plaintiffs filed suit in September 2017 and, thereafter, the *Buck* Plaintiffs successfully moved to intervene as defendants.  *Dumont*, ECF Nos. 18, 31, 34

On defendants' motion to dismiss, the Court found that the *Dumont* Plaintiffs had stated a claim under both the Establishment and the Equal Protection Clauses.  *Dumont*, 341 F. Supp. 3d 706.  The Court also considered in the context of the motion to dismiss and rejected the Free Exercise and Free Speech arguments raised by the *Buck* Plaintiffs—the same arguments on which they now rely.  "[T]he [*Dumont*] Court [was] unconvinced that St. Vincent can prevail on a claim that prohibiting the State from allowing the use of religious criteria by [CPAs] hired to do the State's work would violate St. Vincent's Free Exercise or Free Speech rights."  *Id.* at 749. Discovery revealed significant admissions concerning the State's apparent practice of permitting (or at least not preventing) discrimination.  *E.g.*, Ex. D, State Defendants' Responses and Objections to *Dumont* Plaintiffs' Requests for Admission, 15 ("[State Defendants admit that f]or at least one child in State custody, that child's family placement or adoption was delayed because a state-contracted child-placing agency was unwilling to work with or place a child with a same-sex couple due to religious reasons.").

As the parties prepared for depositions, the *Dumont* Plaintiffs and the State Defendants sought to stay the case to discuss settlement and to give DHHS and its new director adequate time to consider the implications of a settlement on the child welfare system.  *Dumont*, ECF No. 74.  On March 22, 2019, the *Dumont* Plaintiffs and the State Defendants executed an agreement ("Settlement Agreement").  *Dumont*, ECF No. 82.  The *Dumont* Court dismissed the

case "with prejudice pursuant to the terms of the Settlement Agreement" and "retain[ed] jurisdiction over the enforcement of the Settlement Agreement . . . ." *Dumont*, ECF No. 83.

The *Buck* Plaintiffs were not party to the Settlement Agreement because the *Dumont* Plaintiffs did not seek any relief from them and the *Buck* Plaintiffs never filed any cross-claim or counterclaim.  The *Buck* Plaintiffs did not act to protect their interests in *Dumont* by any procedural avenue available.  They did not file cross-claims, ask to be heard by the *Dumont* Court, or raise objections to the settlement.  When the *Buck* Plaintiffs filed the instant complaint, the *Dumont* action had not yet reached final judgment because the time for an appeal had not yet run. Fed. R. App. P. 4.  Instead of taking any action in *Dumont* and without notifying the *Dumont* Plaintiffs, the *Buck* Plaintiffs filed a new action and now ask this Court, through a preliminary injunction, to nullify the Settlement Agreement entered by the *Dumont* Court.

## LEGAL STANDARD

The preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies," *Bonnell* v. *Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001), so it "should not be extended to cases which are doubtful or do not come within well-established principles of law." *Id.* at 826. The movant may not rely on mere allegations, but rather has a "burden of proving that the circumstances clearly demand it." *Overstreet* v. *Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

"The issuance of preliminary injunctive relief is committed to the discretion of the district court." *Wills* v. *Dreybeck*, 2013 WL 3287986, at *1 (W.D. Mich. June 28, 2013) (Jonker, J.).  "In exercising its discretion . . . , a district court must give consideration to four factors." *Bonnell*, 241 F.3d at 809.  The "plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that

the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*

v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

I.  **PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF PREVAILING ON ANY CLAIMS.**

    A.  **Plaintiffs Will Not Prevail on Their Free Exercise Claims.**

        (1)  ***There is no Free Exercise right to a taxpayer-funded government contract to provide government services in accordance with one's religious beliefs.***

The Settlement Agreement does not burden STVCC's Free Exercise rights—nor would enforcement of the non-discrimination clause in STVCC's contracts with MDHHS—because there is no right under the Free Exercise Clause to carry out a State function, using State funds, in accordance with one's religious beliefs.  The State's actions have no impact on STVCC's private activity outside of the government services it chooses to perform for the State.  When STVCC is acting on the State's behalf in "striv[ing] to achieve a permanent placement for each child in its care," Mich. Comp. L. § 722.954b, it must comply with the terms of the contract it voluntarily executed.  If STVCC does not wish to contract with the State on the terms the State requires for any agency hired to perform this government function, it need not.  *See Agency for Int'l Dev.* v. *Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of [government] funding, its recourse is to decline the funds."); *Rust* v. *Sullivan*, 500 U.S. 173, 193 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity.").

Because the State's enforcement of the non-discrimination provision in its contracts would not burden STVCC's exercise of religion, no further Free Exercise analysis is required. Judge Borman recognized as much, reasoning that the *Dumont* "Plaintiffs are not seeking an order

-10-

prohibiting the State from partnering with faith-based agencies because they are religious." *Dumont*, 341 F. Supp. 3d at 749–50. Rather, they sought to "prohibit[] the State from partnering with faith-based agencies that allegedly use the money they receive from the State under the adoption contract to employ religious criteria to exclude same sex couples—something the State itself could not do—in performing those state services under contract with the State." *Id.*

As Judge Borman reasoned, *Teen Ranch* v. *Udow* is "instructive." *Id.* at 751. There, the Michigan Family Independence Agency had partnered with Teen Ranch, a religious organization providing residential care for youth in state custody. After its contract with Teen Ranch expired, the Agency ceased placing children with Teen Ranch based on concerns that Teen Ranch, while providing services under contract with the State, incorporated religious teachings into its programming. Teen Ranch sued, claiming—much like the *Buck* Plaintiffs—that ending the contract relationship "violate[d] the Free Exercise Clause because it conditions the receipt of a governmental benefit on Teen Ranch's surrender of its religious beliefs and practices and burdens the Free Exercise of Plaintiff's religious beliefs." *Teen Ranch* v. *Udow*, 389 F. Supp. 2d 827, 837 (W.D. Mich. 2005). The court rejected the claim, holding that the Free Exercise Clause's protection against government encroachment on religious beliefs does not mean the government is required to fund religious activity. *Id.* at 838–39. The Sixth Circuit affirmed. 479 F.3d 403, 410 (6th Cir. 2007).[5] The *Dumont* Court found that the same rationale applies here: the *Buck*

---

[5]     *Buck* Plaintiffs argue that *Teen Ranch* does not apply by incorrectly claiming their activity "is not funded by the State." (ECF No. 6, PageID.220.) To the contrary, STVCC is paid for a comprehensive set of services, including "recruitment, retention, and support." (ECF No. 6-8, PageID.308; *see* Ex. C, 43; Ex. E, State Defendants' Objections and Responses to [*Buck* Plaintiffs'] Requests for Admission, 8 ("[A]dministrative case rates paid to [CPAs] include payment for contractual duties relating to recruitment and licensing activities.")).

