UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA BUCK, *et al.*,

     Plaintiffs,

v.

ROBERT GORDON, in his official
Capacity as Director of the Michigan
Department of Health and Human Services,
*et al.*,

     Defendants.

_____/

CASE NO. 1:19-CV-286

HON. ROBERT J. JONKER

## OPINION

### INTRODUCTION

This case is not about whether same-sex couples can be great parents. They can. No one in the case contests that. To the contrary, St. Vincent has placed children for adoption with same-sex couples certified by the State.

What this case is about is whether St. Vincent may continue to do this work and still profess and promote the traditional Catholic belief that marriage as ordained by God is for one man and one woman. In 2015, Michigan's state legislature passed a law designed to ensure it could do just that. And when the State was first sued on the issue, the State defended the right of St. Vincent to maintain its religious belief while it placed children on a non-discriminatory basis in any home approved by the State.

But that changed in the wake of the 2018 general election. While a candidate for Michigan Attorney General, Dana Nessel called the law indefensible. She indicated that she would not defend the State's position in the litigation challenging the law, because she "could not justify

using the state's money" to defend "a law whose only purpose is discriminatory animus." Leading up to the campaign, she described proponents of the law as "hate-mongers" who disliked gay people more than they cared about children. Candidate Nessel won the election, and shortly after taking office, she changed the State's position toward St. Vincent. Under the Attorney General's current interpretation of Michigan law and the parties' contracts, St. Vincent must choose between its traditional religious belief, and the privilege of continuing to place children with foster and adoptive parents of all types.

Because the record demonstrates that the State's new position targets St. Vincent's religious beliefs, strict scrutiny applies, and St. Vincent has established a basis for preliminary injunctive relief to preserve the status quo while the validity of the State's new position is tested in plenary litigation.

## BACKGROUND

### A.    The Parties

St. Vincent Catholic Charities ("St. Vincent") is a non-profit, faith-based organization based in Lansing, Michigan. (Snoeyink aff., ECF No. 6-1, PageID.228-229.) Its mission is "to share the love of Christ by performing the corporal and spiritual works of mercy." (*Id.*, PageID.229.) St. Vincent focuses on serving children and families and provides a range of services, including, without limitation, adoption and foster placement; professional mental health and substance abuse counseling; marriage and family counseling; and refugee resettlement. (*Id.*, PageID.228-229.) This case centers on St. Vincent's adoption and foster placement services.

Plaintiffs Chad and Melissa Buck have adopted four siblings through St. Vincent. (M. Buck aff., ECF No. 6-2, PageID.262.) The Bucks "see fostering and adopting not just as a choice we made, but as a ministry and as a calling" based on their Christian beliefs. (*Id.*) They chose to work

with St. Vincent "because we were comfortable working with an agency with a religious mission to serve children." (*Id.*) Melissa Buck notes that St. Vincent "provides ongoing services to our family[,]" including by facilitating a monthly parent support group that is the "only parent support group for foster parents anywhere in the tri-county area." (*Id.*, PageID.265.) The group is open to any parents, including same-sex couples, and same-sex couples have attended from time to time. (*Id.*) The Bucks have worked with St. Vincent to recruit foster and adoptive families, and they sometimes help lead the parent support group. (*Id.*) Melissa Buck is "aware of many [adoptive and foster] families who would not be willing or able to transfer their license to another agency and continue adopting or fostering children if St. Vincent were forced to close its foster and adoption programs." (*Id.*, PageID.266-67.)

Plaintiff Shamber Flore was removed from her birth home when she was five years old after years of abuse, neglect, and exposure to drugs, gangs, and prostitution. (Flore aff., ECF No. 6-3, PageID.272.) St. Vincent placed her and her two siblings with an adoptive family, the Flores. (*Id.*) The Flores "had previously tried to adopt with a state adoptive agency and had a very negative experience." (*Id.*) They "would not have been able to continue with the adoption process if they had not found in St. Vincent a trusted partner and ally." (*Id.*) The Flores have adopted sixteen children over the past fourteen years. (*Id.*) Ms. Flore "mentor[s] other foster kids and youth at St. Vincent who have dealt with trauma and abuse." (*Id.*, PageID.273.) She shares her experience and "encourage[s] them that they, too, can overcome great hardship and find happiness." (*Id.*) If St. Vincent had to cease its adoption and foster services, Ms. Flore "would lose the opportunity to mentor many of these youth as a volunteer at St. Vincent." (*Id.*)

Defendant Robert Gordon is the Director of Michigan Department of Health and Human Services ("MDHHS" or "the Department"), which is the state agency responsible for foster care

and adoption services. (ECF No. 1, PageID.7.) Defendant Herman McCall is the Executive Director of Michigan's Children's Services Agency ("CSA"), which is a sub-agency of MDHHS that oversees the work of all private child placing agencies. (*Id.*, PageID.8.) Defendant Dana Nessel is the Attorney General of the State of Michigan. (*Id.*) These three Defendants (collectively, the "State Defendants" are sued in their official capacities only. Defendant Alex M. Azar is the Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity only. (*Id.*, PageID.8-9.) Defendant HHS is responsible for the promulgation, administration, and enforcement of federal regulations challenged in this case. (*Id.*, PageID.9.)

B.     *Michigan's Foster and Adoption System*

"Michigan has a chronic shortage of foster and adoptive homes." (ECF No. 6-1, PageID.286.) In Michigan, there are "approximately 13,000 children in foster care, about 2,000 of whom have a permanency goal of adoption." (Neitman aff. ECF No. 34-5, PageID.971.) MDHHS administers the State of Michigan's Foster Care and Adoption Services programs as the Title IV-E agency in Michigan. (Goad aff., ECF No. 34-2. PageID.966.) MDHHS "holds 137 contracts with 57 private child placing agencies, or CPAs, to provide foster care or adoption services throughout Michigan." (*Id.*)[1] MDHHS not only contracts with CPAs to provide foster and adoption services but also is itself a CPA that may provide foster care services. (*Id.*, PageID.967.) Most adoption services in Michigan are privatized. (*Id.*) St. Vincent provides both foster and adoption services in Michigan under contracts with the State. "[I]n the last four fiscal years, St. Vincent has served an average of 74 children in its foster care program every year, and through its work over 100 adoptions for foster children were finalized." (Snoeyink aff., ECF No. 6-1, PageID.228.)

---

[1] Elsewhere the record states that the State contracts with over 90 private agencies to provide foster and adoptive support. (Snoeyink aff., ECF No. 6-1, PageID.232.) This potential factual inconsistency does not affect the preliminary injunction analysis, and the Court is making no findings of fact in this Opinion.