Plaintiffs have failed to assert a burden on their ability to freely exercise their religion.  *Dumont*, 341 F. Supp. 3d at 752.[6]

> **(2)**  *The Settlement Agreement and the non-discrimination clause are neutral and generally applicable policies.*

Even assuming the non-discrimination provision in the State's contract incidentally burdens STVCC's exercise of religion, because the requirement is neutral and generally applicable, it would not violate the Free Exercise Clause.  *See Emp't Div., Dept. of Human Res. of Ore.* v. *Smith*, 494 U.S. 872, 878–82 (1990) ("Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs.") (quoting *Minersville Sch. Dist. Bd. Of Educ.* v. *Gobitis*, 310 U.S. 586, 594–95 (1940)).

In *Fulton*, the Third Circuit rejected a near-identical challenge by Catholic Social Services ("CSS"), demanding that the City of Philadelphia abandon a non-discrimination requirement in order to allow it to exclude same-sex couples for religious reasons.  The Third Circuit considered "whether [the City] must offer CSS a new contract that allows it to continue engaging in its current course of conduct."  922 F.3d at 153.  Like STVCC, CSS argued that the City was required to offer such a contract in light of the Free Exercise Clause.  The Third Circuit disagreed, holding that "a challenger under the Free Exercise Clause . . . must show that it was

---

[6]      The *Buck* Plaintiffs' reading of the Free Exercise Clause has far-reaching implications because States might choose to stop contracting out public child welfare work if necessary to operate their foster care systems in the manner they believe best serves children.  As seventeen States and the District of Columbia wrote in *Fulton*, if State contractors must "be able to tailor contractual requirements based on religious belief to serve only those they choose in the particular manner that they choose[,] [s]uch a framework would at a minimum hinder, and potentially preclude altogether, government agencies' reliance on contractors to deliver services mandated by state law and policy to be provided to all who qualify for them."  Brief of Massachusetts et al. as Amici Curiae in Support of Philadelphia at 26, *Fulton*.

treated more harshly than the government would have treated someone who engaged in the same conduct but held different religious views."  *Id.* at 154.  As with Plaintiffs here, CSS could not do so.

> CSS's theme devolves to this:  the City is targeting CSS because it discriminates against same-sex couples; CSS is discriminating against same-sex couples because of its religious beliefs; therefore, the City is targeting CSS for its religious beliefs.  But this syllogism is as flawed as it is dangerous. . . . That CSS's conduct springs from sincerely held and strongly felt religious beliefs does not imply that the City's desire to regulate that conduct springs from antipathy to those beliefs.

*Id.* at 159.  STVCC relies on the same syllogism, and its claims fail for the same reasons.  *See New Hope Family Servs., Inc.* v. *Poole*, 2019 WL 2138355, at *19, *9, *10 (N.D.N.Y. May 16, 2019) (holding, in challenge by a child-placing agency to New York's non-discrimination policy, that the state "stands on firm ground in requiring authorized agencies to abide by New York's non-discrimination policies when administering public services" where "[t]he regulation applies to all authorized agencies, regardless of any religious affiliation" and "[t]he plain language of the regulation demonstrates its neutrality").

### (3)     *The non-discrimination clause is not subject to individualized exemptions.*

The *Buck* Plaintiffs argue that the State's non-discrimination policy is not neutral and generally applicable because the State permits individualized exemptions, but they have not demonstrated such exemptions.

In *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, the Supreme Court struck down two ordinances because those challenging them proved that "suppression of the central element of the Santeria worship service was the object of the ordinances."  508 U.S. 520, 531, 534 (1993).   The anti-religious purpose was evident because the ordinances were "underinclusive"—they banned ritual Santeria sacrifice while failing to prohibit nonreligious

-13-

conduct, such as slaughter for food purposes, that endangered the government's stated interest in a similar or greater degree.  *Id.* at 543-45.

Here, by contrast, Michigan's secular purposes in prohibiting discrimination against families are to serve the health, safety, and well-being of the State's most vulnerable children and to comply with the Constitution.  Unlike in *Lukumi*, here the non-discrimination policy is perfectly aligned with the State's intended purposes and the *Dumont* Settlement Agreement does not permit Michigan to enforce that policy selectively.  Any agency—religious or not—that fails to comply with the non-discrimination provision is in breach.

The *Buck* Plaintiffs claim that this case is like *Ward* v. *Polite*, in which a public university expelled a counseling student for requesting not to counsel someone regarding a same-sex relationship.  The Sixth Circuit held that Ward had plausibly alleged that the expulsion was unconstitutional because "values-based referrals in general" were permitted.  667 F.3d 727, 730 (2012).  This case is unlike *Ward*, however, because MDHHS does not permit agencies to violate the non-discrimination provision for *any* reason—nor could it, in light of the Settlement Agreement or the Constitution.[7]

The *Buck* Plaintiffs allege that STVCC is being targeted like Ward because MDHHS permits contractors to specialize in working with particular types of children, *e.g.*, African-American children, Native American children, or children with disabilities.  (ECF No. 6, PageID.203-204 & nn.38-42.)  These examples do not show that the State has singled out religion or STVCC; they instead show that other CPAs are seeking to address unmet needs and act in the

---

[7]    The *Buck* Plaintiffs invoke the fact that the contract permits STVCC to return children to MDHHS's care with MDHHS's approval.  (ECF No. 6, PageID.201 & n.37.)  Returning a child to MDHHS's care is quite unlike refusing to accept a family that could provide a home for a child in the agency's care, so this provision is not relevant.

best interest of those children.  In contrast, by limiting the pool of potential *families*, STVCC is not serving the best interests of the children in its care.  Unlike allowing agencies to turn away potential families, allowing agencies to specialize in serving certain populations of children does not undermine the State interests at issue here, so, unlike *Lukumi*, these examples do not show that the State policy is "underinclusive."