To become a foster or adoptive parent in Michigan, a person or couple must first obtain a license from the State. Private CPAs not only place children in licensed foster and adoptive homes, but also assist prospective foster or adoptive parents in applying to the State for licensure. As part of the application process, a CPA performs a home evaluation of the prospective parent or parents that includes a written assessment and a recommendation that a license be granted or denied. Based partly on the CPA's recommendation, the State itself decides whether to license the prospective foster or adoptive parent.

MDHHS establishes the criteria to consider in performing a home evaluation. (Neitman aff., ECF No. 34-3, PageID.973.) Factors for consideration include, without limitation, the "'[s]trengths and weaknesses' of the parents and the '[s]trengths of the relationship' between the couple[;] …. marital and family status and history, including current and past level of family functioning and relationships, parenting skills and childrearing techniques, values and the role of religion in the family." (*Id.*) A home evaluation entails "an exhaustive review of the family's eligibility" that includes an assessment of "the relationships between all the adults living in the home[.]" (Snoeyink aff., ECF No. 6-1, PageID.229-30.) The State's required home evaluation form spans twelve pages. (*Id.*, Ex. A, PageID.241-253.) The form calls for subjective as well as objective determinations. For example, the evaluating CPA must describe for each adult member of the household "strengths and weaknesses, worker's assessment in addition to what the applicant tells you." (*Id.*, PageID.245.) Similarly, the form asks the evaluating CPA to describe "marital and family status and history" and to include as to the current relationship "strengths of relationship, areas of work or attention …. level of satisfaction, stability." (*Id.*, PageID.246.) For each child living in the home, the form asks the evaluating CPA to interview the child and describe the "[w]orker's assessment of the child's adjustment, development, special needs, relationships with

parents and their significant others, and other strengths and weaknesses." (*Id.*) The evaluating CPA must note whether "anyone in the household [has] a physical or mental health diagnosis or condition that would make care of the child difficult" and, if so, "describe how it may affect the care of a child." (*Id.*, PageID.247.) The form asks the evaluating CPA to make a recommendation regarding licensure and to detail "[i]ssues to be considered in making placements." (*Id.*, PageID.251.)

St. Vincent states that "as a Catholic organization, [it] cannot provide a written recommendation to the State evaluating and endorsing a family situation that would conflict with [its] religious beliefs." (ECF No. 6-1, PageID.231.) "St. Vincent cannot provide written recommendations and endorsements of unmarried or LGBTQ couples consistent with its Catholic mission. Nor does St. Vincent want to send the State written recommendations that all unmarried or LGBTQ couples who come to it are unsuitable for adoption." (*Id.*) When an unmarried or LGBTQ couple approaches St. Vincent to assist in the foster or adoption certification process, St. Vincent simply refers the couple to other agencies that can help. St. Vincent provides the prospective unmarried or LGBTQ couple with "written information on the State's website and contact information for a list of other local adoption or foster care service providers" willing and able to assist the family. (*Id.*, PageID.235.) Thus, "St. Vincent stands aside and allows other qualified agencies to make recommendations on behalf of unmarried or LGBTQ couples." (*Id.*) Historically, the State of Michigan has permitted St. Vincent to refer prospective parents to other agencies if St. Vincent's sincerely held religious beliefs prevented it from assisting with the certification and licensing recommendation process.[2]

---

[2] Ms. Snoeyink avers that "[p]rivate agencies in Michigan have always been able to refer families to other agencies (or return a referral to DHHS) for a variety of other reasons," such as "(1) the family may live further away than the agency would like to drive for home visits, so they refer them to a closer agency, (2) the agency already has a waiting

St. Vincent does not prevent any couples, same-sex or otherwise, from fostering or adopting. (*Id.*, Page ID.235.) To the contrary, same-sex couples "certified through different agencies have been able to adopt children in St. Vincent's care in the past" using the Michigan Adoption Resource Exchange ("MARE") process. (*Id.*, PageID.235-36.) MARE's website "includes information about all children currently seeking adoption in the State[,] … [and] families certified by any of the numerous private child placing agencies in Michigan are allowed to adopt every child on MARE's website – no family is disqualified from adopting a child based solely on the agency with which they work." (*Id.*, PageID.236.) Through this process, any certified adoptive family, whether a same-sex couple or otherwise, may adopt children in St. Vincent's care. (*Id.*, PageID.235-36.)[3] St. Vincent "immediately places all children within its care on MARE." (Snoeyink aff., ECF No. 42-4, PageID.1662.)

### C.    Contracts and Funding

The present contract for adoption services (the "adoption contract" or "contract") between the State of Michigan and St. Vincent became effective on October 1, 2016 and has a termination date of September 30, 2019.[4] Under the heading "Compliance Requirements," the adoption contract states:

c.    The Contractor shall comply with the MDHHS non-discrimination statement:

Michigan Department of Health and Human Services (MDHHS) will not discriminate against any individual or group because of race, sex, religion,

_____

list, (3) the family has not been satisfied with the agency's services, and (4) the family is looking for a specific type of child not currently in that agency's care." (*Id.*, PageID.238.)

[3] St. Vincent notes that it "happily serves both LGBTQ individuals and children" in a variety of ways. (*Id.*, PageID.231.) For example, St. Vincent serves LGBTQ children in its foster program and group home, and St. Vincent welcomes LGBTQ couples at the parent support group it facilitates. (*Id.*)

[4] The adoption services contract between the State and St. Vincent, as amended, may be viewed in its entirety as part of the public record in *Dumont v. Gordon*, Case No. 2:17-cv-13080 (E.D. Mich. Sept. 20, 2017) (ECF Nos. 16-2, 16-10).

age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs or disability.

The above statement applies to all MDHHS supervised children, and to all applications filed for adoptions of MDHHS supervised children, including MDHHS supervised children assigned to a contracted agency.

(ECF No. 6-12, PageID.352.)[5]

Under the same heading, "Compliance Requirements," the adoption services contract states:

e.     Under 1973 PA 116, as amended by 2015 PA 53, the Contractor has the sole discretion to decide whether or not to accept a referral from MDHHS. Nothing in this Agreement limits or expands the application of the Public Act.

Adoption referrals are initiated by MDHHS. Contractors may not transfer adoption cases to another child placing agency. After acceptance of an adoption referral, the Contractor may not transfer the case back to the Department, except upon the written approval of the County Director, the Children's Services Agency Director, or the Deputy Director.