The *Buck* Plaintiffs also claim selective enforcement by asserting that agencies are permitted to "refer families elsewhere for any number of reasons," as when the family lives far from the agency or the agency has a waiting list.  (ECF No. 6, PageID.202; ECF No. 6-1, PageID.238.)  However, none of these is an example of an agency violating the contract by discriminating against a family based on a protected characteristic.  Using the benign term "referral" to conflate STVCC's conduct with that of other agencies does not change the fact that STVCC, unlike the agencies in Plaintiffs' examples, is refusing to serve families in violation of the State's contracts.[8]

STVCC fails to show that the State permits secular exemptions to its contracts' non-discrimination requirement.

### (4)   The **Buck** *Plaintiffs have not shown that the Settlement Agreement was motivated by anti-religious animus.*

The *Buck* Plaintiffs claim that in entering into the Settlement Agreement the "State officials have acted in a manner that passes judgment upon and presupposes the illegitimacy of St.

---

[8]     Similarly, the *Buck* Plaintiffs distort a comment by Steve Yager, a former MDHHS official, who wrote, "We do not compel agencies to accept referrals."  When "the department makes a referral to a child placing agency for foster care case management or adoption services under a contract with the child placing agency," the CPA can, indeed, decline for any reason.  *See* Mich. Comp. L. § 722.124f(a).  But when a couple calls an agency to inquire about fostering or adopting, that call is not a "referral," and the agency may not choose whether to "accept" or "reject" it.  If the CPA has wards of the State in its care, then in recruiting and selecting families for them, it must not discriminate against families based on characteristics prohibited in the contract.

Vincent's religious beliefs and practices."  (ECF No. 6, PageID.206.)  The only purported evidence offered is a handful of statements by now-Attorney General Dana Nessel which do not demonstrate that anyone, much less MDHHS, acted with anti-religious bias.[9]

The *Buck* Plaintiffs claim this case is analogous to *Masterpiece Cakeshop Ltd.* v. *Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018).  In *Masterpiece*, the Supreme Court reversed an adjudication by the Colorado Civil Rights Commission finding unlawful discrimination by a business.  The Court held that the Commission's hostility toward the business owner's religious beliefs tainted the proceeding.  That conclusion was based on (1) statements by commissioners that disparaged the business owner's religious beliefs as "despicable" and merely rhetorical and insincere, and (2) the fact that in other adjudications the Commission had treated other conscience-based objections differently.  *Masterpiece*, 138 S. Ct. at 1729–30.

MDHHS does not permit agencies to violate the non-discrimination provision for any reason, so unlike in *Masterpiece*, Plaintiffs have not shown differential treatment.  *See supra* Part I.A.3.  And none of the proffered quotes attributed to Nessel establish that the non-discrimination requirement in the State's contract, or the Settlement Agreement, were motivated by anti-religious hostility.

*First*, the *Buck* Plaintiffs cherry-pick passages from statements Nessel gave to reporters in 2015 without any of the surrounding comments or context.  But her statements do not reflect disparagement of STVCC's religious beliefs; in fact, they do not mention religion at all. Nessel was at the time an attorney for a lesbian couple that was challenging Michigan's same-sex

---

[9]     The *Buck* Plaintiffs also note that MDHHS initiated an investigation into alleged violation of the non-discrimination provision after the *Dumont* complaint was filed, but this shows only that the State investigates allegations of contractual noncompliance.

marriage ban before the Supreme Court—in what began as an adoption rights case—and she was so identified in both interviews.  Unlike the Commission in *Masterpiece*, Nessel said nothing about religious beliefs, but was instead speaking about discrimination against same-sex couples and how allowing such discrimination undermines the interests of children in State care, as a full reading of the articles and a full hearing of the associated recordings makes clear.[10]

*Second*, even if one could read into Nessel's past statements a judgment about religious beliefs, Plaintiffs offer no evidence to show it affected the pertinent decision-making processes.  In *Masterpiece*, the anti-religious statements were made by the actual adjudicatory body during the adjudicative proceedings.  Here, MDHHS made the decision to include non-discrimination clauses in its contracts long before Attorney General Nessel took office; the *Buck* Plaintiffs could not possibly show that Nessel's statements caused MDHHS to impose a non-discrimination requirement.

And the *Buck* Plaintiffs do not attempt to show that anti-religious hostility motivated MDHHS's decision to enforce that requirement by entering into the Settlement Agreement.  After her inauguration, as counsel to MDHHS, Attorney General Nessel evaluated the *Dumont* action and concluded that the 2015 laws did not apply to State-contracted services. She recommended settlement "on terms consistent with the law and existing agency contracts and that best serve the health, safety and well-being of children in need of state-contracted foster care

---

[10]     Ex. F, NPR, *Faith Based Adoption Bill Headed to House Floor*, *available at* https://www.michiganradio.org/post/faith-based-adoption-bills-headed-house-floor; Ex. G, Fox 2 News, *Opponents Say Adoption Bill Discriminates Against Gays and Lesbians*, *available at* http://www.fox2detroit.com/news/opponents-say-adoption-bill-discriminates-against-gays-and-lesbians.  In addition to the text attached hereto, each website also includes a recording or video containing statements made by Nessel.

case management and adoption services."[11]  MDHHS officials Gordon and Wrayno then decided to execute the Settlement Agreement.  The *Buck* Plaintiffs offer no proof that, in executing the Settlement Agreement, Gordon and Wrayno were motivated by anything besides their statutory obligations, including to "promote the well-being and safety of all children who receive foster care or are adopted, . . . eliminate barriers to the adoption of children[,] and . . . promote the provision of a stable and loving family environment."  Mich. Comp. L. § 722.953.