(ECF No. 6-12, PageID.352.)

The present contract for foster services (the "foster contract" or the "contract") between the State of Michigan and St. Vincent became effective on October 1, 2018 and terminates on September 30, 2021. (ECF No. 6-9, PageID.323.) The foster contract states that

[e]xcept as provided in subsection (h), the Contractor shall comply with the following requirements: …. The Contractor shall comply with the MDHHS non-discrimination statement:

Michigan Department of Health and Human Services (MDHHS) will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs, or disability.

The above statement applies to all licensed and unlicensed caregivers and families and/or relatives that could potentially provide care or are currently providing care for MDHHS supervised children, including MDHHS supervised children assigned to a contracted agency.

---

[5] The language quoted here is modified to reflect Amendment No. 1, which appears in *Dumont* at ECF No. 16-10, PageID.338-39.

(ECF No. 34-7, PageID.1047-48.)[6] Subsection (h) provides

> Under 1973, PA116, as amended by 2015 PA53, the Contractor has the sole discretion to decide whether to accept or not accept a referral from MDHHS. Nothing in this Agreement limits or expands the application of this Public Act.

(*Id.*, PageID.1049.)

The foster contract also states that

> [i]f MDHHS makes a referral to a child placing agency for foster care case management services pursuant to a contract with the child placing agency, the child placing agency must accept or decline the referral within one hour of receipt of the referral….After acceptance of a foster care referral, the Contractor may not refer the case back to the Department except for the reasons outlined in the Children's Foster Care Manual ("FOM") or upon the written approval of the County Director, the Children's Services Agency Director, or the Deputy Director.

(ECF No. 6-9, PageID.323.)

Michigan pays private CPAs, including St. Vincent, for providing foster and adoptive placements "using a mix of state and federal funds, including funds from Title IV-E and Temporary Assistance for Needy Families block grants." (ECF No. 6-1, PageID.232.) Michigan generally pays a per diem to the agency overseeing a foster placement only after the CPA places the child with a licensed family. (*Id.*) For most adoptions from foster care, "the State makes payments to the agency as part of the foster care system in pre-adoptive placements, and makes a lump-sum payment to the agency after the adoption is complete." (*Id.*, PageID.232-33) According to St. Vincent, "[p]rivate agencies generally do not bill the State, nor are they compensated, for performing home studies for prospective foster or adoptive parents." (*Id.*, PageID.233.) Subject to

---

[6] The foster contract in the record (ECF No. 34-7) is an amended version of the foster contract that became effective in 2014 and expired on September 30, 2017. No one has disputed that the same language appears in the foster contract having an effective period from October 1, 2018 – September 30, 2021.

a narrow exception,[7] St. Vincent itself "pays for home studies, assessments, and its general recruitment with private funds in a cost center that is kept separate from the funding provided by the State for other child welfare activities." (ECF No. 6-1, PageID.233)

D. *Michigan Legislation*

Both the adoption and foster contracts refer explicitly to "1973, PA 116, as amended by 2015 PA 53," codified as MICH. COMP. L. § 722.124e and § 722.124f (the "2015 statute or "2015 law"). In enacting the 2015 law, the Michigan legislature noted, "It is the intent of the legislature to protect child placing agencies' free exercise of religion protected by the United States constitution and the state constitution of 1963. This amendatory act is not intended to limit or deny any person's right to adopt a child or participate in foster care." MICH. COMP. L. § 722.124e, Historical and Statutory Note. The 2015 statute itself states,

(1)     The legislature finds and declares all of the following:

(a)     When it is necessary for a child in this state to be placed with an adoptive or foster family, placing the child in a safe, loving, and supportive home is a paramount goal of this state.

….

(c)     Having as many possible qualified adoption and foster parent agencies in this state is a substantial benefit to the children of this state who are in need of these placement services and to all of the citizens of this state because the more qualified agencies taking part in this process, the greater the likelihood that permanent child placement can be achieved.

(d)     As of the effective date of the [legislation], the adoption and foster care licensees of this state represent a broad spectrum of organizations and groups, some of which are faith based and some of which are not faith based.

(e)     Private child placing agencies, including faith-based child placing agencies, have the right to free exercise of religion under both the state and federal constitutions. Under well-settled principles of

---

[7] "In exceptional circumstances, the state has unique contracts it provides where it does pay agencies specifically for licensing a relative for a kincare placement." (*Id.*, PageID.233, PageID.254-59.)

constitutional law, this right includes the freedom to abstain from conduct that conflicts with an agency's sincerely held religious beliefs.

….

(g) Children and families benefit greatly from the adoption and foster care services provided by faith-based and non-faith-based child placing agencies. Ensuring that faith-based child placing agencies can continue to provide adoption and foster care services will benefit the children and families who receive publicly funded services.

(h) Under well-established department contracting practices, a private child placing agency does not receive public funding with respect to a particular child or particular individuals referred by the department unless that agency affirmatively accepts the referral.

(2) To the fullest extent permitted by state and federal law, a child placing agency shall not be required to provide any services if those services conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency.

(3) To the fullest extent permitted by state and federal law, the state or local unit of government shall not take an adverse action against a child placing agency on the basis that the child placing agency has declined or will decline to provide any services that conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency.

(4) If a child placing agency declines to provide any services under subsection (2), the child placing agency shall provide in writing information advising the applicant of the department's website, the Michigan adoption resource exchange or similar subsequently utilized websites, and a listing of adoption or foster care service providers with contact information and shall do at least 1 of the following:

(a) Promptly refer the applicant to another child placing agency that is willing and able to provide the declined services.

(b) Promptly refer the applicant to the webpage on the department's website that identifies other licensed child placement agencies.

….

(6)     If a child placing agency declines to provide any services under subsection (2), the child placing agency's decision does not limit the ability of another child placing agency to provide those services.

(7)     For the purpose of this section:

(a)     "Adverse action" includes, but is not limited to, denying a child placing agency's application for funding, refusing to renew the child placing agency's funding, canceling the child placing agency's funding, declining to enter into a contract with the child placing agency, refusing to renew a contract with the child placing agency, canceling a contract with the child placing agency, declining to issue a license to the child placing agency, refusing to renew the child placing agency's license, canceling the child placing agency's license, taking an enforcement action against a child placing agency, discriminating against the child placing agency in regard to participation in a government program, and taking any action that materially alters the terms or conditions of the child placing agency's funding, contract, or license.