   *Finally,* the *Buck* Plaintiffs seek unprecedented relief.  This case is not, as in *Masterpiece*, an adjudication concerning past discrimination; rather, Plaintiffs ask this Court to *permanently* enjoin enforcement of a non-discrimination policy embodied in a State contract.  Plaintiffs offer no authority for the proposition that an individual government official's alleged anti-religious bias can forever eliminate the State's power to enforce its contracts.  In *Masterpiece*, the Court did not enjoin the Commission from enforcing its law against the business owner or anyone else.  *See Fulton*, 922 F.3d at 153 n.8 ("It should be noted that the remedy CSS seeks—an injunction forcing the City to renew a public services contract with a particular private party— would be highly unusual . . . . We have some doubt, therefore, that CSS could be entitled to the relief it seeks.").

   **(5)**  ***The non-discrimination clause does not single out agencies because of their religious identity.***

   Contrary to the *Buck* Plaintiffs' contention, the Settlement Agreement and non-discrimination provisions are not "specifically designed to end government partnerships with religious groups based upon a disfavored religious belief."  (*See* ECF No. 6, PageID.208 (citing *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 137 S. Ct. 2012, 2025 (2017)).)  *Trinity*

---

[11]  Department of Attorney General, *State Settles Same-Sex Adoption Case*, *available at* https://www.michigan.gov/ag/0,4534,7-359-92297_47203-492743--,00.html.

*Lutheran* is inapposite because there, the Supreme Court held only that the government could not disqualify a church from a generally available public benefit (a subsidy for children's playgrounds) solely because of its "religious identity." *Trinity Lutheran*, 137 S. Ct. at 2024 ("The rule is simple: No churches need apply.").  Here, the non-discrimination provision concerns not the religious "identity" of the State contractors, but rather what they are permitted to do in carrying out contractual obligations using State funds, something *Trinity Lutheran* did not reach.  *See id.* at 2024 n.3 ("We do not address religious uses of funding or other forms of discrimination.").  The State's policy is to require compliance with its non-discrimination requirement; it cares not about the faith (or lack thereof) of contracted agencies.  *Trinity Lutheran* guarantees religious organizations equal treatment; it offers no support for the claim that a government contractor's religious beliefs give it the right to opt out of requirements applicable to all other contractors.  *See Dumont*, 341 F. Supp. 3d at 749.

The non-discrimination provision in the State's CPA contracts does not disqualify any person or organization from participating in government benefit programs.  And it surely does not disqualify any organizations based on their religious identity.  The requirement that all contracted CPAs refrain from discriminating in the provision of services to wards of the State "does not mean that the City's enforcement of its requirements constitutes anti-religious hostility." *Fulton*, 922 F.3d at 159.

Whether the Settlement Agreement represents a new policy does not matter as Plaintiffs must show not merely a new policy, but that the relevant decision-makers within MDHHS changed the policy for impermissible reasons.  Plaintiffs offer no evidence to show

MDHHS changed its policy for impermissible reasons, so it matters not whether the Settlement Agreement is a new policy.[12]

### B.   Plaintiffs Will Not Prevail on Their Free Speech Claim Because Defendants Have Not Compelled Any Private Speech.

Plaintiffs will not succeed on their Free Speech claim because "[t]he speech here only occurs because [the agency] has chosen to partner with the government to help provide what is essentially a public service." *Fulton*, 922 F.3d at 161.   STVCC argues that the non-discrimination provision in State CPA contracts compels the agency to engage in speech contrary to its religious beliefs in that it requires it to provide the State with written assessments of families that conflict with its religious beliefs.   However, when a CPA provides public foster care and adoption services pursuant to contracts with the State, its services under those contracts are not private speech but rather "instances in which the government uses private speakers to transmit information concerning the government's own program." *Teen Ranch*, 389 F. Supp. 2d at 840. Thus, requiring CPAs to work with all qualified prospective families for children in the agencies' care does not compel private speech.   "All that is forbidden is discrimination against prospective adoptive parents on the basis of their marital status and/or sexual orientation." *See New Hope*, 2019 WL 2138355, at *13.

The *Buck* Plaintiffs' principal argument is that home studies are private speech. (ECF No. 6, PageID.215.)   However, as Judge Borman recognized, "a State's decision to contract

---

[12]    Even assuming *arguendo* that strict scrutiny was applied, the State's non-discrimination policy would survive because preventing discrimination in the selection of families for State wards serves compelling state interests—the best interests of children, and equality for LGBTQ prospective parents. *See, e.g.*, *Fulton*, 922 F.3d at 163–64.  And it is narrowly tailored because allowing any agencies to discriminate would harm those interests.  *See infra* Part IV (explaining that same-sex couples have been, and will continue to be, deterred from participation if the State allows discrimination by its contractors).

with private entities to deliver public child welfare services does not create, encourage or otherwise facilitate private expression, and accordingly the state can make a content-based selection of private sector providers without violating the First Amendment." *Dumont*, 341 F. Supp. 3d at 752 (quoting *Teen Ranch*, 389 F. Supp. 2d at 839) (internal punctuation omitted).  For this reason, that the State requires a specific kind of speech—*e.g.*, home studies—of its contractors is not in any respect constitutionally infirm.

The *Buck* Plaintiffs cite *Agency for International Development*, but that case expressly distinguished between "conditions that define the limits of the government spending program—those that specify the activities [the government] wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself."  570 U.S. at 214–15.  In light of this distinction, the *Buck* Plaintiffs try to characterize home studies as "St. Vincent's private speech and outside the scope of MDHHS' foster care and adoption funding programs."  (ECF No. 6, PageID.217.)