(b)     "Services" include any service that a child placing agency provides, except foster care case management and adoption services provided under a contract with the department.

MICH. COMP. L. § 722.124e.

St. Vincent's executive director testified before the legislature in support of the legislation. After the enactment of the 2015 statute, MDHHS updated its adoption services master contracts "to reflect changes to state law that permit a private agency to decline to serve an individual based on the agency's religious beliefs." (Bladen memorandum, ECF No. 6-14, PageID.372.)

E.     *Dumont Litigation*

In 2017, the ACLU on behalf of two same-sex couples sued MDHHS for allowing St. Vincent to refer prospective parents to other agencies for assistance if St. Vincent's sincerely held religious beliefs prevented it from assisting with the certification and licensing recommendation process. *Dumont v. Gordon*, Case No. 2:17-cv-13080 (E.D. Mich. Sept. 20, 2017). Amici curiae in this case were plaintiffs in the *Dumont* case. The State initially defended

the suit, invoking the 2015 statute in support of its position.[8] But that changed after the general election in November of 2018, when new leaders assumed power in Michigan. During her campaign for Attorney General, Defendant Nessel asserted that there was "no viable defense" for the statutes enacted under 2015 PA53 and that the 2015 statutes' "only purpose is discriminatory animus." Ed White, *Dem AG candidate: Adoption law discriminates against gays*, Associated Press (Sept. 27, 2018), https://apnews.com/a1fc021e8e2e4b3b829586ba56ad9c07 (last visited September 4, 2019). According to the same article, Defendant Nessel indicated that she would not be inclined to defend the *Dumont* lawsuit against MDHHS, because she "could not justify using the state's money defending a law whose only purpose is discriminatory animus." (*Id.*)[9]

The ACLU and the State announced a settlement in the *Dumont* litigation in March 2019, and the Court granted a motion for stipulated dismissal. The Court dismissed the plaintiffs' claims against the State "with prejudice pursuant to the terms of the Settlement Agreement." The Court retained jurisdiction over the enforcement of the Settlement Agreement under *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), and its progeny. (ECF No. 31-6, PageID.746-47.) The Court was not asked to approve or disapprove the terms of settlement. Nor did the Court reach a final merits determination one way or the other on the issues.

Among other things, the Settlement Agreement provides:

Unless prohibited by law or court order:

---

[8] Plaintiffs St. Vincent, Chad and Melissa Buck, and Shamber Flore were granted leave to intervene in the *Dumont* case on the side of the State defendants in that case.

[9] In 2015, before her election, Defendant Nessel reportedly said of PA 53 "[t]hese types of laws are a victory for the hate mongers but again a disaster for the children and the state." Fox 2 Detroit, Opponents say adoption bill discriminates against gays and lesbians (Mar. 4, 2015, 5:34 p.m.), http://www.fox2detroit.com/news/opponents-say-adoption-bill-discriminates-against-gays-and-lesbians (last visited September 4, 2019). Another article describes her as stating, "If you are a proponent of this type of bill, you honestly have to concede that you just dislike gay people more than you care about the needs of foster kids." Rick Pluta, Faith-based adoption bills headed to House floor, Michigan Radio NPR (Mar. 4, 2015), https://www.michiganradio.org/post/faith-based-adoption-bills-headed-house-floor (last visited September 4, 2019).

a. The Department shall continue including in Contracts, and shall continue requiring all Contractors to include in Subcontracts, the Non-Discrimination provision, or a materially and substantially similar provision….

b. For the avoidance of doubt, policies and practices prohibited under the Non-Discrimination Provision include, without limitation,

i. turning away or referring to another contracted CPA an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a Contract or a Subcontract;
….

iii. refusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a Contract or a Subcontract; and

….

d. The Department shall require all Contractors to enforce the Non-Discrimination provision or Similar Provision against a CPA that the Contractor or the Department determines is in violation of, or is unwilling to comply with, such provisions … up to and including termination of the Subcontracts … including without limitation:

i. In the event a CPA refuses to comply with the Non-Discrimination Provision or Similar Provision within a reasonable time after notification by the Contractor or the Department of a Subcontract Violation, the Department will require the Contractor to terminate the CPA's Subcontracts."

(ECF No. 31-5, PageID.719-720.)

In a public statement (the "Summary Statement") summarizing the Settlement Agreement, the State explains that "a significant portion of funding" for the State's foster care case management and adoption services comes from the federal Title IV-E program. Michigan Government, Summary Statement of *Dumont v. Gordon* Settlement Agreement, https://www.michigan.gov/documents/ag/03.22.19_FINAL_Dumont_settlement_summary_6500 97_7.pdf. Citing 45 C.F.R. 75.300(c), the Summary Statement notes that "as a condition of

receiving these federal funds, the United States Department of Health and Human Services requires that states' Title IV-E-funded programs prohibit discrimination on the basis of sexual orientation or gender identity." (*Id.*) The Summary Statement explains that "in compliance with this federal requirement, MDHHS contracts mandate that, except for an agency's sole discretion to decide whether to accept a referral from MDHHS, all agencies must comply with MDHHS's non-discrimination statement when providing state-contracted services." (*Id.*)[10] The Summary Statement posits that if an agency accepts an MDHHS referral of a child for foster or adoption services, the agency relinquishes the "discretion to refuse to provide the accepted child or individual with state-contracted foster care case management or adoption services that conflict with its sincerely held religious beliefs" and remains subject to "the terms of the agency's contract with the State expressly prohibit[ing] discrimination in the provision of these contracted services." (*Id.*) According to the Summary Statement, prohibited discriminatory conduct includes, without limitation, "refusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the agency for contracted services." (*Id.*)

The Department of Attorney General "determined that MDHHS may be subject to liability on [the *Dumont*] Plaintiffs' claims" and "strongly recommended resolving the case on terms that are consistent with the law and existing agency contracts[.]" (*Id.*) The Summary Statement points out that on the dates that St. Vincent referred the *Dumont* plaintiffs elsewhere for certification and recommendation services, St. Vincent "was providing foster care case management services or

---

[10] The exception is based the statutory provision in MICH. COMP. L. 722.124e(h) that "an agency does not receive public funding with respect to a particular child or particular individual referred by MDHHS unless the agency affirmatively accepts the referral." (*Id.*)

adoption services for one or more children for whom the agency had accepted an MDHHS referral." (*Id.*) No exception applied, because "Plaintiffs were not seeking direct-placement or private adoption services, and they did not approach the agencies through an MDHHS referral that the agencies could accept or reject under existing state law." (*Id.*) The Summary Statement concludes that "consequently, [St. Vincent] was contractually prohibited from discriminating against Plaintiffs as potential qualified foster care or adoptive families for any child for whom the agencies were providing services under contract with MDHHS." (*Id.*) Under the State's new position, St. Vincent was no longer permitted based on its religious beliefs to refer unmarried and same-sex couples to other agencies for certification review and assistance, even though it was continuing to make non-discriminatory placements for all the children for whom it had accepted referrals.