This argument is as factually inaccurate as it is legally unsupportable.  The non-discrimination provision "applies to all applications filed for adoption of MDHHS supervised children, including . . . children assigned to a contracted agency."  (*See* ECF No. 6-8,  PageID.305.) Home studies for prospective parents are just one component of the "recruitment, retention, and support" all contracted CPAs must provide for children in their care.  *See id.*, PageID.308; Mich. Admin. Code R. 400.12304(1) ("An agency shall have an ongoing foster home recruitment program to ensure an adequate number of suitable and qualified homes to meet the needs of children served by the agency."); *id.* .12310(1) ("An agency social service worker shall complete a written initial foster home evaluation before certifying the home for licensure.").  STVCC is paid for these services.  Ex. E, 8 ("[A]dministrative case rates paid to [CPAs] include payment for

contractual duties related to recruitment and licensing activities.").  Home studies are at the heart of the child placing services STVCC performs under contract with the State, so denying a home study to same-sex couples is denying them services under the government contracts.  Insisting that STVCC do the job it is accepting taxpayer dollars to do is not an unconstitutional regulation of STVCC's speech.

> **C.**  **Plaintiffs Cannot Succeed on the Merits Because, if the State Were To Allow STVCC To Use Religious Criteria To Exclude Qualified Families, It Would Violate the Establishment Clause.**

In *Dumont*, the State acknowledged that it contracted with "faith-based agencies that, for religious reasons, only work with married, opposite-sex couples."  *Dumont*, ECF No. 16, at PageID.76.  Now, the *Buck* Plaintiffs seek to *compel* the State to allow contracted agencies to use religious criteria to exclude prospective foster and adoptive parents.  That would violate the Establishment Clause.

> **(1)**  ***Permitting the State to delegate a government function to be performed using religious criteria would violate the Establishment Clause.***

If the State were to permit agencies to use religious criteria to screen out prospective families, this would violate "the core rationale underlying the Establishment Clause[:]  preventing 'a fusion of governmental and religious functions.'"  *Larkin* v. *Grendel's Den*, 459 U.S. 116, 126–27 (1982) (quoting *Sch. Dist.* v. *Schempp*, 374 U.S. 203, 222 (1963)).[13]  In *Larkin*, the Supreme Court invalidated a municipal ordinance that gave churches discretion to veto a liquor license application for any premises located within 500 feet of a church.  The ordinance at issue

---

[13]      *See also Bd. of Educ. of Kiryas Joel Village Sch. Dist.* v. *Grumet*, 512 U.S. 687, 702 (1994) (religious community's control over public education policy violated Establishment Clause); *Doe* v. *Porter*, 370 F.3d 558, 564 (6th Cir. 2004) (school board violated Establishment Clause by "ced[ing] its supervisory authority over [certain] classes to Bryan College, which requires its students and faculty to subscribe to a sectarian statement of belief").

"delegate[d] to private, nongovernmental entities . . . a power ordinarily vested in agencies of government."  459 U.S. at 122.  Likewise, here, the State has vested discretionary authority in CPAs—the authority to recommend prospective foster and adoptive parents for children in the State's custody.  The *Larkin* Court concluded that the ordinance merely "*could* be employed for explicitly religious goals."  *Id.* at 125 (emphasis added).  Here, the State *knows* that religious entities are screening out certain prospective parents based solely on religious criteria unrelated to the ability to care for a child.

Vesting discretionary governmental power in a religious organization, to be exercised pursuant to religious strictures, presents the "danger of political oppression through a union of civil and ecclesiastical control" that motivated the Framers to draft the Establishment Clause.  *Id.* at 127 n.10.  If the State were to delegate public child welfare services to private CPAs with permission to use religious eligibility criteria, that would violate the Establishment Clause principle that "civil power must be exercised in a manner neutral to religion," *Kiryas Joel*, 512 U.S. at 704, so this Court should not compel the State to do so.  Judge Borman held that, if proved, *Dumont* Plaintiffs' allegations would demonstrate excessive entanglement.  *See Dumont*, 341 F. Supp. 3d at 740; *see also Bowen* v. *Kendrick*, 487 U.S. 589, 608–609 (1988) (although mere participation of faith-based organizations in government-funded programs does not violate the Establishment Clause, when such organizations receive government funds, they may not use those funds to advance religion, including through discrimination).

**(2)** ***Requiring the State to condone discrimination would objectively favor religion in contravention of the Establishment Clause.***

Allowing the use of religious criteria in the public child welfare system would also violate the Establishment Clause because it would give preference to those religious groups that oppose same-sex relationships as a matter of religious doctrine.  *Edwards* v. *Aguillard*, 482 U.S.

578, 593 (1987) (invalidating Creationism Act because it preferenced religious views).   An injunction requiring the State to carve out a special exception from its anti-discrimination requirements for religious groups that hold a particular religious view would create a governmental preference for such beliefs.

In addition to having an impermissible subjective purpose, the State's practice would "objectively convey a message" of endorsement of a particular religious view about same-sex relationships.   *See Smith* v. *Jefferson Cnty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 588 (6th Cir. 2015).   Agencies, acting on behalf of the State, would send to the families they turn away the "message . . . that they are outsiders, not full members of the political community."   *Santa Fe Indep. Sch. Dist*. v. *Doe*, 530 U.S. 290, 309 (2000); *see* Sander Decl. ¶ 17.   By allowing religious agencies performing a State function to turn families away on the basis of their religious beliefs, the State gives the appearance that those agencies' religious beliefs are favored.   *See Sante Fe*, 530 U.S. at 310.

Judge Borman recognized that these allegations were plausible and, if proved, would demonstrate a violation of the Establishment Clause.   And Sander's testimony demonstrates that an objective observer, informed about the public child welfare system, sees the State's former practice as objectively favoring religion.   Sander Decl. ¶ 20 ("[W]hen MDHHS allows agencies to exclude LGBTQ individuals regardless of their qualifications, this appears to be approving those CPAs' use of religious eligibility criteria in providing public child welfare services—even when to the detriment of children in the foster care system, who have no choice whether they are referred to an agency that excludes families based on religious tests or an agency that accepts all qualified families.").

Finally, permitting discrimination here would not be a mere accommodation of religion, as Judge Borman held, distinguishing *Corporation of Presiding Bishop of Church of Jesus Christ of Latter Day Saints* v. *Amos*, 483 U.S. 327 (1987).  "The defendants in *Amos* were religious organizations engaged in their own activities seeking exemptions from generally applicable laws so that they could continue carrying on their own work consistent with their religious beliefs.  A very different set of facts from those alleged here."  *Dumont*, ECF No. 49, at 55.