The Summary Statement emphasizes that the Settlement Agreement provides that MDHHS will "maintain federally required non-discrimination provisions in its foster care and adoption agency contracts" and that "settling the *Dumont* litigation on the terms of the settlement agreement "allows MDHHS to avoid liability on Plaintiffs' claims and remain compliant with federal and state law." (*Id.*)

F.     *MDHHS Enforcement*

An MDHHS Communication Issuance regarding the *Dumont* settlement notifies recipients, including St. Vincent, of requirements under the Settlement Agreement. (ECF No. 42-2.) The Communication Issuance advises that the Settlement Agreement requires the MDHHS to "investigate reports of alleged non-compliance with the non-discrimination provision" and to "[i]nitiate contract action when violations occur or when an agency expresses unwillingness to comply." (*Id.*, PageID.1574.) The Communications Issuance reiterates that "policies and practices

prohibited under the non-discrimination provision include, among others: … [r]efusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a contract or a subcontract." (*Id.*)

After the filing of the *Dumont* litigation, the MDHHS opened an investigation into allegations that St. Vincent was not complying with the non-discrimination provision. (Neitman aff., ECF No. 34-3, PageID.976.) MDHHS has not finalized its investigation of St. Vincent due to the present lawsuit. (*Id.*, PageID.978.) The State says that after completing the investigation, if a violation is found, "St. Vincent would have the opportunity to complete a corrective action plan demonstrating how it would achieve compliance." (*Id.*) If St. Vincent elects not to comply, "the Department could take licensing and/or contract action." (*Id.*) St. Vincent anticipates that the MDHHS will terminate or decline to renew the foster and adoption contracts unless St. Vincent agrees to perform home studies and provide written evaluations and recommendations for same-sex couples who wish to apply for certification. If unable to partner with the State, "St. Vincent would not be able to continue its adoption and foster programs … either legally or financially." (Snoeyink aff., ECF No. 6-1, PageID.237.)

G.     *Current Proceedings*

St. Vincent, the Bucks, and Ms. Flore filed this lawsuit on April 15, 2019. Plaintiffs claim that: (1) Defendants have violated the Free Exercise Clause of the First Amendment by "adopting a policy requiring the State to discriminate against child placing agencies with religious objections to same-sex marriage" and granting individualized exemptions from child placing agency requirements selectively (Complaint, ECF No. 1, PageID.42-46 ); (2) Defendants have violated

the Free Speech Clause of the First Amendment by "conditioning St. Vincent's license, its contracts with MDHHS, and the ongoing ability to engage in the religious exercise of helping children in need, on St. Vincent's willingness to make [affirmative statements that contradict St. Vincent's religious beliefs];" (3) Defendants have retaliated against Plaintiffs for protected speech and religious exercise, in violation of the Free Exercise and Free Speech clauses of the First Amendment; (4) Defendants have violated the Free Exercise and Establishment Clauses of the First Amendment by applying laws in a manner that selectively penalizes Plaintiffs for their religious beliefs; (5) Defendants have violated the Equal Protection Clause of the Fourteenth Amendment by penalizing Plaintiffs because of their religious beliefs while allowing contractors espousing contrary religious beliefs to maintain contractual relationships with the State; and (6) Defendants have violated the RFRA by enforcing federal law in a manner that substantially burdens Plaintiffs' sincere religious exercise without a compelling government interest and through a means more restrictive than necessary to achieve the stated interest.

Plaintiffs now seek a preliminary injunction that would (1) enjoin State Defendants from terminating or suspending performance of their contracts with St. Vincent, or declining to renew the contracts or taking other adverse action against St. Vincent "for engaging in protected speech and religious exercise, including continuing to refer couples to other agencies when St. Vincent cannot assist those couples due to its religious beliefs"; and (2) enjoin Defendant Azar from "taking any enforcement action under 45 CFR 75.300(c) based upon St. Vincent's protected speech and religious exercise or upon Michigan's actions to accommodate such protected speech and religious exercise." The Federal and State Defendants seek dismissal under Rule 12(b)(2) and 12(b)(6). The motions are fully briefed, and the Court has heard oral argument on the motions. The Court addresses the motions in turn.

## 1.      *Motion for Preliminary Injunction*

"The purpose of a preliminary injunction is simply to preserve the status quo" until a trial on the merits can be held. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). Accordingly, "findings of facts and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits." *Id.* (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). To determine whether a preliminary injunction is warranted, a district court considers: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; (4) whether the public interest would be served by the issuance of an injunction." *Hall v. Edgewood Partners Ins. Center, Inc.*, 878 F.3d 524, 526 (6th Cir. 2017) (quotation omitted). "As long as there is some likelihood of success on the merits, these factors are to be balanced, rather than tallied." *Id.*

### A.      *Likelihood of Success*

Plaintiffs have established a likelihood of success on the merits. The record supports a determination that strict scrutiny applies to the Free Exercise claim. Supreme Court cases "establish the general principle that a law that is neutral and of general applicability need not be justified by a compelling interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)). But this general rule "comes with an exception. If the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if

it 'advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests.'" *Ward v. Polite*, 667 F.3d 727, 738 (quoting *Lukumi*, 508 U.S. at 546). Evidence to consider in determining whether a law or regulation is neutral and of general applicability include, among others, "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540. The exception applies here because the historical background, specific series of events, and statements of Defendant Nessel all point toward religious targeting.

The history of this case, the *Dumont* litigation, the Michigan Legislature's enactment of 2015 PA53, the 2018 campaign for Michigan Attorney General and General Nessel's statements create a strong inference that the State's real target is the religious beliefs and confessions of St. Vincent, and not discriminatory conduct. St. Vincent has never prevented a same-sex couple from fostering or adopting a child. St. Vincent has actually placed children through the MARE system with same-sex adoptive parents. And St. Vincent provides parenting support groups at which same-sex parents are welcome and, in fact, attend. This is non-discriminatory conduct consistent with everything the State says it is trying to promote.