Indeed, here the requested relief would impose substantial burdens on third parties—children and same-sex couples seeking to care for them, *see infra* Parts III-IV—and the Establishment Clause *forbids* accommodations that privilege religious exercise to the detriment of others.  *See Estate of Thornton* v. *Caldor, Inc.*,  472 U.S. 703, 708-09 (1985) (striking statute requiring employers to honor Sabbath in light of "burden or inconvenience this imposes on the employer or fellow workers"); *Cutter* v. *Wilkinson*, 544 U.S. 709, 720 (2005) ("[C]ourts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.").

> **D.      Plaintiffs Cannot Succeed on the Merits Because, if the State Were To Allow STVCC To Turn Away Same-Sex Couples, It Would Violate the Equal Protection Clause.**

The State Defendants also cannot be required to allow contracted agencies to discriminate against same-sex couples seeking to foster or adopt because that would violate the Equal Protection Clause, which requires the government to treat all similarly situated persons alike. *City of Cleburne, Tex.* v. *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  At a minimum, Equal Protection prohibits the government from making "distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective."  *Lehr* v. *Robertson*, 463

U.S. 248, 265 (1983).  Under any level of scrutiny,[14] the categorical exclusion of same-sex couples

by an agency acting on behalf of the State would violate the Equal Protection Clause.  It serves no

legitimate government interest to deny children good families based on religious criteria unrelated

to the ability to care for a child.

Judge Borman held that the *Dumont* Plaintiffs plausibly alleged "that allowing

faith-based agencies to turn away same-sex couples actually exacerbates the shortage of qualified

families who are available to adopt or foster and means that some children may be denied the

family that is best matched to meet their individual needs." *Dumont*, ECF No. 49, at 66.  Discovery

revealed evidence to support these allegations.[15]

In addition, as the Supreme Court recognized in *Obergefell*, the State cannot "deny

gays and lesbians [the] many rights and responsibilities intertwined with marriage"—expressly

including "adoption rights."  135 S. Ct. 2584, 2601, 2606 (2015).  If the *Buck* Plaintiffs prevail,

married "same-sex couples [would be] denied all the benefits afforded to opposite-sex couples"

with respect to adoption and foster care.  *Id.* at 2604.  This principle was applied to adoptions,

including public adoptions like those at issue here, in *Campaign for Southern Equality* v.

*Mississippi Department of Human Services*, 175 F. Supp. 3d 691, 710 (S.D. Miss. 2016), in which

the court enjoined the State of Mississippi's practice of excluding same-sex couples from adopting

out of the foster care system because it "interfer[ed] with the right to marry" and thereby

---

[14]     Although the Sixth Circuit has stated that rational basis review applies to "state actions involving sexual orientation," *Ondo* v. *City of Cleveland*, 795 F.3d 597, 608-09 (6th Cir. 2015), the Dumonts expressly preserve the issue of whether sexual-orientation classifications are suspect or quasi-suspect and trigger heightened Equal Protection scrutiny.  *See Windsor* v. *United States*, 699 F.3d 169, 185 (2d Cir. 2012) (intermediate scrutiny), *aff'd on other grounds*, 570 U.S. 744 (2013).

[15]     *See infra* Part IV (describing harms to children caused by discrimination in the child welfare system).

"violate[d] the Equal Protection Clause."  By the same token, the Constitution prevents compelling Michigan to permit such discrimination in its child welfare system.

## II.     PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF.

"The single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  *Taylor Novelty, Inc.* v. *City of Taylor*, 816 F.2d 682, at *6 (6th Cir. 1987) (per curiam) (internal punctuation and citations omitted).  A mere possibility of harm is not enough; "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  The *Buck* Plaintiffs assert that the alleged violation of their First Amendment rights automatically demonstrates irreparable injury, but this argument fails because the *Buck* Plaintiffs have not shown a likelihood of success on the merits.

The *Buck* Plaintiffs also argue that, "[i]n addition to the loss of their First Amendment rights, St. Vincent will be forced to close its foster care and adoption ministries" unless the Court compels Michigan to enter into a contract on terms of STVCC's choosing.  (ECF No. 6, PageID.222.)  This is far from clear.  Michigan has made clear that it welcomes STVCC's participation in the public child welfare system—so long as STVCC complies with the non-discrimination policy that is already included in the parties' contract.  If STVCC terminates its involvement in the public child welfare program, that will be its own choice.  Moreover, even if it did so, this would not require STVCC to close.  STVCC has other programs, including a children's home, refugee resettlement, and counseling (ECF No. 6-1, PageID.229, 237), and has acknowledged that it loses money on its public foster care and adoption programs.  (ECF No. 6-1, PageID.237.)  Accordingly, even if STVCC decided to close its foster care and adoption programs

during the pendency of this suit rather than comply with its contractual obligations, this would not endanger STVCC's other operations.[16]

By electing not to participate in *Dumont* once on notice that the State and the *Dumont* Plaintiffs were discussing a potential resolution, Plaintiffs themselves have shown that they are not suffering irreparable injury.  Were Plaintiffs subject to any such threat, their remedy was to speak up then, as they told Judge Borman they would in their intervention motion.  *See Dumont*, ECF No. 18, PageID.452.  ("[State] Defendants may eventually want to settle this case with [*Dumont*] Plaintiffs," in which case *Buck* Plaintiffs would need to be able "to immediately appeal and protect their interest.")

### III.    THE BALANCE OF THE EQUITIES REQUIRES DENYING PLAINTIFFS' REQUESTED RELIEF.

Plaintiffs assert that "others will not suffer any harm" should this Court grant a preliminary injunction.  (ECF No. 6, PageID.223.)  Quite to the contrary.

*First*, the requested injunction would contravene established child welfare standards and would harm the children in Michigan's child welfare system by denying them access to families.  *See infra* Part IV.

*Second*, because the requested injunction would compel the State to violate the Establishment and Equal Protection Clauses, *see supra* Sections I.C–I.D, the *Dumont* Plaintiffs' constitutional rights, and those of other prospective same-sex couples, weigh against the granting of a preliminary injunction.