The State is willing to prevent St. Vincent from doing all this in the future simply because St. Vincent adheres to its sincerely held religious belief that marriage is an institution created by God to join a single man to a single woman. Because of that religious belief, St. Vincent says it cannot in good conscience review and certify an unmarried or same-sex parental application. St. Vincent would either have to recommend denial of all such applications, no matter how much value they could provide to foster and adoptive children; or St. Vincent would have to subordinate its religious beliefs to the State-mandated orthodoxy, even though the State is not compensating

them for the review services anyway. To avoid the conflict, St. Vincent refers any such applicants and declines the referral, as the contract language permits.[11] The State legislature protected this choice by enacting the 2015 statute. Consistent with the contract and the 2015 law, St. Vincent had a longstanding practice of referring to other agencies same-sex and unmarried couples seeking assistance with the certification process. Once the State certifies these couples based on home visits by other agencies, St. Vincent will place children with them, or with any other parents certified by the State, on a non-discriminatory basis. Until January 2019, the State accepted and defended this practice in the *Dumont* litigation as complying fully with the 2015 statute and other applicable law.

Defendant Nessel made St. Vincent's belief and practice a campaign issue by calling it hate. She made the 2015 statute a campaign issue by contending that the only purpose of the statute is discriminatory animus. After Defendant Nessel took office, the State pivoted 180 degrees, reversing its position in the *Dumont* litigation. The State also threatened to terminate its contracts with St. Vincent. The Summary Statement's conclusion – that if an agency accepts even one MDHHS child referral for case management or adoption services, the agency forfeits completely the right to refer new parental applicants to other agencies based on its sincerely held religious beliefs – is at odds with the language of the contracts, with the 2015 law, and with established State practice. Moreover, it actually undermines the State's stated goals of preventing discriminatory conduct and maximizing available placements for children. This further supports a

---

[11] The contractual language focuses on referrals of the children themselves for foster or adoptive services, not the home visits for new parental applicants. That is natural enough because St. Vincent is paid under the contracts for services provided to the children, not home visits for new parental applicants. Because the contract gives a CPA "sole discretion" to accept or decline referrals of children – whether for religious or any other reason – then *a fortiori*, the parties to the contracts contemplate unfettered discretion when it comes to referrals involving new parental applicants. The record fully supports this established practice. (*See* footnote 2, *supra*.)

finding of pretext for religious targeting. Strict scrutiny applies to the State's position and dictates a likelihood of success on the merits.

The State's position is not likely to survive strict scrutiny on this record. There are two potentially compelling state interests at stake, neither of which supports a State orthodoxy test. The first compelling interest the Court sees is preventing discriminatory conduct in services for which the State pays. Here, the State pays CPAs based on the children they place. And St. Vincent places its children with any certified parent – unmarried couples, same-sex couples, or otherwise. This is precisely the non-discriminatory conduct the State desires. But despite that, the State now wants to cancel St. Vincent's contract if St. Vincent uses its religious beliefs when it comes to referring new parental applicants. That strongly suggests the State's real goal is not to promote non-discriminatory child placements, but to stamp out St. Vincent's religious belief and replace it with the State's own. The State's new position would make the stated "sole discretion" of the private agency to decline a referral illusory. It would also flout the letter and stated intention of the Michigan Legislature in 2015 PA53. It would disrupt a carefully balanced and established practice that ensures non-discrimination in child placements while still accommodating traditional Catholic religious beliefs on marriage. It would replace this with a State-orthodoxy test that prevents Catholic believers from participating.

A second potentially compelling State interest is making available as many properly certified homes for the placement of foster and adopted children as possible. But the State's proposed action here actually undermines that goal. There is nothing in this record that supports a finding that the power of CPAs to decline referrals limits the pool of applicants. To the contrary, any CPA referring an applicant to a different CPA for any reason must provide information on other agencies. Nothing in the referral practice prevents anyone from seeking assistance with the

application process. Instead, it facilitates certification. The record here reflects that St. Vincent affirmatively refers same-sex and unmarried couples seeking that assistance to other agencies available to provide it. And when the applicant is certified, nothing stands in the way of placement of children in certified households of same-sex and unmarried couples. To the contrary, the record reflects that St. Vincent through the MARE system actually places children with same-sex couples certified as foster or adoptive parents. Paradoxically, the State's course of action here would constrict the supply of CPAs and undermine the State's intent of getting certified placements for kids. Again, this strongly suggests that something else – namely, religious targeting – is the State's real purpose.

The recent decision from the Third Circuit in *Fulton v. City of Philadelphia*, 922 F.3d 140 (2019), does not require a different conclusion. *Fulton* differs in key respects factually and analytically. In *Fulton*, the City of Philadelphia declined to renew a contract with a faith-based child placing agency after becoming aware that the agency declined to certify same-sex or unmarried couples as foster parents based on religious objections. *Fulton*, 922 F.3d, 147-48. The city argued that the agency's practice violated a provision in the contract incorporating the city's Fair Practices Ordinance, which prohibits sexual orientation discrimination in public accommodation. *Id.* at 147. But in *Fulton*, the challenged practice was an actual refusal to certify, not a referral to some other agency for an impartial evaluation. The City acted as soon as it became aware of the agency's practice. There was no sudden change in the City's position after new officials who had expressed anti-religious views took office. Nor was there any duly enacted public policy of the State or municipality that aimed to protect the agency's choice to the maximum extent provided by law.[12] Moreover, in *Fulton*, unlike here, there was no record of the agency involved

---

[12] The Pennsylvania Religious Freedom Act, 70 Pa. Stat. Ann. § 2401 *et seq.* is a general religious freedom law modeled on RFRA that does not focus specifically on child placing agencies as the Michigan 2015 statute does.

actually placing children on a non-discriminatory basis with same-sex parents certified by others. Nor was there any record in *Fulton* of the agency facilitating certification with referrals to other agencies.

The *Fulton* court found no evidence that the city "was motivated by ill will toward a specific religious group or otherwise impermissibly targeted religious conduct." *Fulton*, 922 F.3d at 153-54. Accordingly, the more deferential analytical framework of *Employment Division v. Smith*, 494 U.S. 872 (1990), and not strict scrutiny, applied. *Id.* at 152-54. Similarly, the court in *New Hope Family Services, Inc. v. Poole*, 387 F. Supp. 3d 194 (N.D.N.Y. 2019), explicitly found the record devoid of evidence of religious animus or targeting and applied the more deferential scrutiny of *Smith*. *New Hope Family Services*, 387 F. Supp. 3d 213-216. Unlike *Fulton* and *New Hope*, the record before the Court in this case supports an inference of religious targeting, which means that strict scrutiny applies. The degree of scrutiny drives the analysis in a Free Exercise case. And the application of strict scrutiny in this case makes it likely that Plaintiffs will succeed on the merits of their Free Exercise Claim.[13]

The federal government has not made any direct statements or threats to St. Vincent about funding or otherwise. But as the case is currently positioned, the Federal Defendants are inextricably in the mix, at least for preliminary injunction purposes. RFRA precludes the federal government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the federal government "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest."