---

[16]      There is no merit to the *Buck* Plaintiffs' assertion that if STVCC closes, the Bucks may not be able to adopt a biological sibling of one of their children.  While *foster* placement decisions often must be made quickly, adoption decisions take much longer.  *See, e.g.*, M.C.L.A. 722.954b. The *Buck* Plaintiffs offer no evidence that any agency would overlook a potentially loving adoptive home with a child's biological siblings.

*Third*, the State Defendants have an interest in the enforcement of their contract with STVCC, including the non-discrimination provision, which it deems to serve the best interests of children in State care, and for which they offer consideration including taxpayer funds.

*Fourth*, the *Dumont* Plaintiffs and the State Defendants have an interest in the enforcement of the Settlement Agreement they negotiated, which offered each side certain benefits and would be unraveled by the relief the *Buck* Plaintiffs seek.

*Fifth*, granting their request that the Court order the State to cease enforcing the non-discrimination provision would impose substantial, lasting injury, both stigmatic and practical, on the *Dumont* Plaintiffs and other same-sex couples.  The *Buck* Plaintiffs minimize the *Dumont* Plaintiffs' interests by suggesting that "[g]ay couples interested in adopting and who receive their certification through another agency can still adopt children in St. Vincent's care at any time" through MARE.  (ECF No. 6, PageID.223.)  But children outside of the MARE program are generally placed by agencies with their own licensed families.  And the fact that STVCC may be willing to accept same-sex couples for a subset of the children in their care does not remove the stigma of being excluded from consideration for others and being denied equal treatment.

Finally, to the extent any equities weigh in the *Buck* Plaintiffs' favor, those equities are diminished by the *Buck* Plaintiffs' inequitable delay in seeking relief.

## IV.    EXPERT TESTIMONY DEMONSTRATES THAT AN INJUNCTION WOULD HARM THE PUBLIC INTEREST.

A preliminary injunction is a "drastic" remedy, *Bonnell* v. *Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001), and that is particularly true here because the *Buck* Plaintiffs ask this Court not only to enjoin enforcement of a State policy but also to affirmatively decree that MDHHS must contract with an agency on terms dictated by that agency, which contradict the terms deemed to

promote the best interest of children by the State agency with expertise on child welfare practice. This would harm children in the public child welfare system.

Experts have recognized that requiring state-contracted CPAs to work with all qualified families is in the best interest of the children in the public child welfare system.  Dr. Brodzinsky explains, "well-established professional standards in the field of child welfare promote practices that welcome all capable prospective foster and adoptive parents regardless of race, religion, marital status, gender, disability, or sexual orientation."  Brodzinsky Rpt. ¶ 21; *see also id.* ¶¶ 22–24 (The Child Welfare League of America, "the national standard setter in the field of child welfare," makes clear that "all individuals and families should be considered when applying to adopt or foster children.").  The most obvious reason agencies should work with all qualified families is "the dramatic shortage of families available to meet the needs of children in the foster care system," *id.* ¶ 25—a shortage the *Buck* Plaintiffs concede (ECF No. 6, PageID.173.).  Further, "[i]f the State permits agencies to exclude any group of qualified applicants, . . . it will reduce the chances of these children finding permanent life-long family connections in a timely manner . . . ." *Id.* ¶ 25.  Discouraging LGBTQ prospective parents could have especially damaging effects because "research indicates that [same-sex couples] are disproportionally more likely to foster and adopt children than their heterosexual peers."  *Id.*

A paucity of willing families, in turn, substantially harms the public interest because it could result in (1) children being separated from siblings because of an insufficient number of parents willing to accept multiple children, *id.* ¶ 32; (2) children being placed in "group homes or institutional environments," which "cannot offer children the stability, nurturance, safety, life-long family connections and support, and genuine sense of . . . permanence that families can provide," *id.* ¶ 30; and (3) children aging out of the system without ever being adopted, *id.*

¶ 31.  Even if there were no shortage of families willing to serve as foster and adoptive parents, discouraging LGBTQ applicants would harm children because "[a]ll children have unique needs and families are not fungible."  *Id.* ¶ 27.  "[E]xcluding sexual minority adults from adopting and fostering reduces the pool of families from which to choose when looking for good matches."  *Id.*

In sum, "the public interest is best served by ensuring that at-risk children are placed with loving foster parents and that children seeking adoption can quickly find permanency." (ECF No. 6, PageID.222.)  The way for the State to do this, as Dr. Brodzinsky explains, is to require its contractors to accept all qualified families.

The *Buck* Plaintiffs offer two responses, but neither addresses the public harm of the discrimination at issue.  They state that (1) having a few discriminatory agencies is not a problem since LGBTQ people can go to other agencies, and (2) the State's current policy will force STVCC to close.

*First,* the *children* don't have the option of going to another agency.    MDHHS's past investigations show that agency refusals to place children with same-sex couples delayed two adoptions and kept one child separate from his siblings.  Ex. C, Special Investigation Report 2018C0223029; Ex. D, Special Investigation Report 2017C0208001.  The *Buck* Plaintiffs suggest that children in the care of agencies with religious objections to placing children with same-sex couples could be placed with such families through MARE.  Even if these agencies permit caseworkers to determine "that the MARE potential family 'match' is appropriate" when that family is a same-sex couple (*see* ECF No. 6-8, PageID.297), not all children in the public child welfare system are listed on the MARE website. Ex. D, 25.  In particular, many people, including the Dumonts, hope to adopt through foster care—*i.e.*, to foster a child and then, if parental rights are terminated, to adopt *before the child is listed on MARE.*

If this Court grants Plaintiffs' motion, prospective parents like the Dumonts will be unable to adopt children in the care of STVCC through foster care.  Happenstance will dictate whether children are placed by an agency that looks to their best interests or by an agency that makes placement decisions according to its religious beliefs.