---

[13] The Court's ruling on the probability of success on the Free Exercise claim makes it unnecessary to evaluate separately the probability of success of the compelled speech, retaliation, and equal protection theories. Suffice to say the Court is satisfied that St. Vincent has stated plausible claims sufficient to survive Rule 12(b)(6) review.

42 U.S.C. §§ 2000bb-1(a), (b). The RFRA test is easier for a plaintiff to satisfy than the constitutional test already applied.

The State argues that it must proceed against St. Vincent here to prevent the federal government from cutting off all funds it provides to the State for the purpose of funding foster care and adoption programs. According to the State, $171 million in federal funding to the State is at risk, and the federal government's obligation to enforce a federal regulation "is not optional." (State Defendants' Resp. to Federal Defendants' Mot. to Dismiss, ECF No. 53, PageID.1875.) Indeed, according to the State, "there *is* a credible threat that the Federal Defendants will enforce the regulation against MDHHS…." (*Id.*) (emphasis in original).

In response, the federal government has not promised to keep funds in place, and has not said that the State is misinterpreting federal law. Moreover, the Federal Defendants themselves have affirmatively noted that the government "can almost *always* change its position on whether to enforce a law or regulation," (ECF No. 61, PageID.2159), which is exactly what St. Vincent is trying to prevent, especially after experiencing the State's change of position. The Federal Defendants point out that States can seek an exemption from the federal regulation at issue, but that is hardly reassuring to St. Vincent, because the State Defendants currently have no interest in that for reasons already addressed. Moreover, as the case demonstrates, government officials can change their minds, re-interpret laws already on the books, and disrupt established practices. Because the Federal Defendants have refused to refute the State's own assertion that there is a credible threat the federal regulation will be triggered against the State if St. Vincent's position prevails, St. Vincent has established a need to enjoin the Federal Defendants from applying the federal regulation to punish the State generally, or St. Vincent in particular, for permitting the continuation of St. Vincent's religiously-based referral practice during the pendency of this case.

*B.      Balance of Harms*

There is a strong likelihood of irreparable harm to St. Vincent absent the preliminary injunction it requests. The loss of rights under the First Amendment is inherently harmful. "The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Newsom v. Norris*, 888 F.3d 371, 378 (6th Cir. 1989) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion of Brennan, J.)). St. Vincent has shown that it is likely to prevail on its constitutional and RFRA claims. Concomitantly, it has shown a likelihood of irreparable harm that warrants injunctive relief.

In addition to the harm inherent in the loss of constitutional rights, St. Vincent risks losing its license to provide foster and adoption services. Without a license, St. Vincent will not be able to provide foster and adoption services lawfully. It would have to cease providing those services. This would harm not only Plaintiffs, but also third parties. Shuttering St. Vincent would create significant disruption for the children in its care, who already face an unpredictable home life and benefit from stability. It would also hurt the foster and adoptive parents who rely on St. Vincent for support and would have to find new resources. And it would harm the employees of St. Vincent who work in the foster and adoption area, who would lose their employment.

The risk of harm to the State, in contrast, is not substantial, especially with concomitant relief against the Federal Defendants. A preliminary injunction would maintain the religious accommodation the State supported for years and defended in the *Dumont* litigation until the 2018 election. Nor is there a risk of harm to prospective adoptive couples, same-sex or otherwise. There are multiple pathways to obtaining certification apart from St. Vincent's assistance. Allowing St. Vincent to continue its practice does not prevent any licensed same-sex couple from becoming

certified, fostering, or adopting. Nor does it prevent any unmarried or same-sex couple from completing the certification process in the first place with an agency with different religious beliefs or no such beliefs at all.

The balance of harms favors preliminary injunctive relief to preserve the status quo.

### C.    *Public Interest*

The public interest factors also favor a preliminary injunction to maintain the status quo. Preventing constitutional violations is always in the public interest. *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Ensuring that as many properly certified homes are available for prospective foster and adoptive children as possible, and that children in the system are placed quickly, is also in the public interest. Allowing St. Vincent to continue its work furthers that interest. The decision of the legislature to enact 2015 PA53 itself reflects a public interest in protecting the ability of faith-based CPAs such as St. Vincent to place children in certified foster and adoptive homes, whether same-sex households or otherwise, while maintaining the ability to exercise their religious beliefs freely by facilitating referrals to other agencies when religious beliefs are implicated. The public interest factors support a preliminary injunction.

For these reasons, all the preliminary injunction factors weigh in favor of granting the preliminary injunction Plaintiffs seek.

### 2.    **Motions to Dismiss**

### A.    *Standing*

The State challenges the individual Plaintiffs' standing, and the Federal Defendants challenge the standing of all the Plaintiffs', as well as the ripeness of Plaintiffs' claims. "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual

or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). In pre-enforcement First Amendment challenges, the doctrines of Article III standing and ripeness, which "originate from the same Article III limitation[,]" merge and are analyzed together. *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014)). In this context, "the line between Article III standing and ripeness … has evaporated." *Id*.

The Court finds that Plaintiff St. Vincent has standing to sue both the State and Federal Defendants. The religious injury St. Vincent alleges is fairly traceable to the State and the Federal Defendants. The State's change of position is the direct and most immediate source of the religious targeting injury alleged. But as already discussed, the federal government is inextricably part of it at this stage based on its refusal to take the $171 million federal funding issue off the table. The State premises its position toward St. Vincent on concern that the State will lose all federal funding for foster and adoption services if the federal government enforces § 45 C.F.R. 75.300(c). The federal government has not denied that risk. An injunction against enforcing the federal regulation during the pendency of this lawsuit would redress the harm St. Vincent alleges, and protect the State along the way.[14] St. Vincent has standing as to all Defendants.