Moreover, even if LGBTQ-friendly agencies exist, State-sanctioned discrimination is harmful to the child welfare system.  "[W]hen State-contracted child placing agencies are permitted to exclude same-sex couples regardless of their qualifications, it creates a deterrent to same-sex couples' participation in the foster care and adoption system as a whole. Same-sex couples who are turned away by an agency because of their sexual orientation may be hesitant about approaching another agency in their community for fear of further discrimination . . . ." Brodzinsky Rpt. ¶ 35.  Sander observed these deterrent effects directly.  Sander recalls one family who was turned away by an agency, citing its religious beliefs, and "[t]he family was so discouraged that they decided not to call another agency."  Sander Decl. ¶ 17.  As this example illustrates, State-sanctioned discrimination deprived the children in Michigan's child welfare system of at least one potential foster family. If this Court orders the State to allow agencies to discriminate, this Court's injunction would likely directly deter more potential parents for children in need.  Nor is the harm solely caused by LGBTQ prospective parents' fear and uncertainty regarding whether they will be rejected by a particular agency.  Even if agencies were required to prominently state their unwillingness to work with LGBTQ couples—something STVCC does not currently do on its website, for example—"some same-sex couples who would be interested in fostering or adopting may decline to pursue it altogether if they know that the State authorizes discrimination against sexual minorities."  Brodzinsky Rpt. ¶ 36.  Not everyone is willing to subject themselves to the sting and humiliation of discrimination.

In addition, different agencies offer different services, and some agencies offer fewer services than others.  Ex. D, 22–23.  Where same-sex couples have a smaller set of options than heterosexual couples, some same-sex couples will find no agency that meets the family's needs and circumstances.  Brodzinsky Rpt. ¶ 38.  That can mean fewer families for children.

There is no merit to the argument that discrimination is harmless when only a few agencies discriminate.

*Second,* whatever the merits of *Buck* Plaintiffs' contention that STVCC would close, *see supra* Part II, this should not guide the question of the *public* interest.  After the Settlement Agreement, Bethany Christian Services, the other agency that turned away one of the *Dumont* Plaintiff couples for religious reasons, agreed to comply with the non-discrimination requirement.[17]  Even if STVCC does not do the same, the children in STVCC's care represent less than 1% of children in the care of CPAs statewide, so MDHHS could likely quickly act to deal with this change.[18]  Indeed, in *Dumont*, the State admitted that "if St. Vincent Catholic Charities chose to cease operations in Michigan, DHHS would be able to use other agencies to provide the recruitment, training and licensing services that had been provided by that agency."  Ex. D, 35.  The State faces a shortage of families, not a shortage of CPAs.

In the end, though they have the burden of proof, the *Buck* Plaintiffs offer nothing but rhetoric to support their claim that enforcement of the State's non-discrimination policy would

---

[17]    David Eggert, *Major Michigan Adoption Agency Just Reversed Policy To Allow Same-Sex Couples To Adopt*, DETROIT FREE PRESS (Apr. 22, 2019, 1:44 PM), https://www.freep.com/story/news/local/michigan/2019/04/22/adoption-foster-bethany-christian/3540472002/.

[18]    (ECF No. 6-1, PageID.228 ("St. Vincent has served an average of 74 children in its foster care program every year."); ECF No. 6, PageID.173 ("There are nearly 12,000 children in foster care in Michigan.").)

harm children.  The *Dumont* Plaintiffs offer evidence, including expert testimony, that shows the

public interest weighs heavily against a preliminary injunction compelling the State to permit

discrimination:  "[C]hild welfare policies and practices that allow the exclusion of families willing

and able to foster and adopt these vulnerable children do not serve the interests of these children

or society in general."  Brodzinsky Rpt. ¶ 26.[19]

## CONCLUSION

For these reasons, the *Buck* Plaintiffs' motion for a preliminary injunction should

be denied.

---

[19]    The *Buck* Plaintiffs also seek an injunction against the Federal Defendants based on the
Religious Freedom Restoration Act ("RFRA").  Plaintiffs do not argue that RFRA applies to the
actions of the State Defendants or Nessel, nor could they.  *See City of Boerne* v. *Flores*, 521 U.S.
507, 532–36 (1997) (holding RFRA unconstitutional as applied to states); *Townsend* v. *Ouellette*,
2018 WL 286427, at *11 (W.D. Mich. Jan. 4, 2018) ("Plaintiff has no cause of action against
[Michigan] state actors for violation of RFRA.").  As against the Federal Defendants, the *Buck*
Plaintiffs argue that this Court should enter a preliminary injunction pursuant to RFRA preventing
them from commencing an enforcement action against Michigan under 45 CFR 75.300(c).  Such
an injunction would serve no purpose.  45 CFR 75.300(c) prohibits discrimination; so does
Michigan.  Thus, there is  no imminent threat of irreparable harm, as needed to warrant preliminary
injunctive relief.

Dated:  August 20, 2019

Respectfully submitted,

*/s/ Ann-Elizabeth Ostrager*

Jay Kaplan (P38197)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone: (313) 578-6823
jkaplan@aclumich.org
dkorobkin@aclumich.org


Daniel Mach
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org

Leslie Cooper
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
lcooper@aclu.org

Garrard R. Beeney
Ann-Elizabeth Ostrager
Leila R. Siddiky
Jason W. Schnier
Lisa M. Ebersole
Hannah M. Lonky
James G. Mandilk
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
beeneyg@sullcrom.com
ostragerae@sullcrom.com
siddikyl@sullcrom.com

*Counsel for Amici Curiae*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of W.D. Mich. LCivR 7.3(b)(i) because, excluding the parts exempted by W.D. Mich. LCivR 7.3(b)(i), it contains 10,787 words.  The word count was generated using Microsoft Word 2016.

*/s/ Ann-Elizabeth Ostrager*

Jay Kaplan (P38197)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone: (313) 578-6823
jkaplan@aclumich.org
dkorobkin@aclumich.org


Daniel Mach
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330
dmach@aclu.org

Leslie Cooper
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
lcooper@aclu.org

Garrard R. Beeney
Ann-Elizabeth Ostrager
Leila R. Siddiky
Jason W. Schnier
Lisa M. Ebersole
Hannah M. Lonky
James G. Mandilk
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
beeneyg@sullcrom.com
ostragerae@sullcrom.com
siddikyl@sullcrom.com

*Counsel for Amici Curiae*