In contrast, the Court finds that the allegations of the Bucks and Ms. Flore do not satisfy the elements of Article III standing. They have no contracts with the State, and the State has made no threats against them based on their religious profession or practice, or otherwise. The alleged

---

[14] To the extent the Federal Defendants argue that the Plaintiffs fail to state a claim, the argument fails. Plaintiffs have stated a plausible RFRA claim. Plaintiffs allege that the Federal Defendants are requiring Michigan to comply with § 45 C.F.R. 75.300(c); that the regulation is unlawful; and that the regulation forces St. Vincent to violate its sincere religious beliefs in order to comply with the State and federal requirements. They have alleged that the federal government has imposed a substantial burden on their sincere religious exercise, and that the burden is neither justified by a compelling state interest nor the least restrictive means of achieving the interest. Dismissal under Rule 12(b)(6) is not appropriate.

harm to the individual Plaintiffs derives entirely from the alleged harm that will befall St. Vincent. The three individual Plaintiffs have benefitted from St. Vincent, and have engaged in their own adoptive and foster ministries through St. Vincent. But none of these individuals indicates a present intention to foster or adopt through St. Vincent. Nor do they make any convincing showing that they will be unable to continue their engagement on foster and adoptive matters with other agencies, even if St. Vincent were to lose its contracts – something that could happen for many reasons wholly unrelated to this case. Indeed, St. Vincent itself has argued and demonstrated that many other agencies are available for the new potential applicants that it chooses to refer. By the same token, many other outlets – including other faith-based outlets – would remain available to the individual Plaintiffs. Moreover, the alignment of claimed injury and the alleged wrong is also skewed for the individual Plaintiffs. The CPA practice at issue is referring new applicants for religious reasons, and the challenged State action is religious targeting aimed at stopping it. But the individual Plaintiffs are not involved in the referrals and are not being targeted for direct action by the State. Not every beneficiary, supporter, or prospective client of St. Vincent has standing to challenge adverse action the State has focused on St. Vincent itself. The alleged harm to the individual Plaintiffs is too attenuated to support standing.[15]

B.    *Defendant Nessel*

The State Defendants seek dismissal of Defendant Nessel from the case. They contend that she is simply the State's chief legal counsel, is not responsible for Michigan's change in policy, and does not belong in the case. The record undercuts the claim. Based on the record to date, Defendant Nessel is at the very heart of the case. She referred to proponents of the 2015 law as

---

[15] The individual Plaintiffs are welcome to proceed as *amici curiae*.

"hate-mongers" and said the only purpose of the 2015 law was "discriminatory animus." She described the 2015 law as "indefensible" during her campaign. These statements raise a strong inference of a hostility toward a religious viewpoint. Based on the present record, she was also a pivotal player in the State's total reversal of position in the *Dumont* litigation. It was her assessment of risk that led the State to move from defending St. Vincent's position to abandoning it in the first month of her term – and this despite the 2015 law, the language of the contracts, and well-established practice. All of this supports a strong inference that St. Vincent was targeted based on its religious belief, and that it was Defendant Nessel who targeted it. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1729-31 (2018) (detailing disparaging statements of government decision-makers regarding particular religious beliefs and emphasizing the "State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint"). On this record, dismissal of Defendant Nessel from the case is not warranted.

C.    *Res Judicata*

The State Defendants contend that dismissal of the case is proper based on res judicata arising out of the *Dumont* litigation. Contrary to the State's arguments, res judicata provides no basis for dismissal here. Res judicata requires: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action." *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995). Potential application falters on the very first element: there was never a final decision on the merits in the *Dumont* litigation. The case was resolved by private settlement between the State and the plaintiffs in the case. The Court did not approve the settlement and was

never asked to do so. Nor did the Court in *Dumont* make any final decision on the merits. There is simply no judgment in *Dumont* to which res judicata can attach.

Moreover, it is important to note that St. Vincent and the State were originally on the same side in Dumont, defending St. Vincent's religiously-based referral practice. When St. Vincent intervened, it did so as a defendant, aligning with the State. In such a posture, St. Vincent had no obligation to assert any claims against the State, let alone the ones they are now bringing. They were co-parties, and under Rule 13(g), crossclaims are entirely permissive. FED. R. CIV. P. 13(g) ("A pleading *may* state as a crossclaim any claim by one party against a coparty….") (emphasis added); *United States Confederate Acres Sanitary Sewage and Drainage System, Inc.*, 935 F.2d 796, 799 (6th Cir. 1991). Nor did St. Vincent have any claims it could have asserted against the State anyway because at the time, the State agreed with St. Vincent.

The State Defendants also suggest that the Settlement Agreement bars Plaintiffs' claims. This is an entirely specious claim. Plaintiffs were not parties to the Settlement Agreement. Moreover, even though the State Defendants call the Settlement Agreement a "consent decree," it was no such thing. It was a private contract between the State and the plaintiffs in the case. No one asked St. Vincent what it thought of the settlement. And no one asked the Court what it thought either. The Court simply entered a routine stipulated dismissal and retained jurisdiction over the enforcement of the Settlement Agreement between the parties to that agreement. There is no basis to conclude that the Settlement Agreement is a consent decree, or that it binds any non-party to the Settlement Agreement, including St. Vincent.

## CONCLUSION

The State pays St. Vincent to place children with foster or adoptive parents certified as suitable by the State. St. Vincent has done that faithfully, regardless of whether the certified parents

were opposite sex, same-sex, or unmarried couples. St. Vincent would like to continue doing so under existing and renewed contracts with the State.

What St. Vincent has not done and will not do is give up its traditional Catholic belief that marriage as instituted by God is for one man and one woman. Based on that belief, St. Vincent has exercised its discretion to ensure that it is not in the position of having to review and recommend to the State whether to certify a same-sex or unmarried couple, and to refer those cases to agencies that do not have a religious confession preventing an honest evaluation and recommendation. In 2015, the Michigan legislature enacted legislation designed to protect that choice, and until January of 2019, the State defended the right of the State and St. Vincent to make that choice.

That changed when Defendant Attorney General Nessel took office. Leading up to and during the 2018 general election campaign, she made it clear that she considered beliefs like St. Vincent's to be the product of hate. She stated that the 2015 law seeking to protect St. Vincent's practice was indefensible and had discriminatory animus as its sole purpose. After her election, she reversed course in the *Dumont* litigation; re-interpreted the 2015 law; and put St. Vincent in the position of either giving up its belief or giving up its contract with the State. That kind of targeted attack on a sincerely held religious belief is what calls for strict scrutiny in this case and supports entry of a preliminary injunction preserving the status quo while the case is fully litigated.


Dated:   September 26, 2019            /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     CHIEF UNITED STATES DISTRICT JUDGE